**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

Civil Action Number _____

**COMPLAINT FOR**
**DEFAMATION, LIBEL, FALSE LIGHT, SLANDER, BREACH OF CONTRACT, ABUSE OF PROCESS,**
**CONSPIRACY, INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS, LOSS OF CONSORTIUM**

**DEMAND FOR JURY TRIAL**

| | | |
|---|---|---|
| **ZIA CHISHTI** | | **TATIANA SPOTTISWOODE** |
| **SARAH POBERESKIN** | | **JAMES SPOTTISWOODE** |
| Plaintiffs | | **NANCY ERIKA SMITH** |
| | AGAINST | **EDWARD E. JOHNSON** |
| | | **MICHAEL ZWEIG** |
| 100 Paseo de Colon | | Defendants |
| Suite 9024186 | | |
| San Juan, PR 00901 | | |
| chishti.legal@gmail.com | | |
| 207-288-7881 | | |

**Ms. Spottiswoode told Congress:**

"Chishti was not willing to treat me as an employee… he oscillated between pressuring me for sex and punishing me… I rebuffed him…I explained that I didn't want to have sex with him in as many different ways as possible… I avoided him as much as I could… Chishti wanted to … punish me for rejecting him…"

**However, Ms. Spottiswoode told me[1]:**

*Two weeks prior to sending me a legal notice accusing me of sexual harassment that expanded to a demand for $50 million, and three days prior to her alleged rape*

"I am excited to see you :)      […]
I am looking forward to stupid things Zia :/
Like when you look at me with this one look in your eye you used to get.
Like you are either going to eat me alive or cover me with gold leaf.
And your hand stroking my body when we're lying next to each other.
Those are the things I miss :/
You seemed so infatuated with me, like you thought we could do no wrong
Anyway, it'll be interesting      […]
I would rather pretend we met in the hotel bar and that I am coming up for a drink  [2]
I'd like to be seduced and slowly undressed" [3]

> Smirking Face
> "especially implies… flirtation and sexual innuendo"

---

[1] Whenever the first person is used in this complaint to refer to a Plaintiff, it refers to Plaintiff Zia Chishti.
[2] Emoji definitions in this complaint are from the Library of Congress Web Cultures Web Archive of Emojipedia.
[3] Edited for readability.  Full exchange in Exhibit A1.

**Ms. Spottiswoode told Congress:**

"Later that night, I went to the hotel bathroom and texted him that I was sick and going back to my hotel… Chishti replied he would meet me there.  I said I was vomiting… I admitted I was still at his hotel.  I felt completely trapped and hopeless"

**However, Ms. Spottiswoode told me:**

*Minutes prior to her alleged rape, and after we had already had one sexual encounter in my hotel room and rejoined a broader social group; the third wheel at the end of the evening is Mr. Khurram Waqar*



**Me @ 1:32am:**    How do we get rid of this guy?
**Ms. Spottiswoode:**    I'm having SO much fun    ← After our first sexual encounter
    […]
    Let's talk to him

*At this point Ms. Spottiswoode whispered to me that she has a plan and excused herself to go to the bathroom.  She then proceeded to fabricate a ruse for Mr. Waqar to leave us:*

Ms. Spottiswoode tells me up front that she is inventing an excuse to get Mr. Waqar to leave

**Ms. Spottiswoode:**    Hey I don't know if you are looking at your phone!  I'm so sorry, I started feeling really bad and uberred home.
    I messaged Khurram too.
    Thanks so much for your hospitality tonight.
**Me:**    I am coming over.
**Ms. Spottiswoode:**    Hahaha no I left already.    Smiling Face "expresses genuine happiness"
**Me:**    On my way.
**Ms. Spottiswoode:**    Slash giving an excuse for Khurram to leave 😊
    I'm hiding

Ms. Spottiswoode tells me up front that she is hiding and has not gone anywhere

    I feel terrible 🙄
    I vomited everywhere
    Don't worry
**Me:**    I am coming
    I am in a car almost home 🙄    This is the ruse.  Face with Rolling Eyes emoji means "playful, sassy … as if saying 'Yeah, whatever'"
**Ms. Spottiswoode:**    
**Me:**    I am in an Uber too
**Ms. Spottiswoode:**    LOL
    Don't come please
    I am so embarrassed
    Just let me go to sleep I'm fine

*Ms. Spottiswoode was communicating that she is not feeling terrible, not vomiting, and not in a car headed home.*



| | | |
|---|---|---|
| **Even I fall for the ruse. Ms. Spottiswoode corrects me.** | | |

**Me:** Already on my way
Will be there in 15
**Ms. Spottiswoode:** You are kidding right?
**Me:** Not at all... 13 mins
**Ms. Spottiswoode:** I'm in your hotel
Tell me when you are alone
** I'm sick **

**Ms. Spottiswoode thinks Mr. Waqar is still with me. Her ** air quotes indicates she wants me to lie to Mr. Waqar**

**Me:** You are at my hotel?
**Ms. Spottiswoode:** Yea
Obvies
**Me:** Shit OK
**Ms. Spottiswoode:** Haha
**Me:** On my way back
**Ms. Spottiswoode:** Did u leave
Hahahahahahah
**Me:** Yes!
**Ms. Spottiswoode:** I'm so convincing
**Me:** Stupid me
I believed you
**Ms. Spottiswoode:** Ur so sweet 😊

**Ms. Spottiswoode enjoys the success of her ruse**

Are you with Khurram?
He's so nice.
Ditched him.
**Me:** Nice. I just got desperate.
**Ms. Spottiswoode:** How far are you? [4]

**Ms. Spottiswoode clarifies that I am alone and informs me that she is desperate to see me**

*At this point Ms. Spottiswoode was waiting for me at the hotel elevators. We entered the elevator together, went to my room, and commenced our second sexual encounter of the evening, lasting several hours. Ms. Spottiswoode repeatedly told me she loved me, covered me with kisses, had sex with me in the superior position, joined me in intimate conversation, and repeatedly asked me to have sex with her.*

*I fell asleep holding Ms. Spottiswoode in my arms. When I woke up, Ms. Spottiswoode and I had a conversation, Ms. Spottiswoode packed her backpack, I walked her to her cab, and kissed her goodbye.*

---

[4] Edited for readability. Full exchange in Exhibit A2.

**Ms. Spottiswoode told Congress:**

"He beat me while having sex with me… I had bruises around my neck that looked like I had been strangled, a large bump on my head, a black eye... I had… a concussion"

**However, she had no strangulation marks, bump on her heard, black eye, or concussion.**

*Ms. Spottiswoode did not disclose to Congress that our sexual history consistently involved the infliction of marks on each other. Ms. Spottiswoode knew before the specific sexual encounter she cites that it would involve our historical practices of biting, scratching, slapping, and choking:*





*Hermes riding crop ("other object") that Ms. Spottiswoode enjoyed being whipped with*

*Hermes leather collar ("bracelet") Ms. Spottiswoode enjoyed being choked with and brought to our sexual encounter*

*Three days prior to our sexual encounter, Ms. Spottiswoode and I had the following exchange:*

| **Me:** | Did you bring your whip and collar? |
| **Ms. Spottiswoode:** | I brought my beautiful bracelet that I love |
| | 😝 |
| | The other object doesn't really fit in any of my bags!! |
| **Me:** | Hmmmm |
| | Will have to improvise |
| | One thing is for sure |
| | Pain will be involved |
| **Ms. Spottiswoode:** | You really know how to smother these things in innuendo |
| | Leave something to the imagination |
| | Lets see what happens maybe .. ???!!!????!!!?? 😝 |
| | Yup |

Squinting Face with Tongue "conveys a sense of fun, excitement, playfulness, hilarity, and happiness as if saying *Squee! Or Awesome!*"

**SUMMARY**

1.     This case is about a consensual love affair between Ms. Tatiana Spottiswoode and me that

was successfully weaponized by Ms. Spottiswoode by deliberately lying to and misleading

Congress while under oath.  In Congress Ms. Spottiswoode falsely testified that I was a

rapist, a pedophile, and a potential murderer, amongst other shocking and heinous

assertions against me.  She did so in order to destroy my reputation, damage me financially,

harm me and my family emotionally, and to advance her personal and financial interests.

2.     Ms. Spottiswoode and I once loved each other.  We were physically and romantically

intimate over the course of almost three years, and at one point I thought we would marry.

Ms. Spottiswoode's family and many of her friends knew of our relationship, although at

various times she had attempted to deceive them about its nature.  Ms. Spottiswoode's

father, Mr. James Spottiswoode and I were close friends and he had worked at various

businesses affiliated with me for several years.

3.     A defining feature of our sexual relationship was the sharing of minor scratch, bite, whip,

and slap marks.  These practices, introduced by Ms. Spottiswoode, required heightened

trust:  both that they would not exceed consent, and that the resultant marks would not be

misused as an indication of a lack of consent.

4.     After a romance that exceeded a year, Ms. Spottiswoode joined Afiniti, a company where I

served as Chief Executive.  Prior to her recruitment, I declared our pre-existing relationship

to senior management and recused myself from Ms. Spottiswoode's recruitment, work

assignment, evaluation, compensation, and advancement.  Ms. Spottiswoode worked in a

different office from me and did not report to me.

5.      Our relationship waxed and waned while Ms. Spottiswoode was employed at Afiniti, and

there were periods in which she asked that we maintain a friendship rather than a physical

relationship, while in other periods she stated her interest in a sexual and romantic

relationship.  I respected Ms. Spottiswoode's wishes when she indicated a preference to not

have a sexual relationship, and, as I loved Ms. Spottiswoode, I would pursue a physical and

romantic relationship with her when she indicated such a preference.

6.      As reflected in written exchanges between us, in 2017 Ms. Spottiswoode and I decided after

lengthy discussion to resume a physical and romantic relationship.  Ms. Spottiswoode

stated in writing her desire for sex and romance with me.  As part of our renewed romantic

relationship, we agreed to meet on a trip to Brazil in September 2017 and discussed having

a sexual encounter there.

7.      We had three sexual encounters in Sao Paolo, Brazil.  Our first encounter took place on the

evening of September 14th at Ms. Spottiswoode's room at the George V Residence hotel.

Shortly afterwards, Ms. Spottiswoode described in writing her enjoyment of the evening.

Two subsequent encounters occurred on the evening of September 15th at my hotel room

at the Fasano Hotel, and Ms. Spottiswoode was an enthusiastic participant in both.  In our

third and final encounter, Ms. Spottiswoode retrieved a leather choker collar she had

brought with her, wore it, and asked me to have sex with her.  While having sex with me in

the superior position, she repeatedly told me that she loved me.

8.      Our final encounter lasted several hours and, consistent with our prior sexual practices, we

scratched, slapped, and bit each other, leaving marks on **both** of us.  I fell asleep holding

Ms. Spottiswoode in my arms, and Ms. Spottiswoode stayed with me until I woke up the

next morning.  I dressed when I awoke, we had a brief conversation, and then I walked Ms.

Spottiswoode to a taxi, and kissed her goodbye.  Ms. Spottiswoode departed for the United

States, and I departed for Germany.

9.     Ms. Spottiswoode then betrayed my trust.  Two weeks after our final sexual encounter, I

received a demand from her lawyers claiming that I assaulted Ms. Spottiswoode and

sexually harassed her.  This demand evolved into the threat that they would make public a

set of photographs of bite, scratch, and slap marks on Ms. Spottiswoode and assert that

they were not consensual unless I paid Ms. Spottiswoode $50 million.

10.    I refused to comply and at this point I sought to document the similar marks on my own

body caused by Ms. Spottiswoode.

11.    After two months of continuing threats and damaging conduct from Ms. Spottiswoode's

legal team, including bringing their demands to my employer, I initiated a confidential

arbitration between Ms. Spottiswoode and me to resolve her allegations as required by her

employment agreement.

12.    Around the same time, in December 2017 Mr. Spottiswoode resigned from his position as

Chief Scientist of Afiniti's largest shareholder, The Resource Group where I served as

Chairman.  Despite my pending arbitration with his daughter, I implored him to stay in

writing, but he refused.

13.    I later learned that Mr. Spottiswoode, whom I thought of as a dear friend, had stolen from

The Resource Group upon his exit.  Although I recused myself from the decision, The

Resource Group chose to pursue the matter with Mr. Spottiswoode in arbitration, as was

required under his employment contract.

14. Ms. Spottiswoode made several attempts to short-circuit The Resource Group's arbitration against her father.  First, she filed a claim for retaliation with the New York City Commission on Human Rights citing the ongoing arbitration against her father as retaliatory towards her. The NYCCHR adjudicated and dismissed Ms. Spottiswoode's claims as lacking merit.

15. Second, Ms. Spottiswoode's lawyer Mr. Michael Zweig threatened me with public disclosure of my arbitration if The Resource Group didn't comply with their demand to drop the arbitration against her father.  I refused to tie the two arbitrations and attempted to negotiate with Ms. Spottiswoode's lawyers to be free of future threats of slander from Ms. Spottiswoode.

16. Ms. Spottiswoode's final strategy to force The Resource Group to dismiss its arbitration against her father was to falsely testify in front of the Judiciary Committee of the United States House of Representatives.  In that testimony she described me as a murderous rapist, pedophile, serial assaulter, harasser, and liar, while positioning herself as an innocent victim.

17. Ms. Spottiswoode's lies and deceptions in front of federal legislators were broadcast globally and are still readily available on the House Judiciary Committee website.  Dozens of media outlets picked up Ms. Spottiswoode's narrative and rebroadcast it globally.

18. Contrary to natural justice, the House Judiciary Committee did not provide me with any opportunity to defend myself before, during, or after Ms. Spottiswoode's public testimony. Additionally, every question asked by the Judiciary Committee of Ms. Spottiswoode presumed the truth of her tale.  As such, Ms. Spottiswoode's false statements were disseminated without rebuttal and with an inherent Congressional endorsement.

19.     Ms. Spottiswoode and her lawyer Ms. Nancy Smith then repeated and amplified Ms.

        Spottiswoode's Congressional narrative calling me a "sexual predator" and a "misogynist"

        and used it to pressure my clients to cease doing business with me, remove me from my

        executive positions, pressure my company into dropping its arbitration against her father,

        and blackmail me into silence.

20.     They succeeded in large part.  I was forced to resign from all my executive and fiduciary

        roles, including from companies that I founded and ran for more than a decade.  As a result

        of Ms. Spottiswoode's false testimony, several prominent advisors to Afiniti terminated

        their affiliations, including former Prime Minister of the United Kingdom David Cameron,

        former Chairman of the US Joint Chiefs of Staff Admiral Michael Mullen, former CEO of

        Lifetime Networks Andrea Wong, and former CEO of Thomson Reuters Thomas Glocer.  The

        market value of business affiliated with me declined by approximately one billion dollars.

21.     This has proved devastating to me.  My career and reputation are ruined.  I continue to

        suffer immense financial harm, and my loved ones and I continue to suffer enormous

        psychological damage.

22.     By contrast, Ms. Spottiswoode successfully used the pressure created on me and my

        businesses to achieve a settlement of her father's arbitration in which he received a large

        cash payment even though he had stolen from his employer.  Ms. Spottiswoode and her

        counsel have also positioned themselves as champions of victims' rights and legislative

        reform, providing them with a platform from which to continue to harm me.

23.     Woven with half-truths and delivered with tearfulness and eloquence, Ms. Spottiswoode's

        lies to Congress are so brazen, numerous and severe that they become falsely compelling.

Observers may be inclined to suspend logic and ignore precisely *what* she is saying and be moved instead by *how* she is saying it.  However, when read individually, carefully, and without bias, her falsehoods become clear.

24.     I have made many errors of judgement, including continuing a romantic relationship with Ms. Spottiswoode after she became an employee, substance use, and taking part in parties and fraternizing in adult environments with employees.

25.     However, I am not a murderer, rapist, pedophile, harasser, serial assaulter, misogynist, or sexual predator as Ms. Spottiswoode and her attorney have publicly described.  And Ms. Spottiswoode is not a victim.  She is a sociopath willing to destroy the lives of others, a pathological liar who comfortably lies to authority and to those who hold her dear, and a hypocrite perverting the positive intentions of the #MeToo movement for personal gain.

26.     In her conduct, Ms. Spottiswoode was animated and assisted by a broader conspiracy including her lawyers, her father, and her father's lawyers.

27.     This lawsuit seeks to redress the harm done to me and my loved ones.  If I prevail, my reputation will at least be partially restored, those that care about me will have a measure of favorable closure, and I will be compensated for the financial loss I have suffered.  I bring this lawsuit together with my wife who has also been harmed as a result of the consequences of Ms. Spottiswoode's and her conspirators' actions upon our marriage.

28.     I am admittedly fearful that I file this complaint at a cultural moment when, in matters of alleged sexual misconduct, an accuser's word is given superordinate credence over that of the accused.  Indeed, attempts by the accused to counter allegations against them are oft decried as "blaming the victim".  That is not this case.

**JURISDICTION, VENUE, AND PARTIES**

29.     **Jurisdiction.**  This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332(a)(1)

because the parties are completely diverse and the amount in controversy exceeds $75,000.

On information and belief, all parties are United States citizens.  My wife and I are plaintiffs

domiciled in Puerto Rico, and the defendants, all of whom have significant ties to the

District of Columbia, are domiciled in California, New Jersey, and New York.

30.     **Venue.** Venue is proper in this district pursuant to 28 U.S.C. §1391(b)(2) because a

substantial part of the events and omissions giving rise to these claims occurred in this

district:

    **a.**  The defamatory lies and deceptions of Defendants Ms. Spottiswoode and Ms.

Smith that sit at the heart of this case were made to the Judiciary Committee of

the United States House of Representatives and its staff in the District of

Columbia.

    **b.**  A portion of the audience for Defendants Ms. Spottiswoode's and Ms. Smith's

defamatory comments in the press was located in the District of Columbia.

    **c.**  The contract between me and Ms. Spottiswoode that Defendant Ms.

Spottiswoode has violated, and that Defendants Mr. Spottiswoode, Ms. Smith,

Mr. Zweig, and Mr. Johnson have tortiously interfered with, has an agreed choice

of laws and venue that is the District of Columbia.

    **d.**  The contracts between me and my employers that Defendants have tortiously

interfered with have choices of laws and venue that are the District of Columbia

and have as counterparties companies that are headquartered in the District of

Columbia.

31.    **Plaintiffs.**  My wife and I are the plaintiffs in this case.  We were married in December 2020

and welcomed our firstborn child in August 2022.

a.    My legal name is Muhammad Ziaullah Khan Chishti; I am commonly known by

the name Zia Chishti.  I was named Wilson Dewey Lear at my birth, and some

members of my family still use that name for me.  I am a dual citizen of the

United States and Pakistan.  I am an inventor, investor, and leader of technology

businesses.  I received my bachelor's degree from Columbia University in

Economics and Computer Science in 1992, and my master's degree in Business

Administration from Stanford University in 1997.  I founded medical technology

company Align Technology in 1997 and led it through a public listing on the

NASDAQ in 2001.  I founded investment company The Resource Group in 2002

and led it through a public listing on the Karachi Stock Exchange in 2003.  I

founded technology company Afiniti in 2006.  Cumulatively the businesses that I

have founded have created over 30,000 jobs and generate over $4 billion in

annual revenue.  I have raised over $1 billion in capital from investors, which has

accreted in value to over $10 billion today. I led both The Resource Group and

Afiniti until 2021, when I was forced to resign because of Defendants' actions.

b.    My wife's legal name is Sarah Jennifer Pobereskin; she is commonly known as

Sarah Pobereskin.  My wife is a dual national of the United States and the United

Kingdom.  She received her undergraduate degree in Social and Political Sciences

in 2006 from Cambridge University where she was President of the Cambridge

Union Society, and her graduate degree in Business Administration from Harvard

University in 2012.  Sarah rose to be an Associate Partner at McKinsey &

Company, a prominent management consulting firm, and is currently a Principal

at ghSMART, a prominent leadership advisory firm.

32.    **Defendants.**  There are five defendants in this complaint:

    **a.**  Defendant <u>Tatiana Spottiswoode</u> is presently a law student at Columbia

University.  She received her undergraduate degree from Brown University in

Philosophy in 2016.  After graduation Ms. Spottiswoode briefly taught at a

private school in New York City, and then joined Afiniti as a Data Analyst in 2016.

Ms. Spottiswoode resigned her position at Afiniti in 2017.  Ms. Spottiswoode is a

United States Citizen domiciled in the state of New York.

    **b.**  Defendant <u>James Spottiswoode</u> is a mathematician and statistician with a

historic focus in researching paranormal phenomena.  From 2007 to 2013 Mr.

Spottiswoode served as Chief Scientist for Afiniti.  From 2014 to 2015 Mr.

Spottiswoode was Chief Scientist of Digital Globe Services.  From 2016 to 2017

Mr. Spottiswoode served as the Chief Scientist for The Resource Group.  Afiniti,

Digital Globe Services, and The Resource Group are all affiliated with me.  On

information and belief, Mr. Spottiswoode is a United States citizen domiciled in

the State of California.

    **c.**  Defendant <u>Nancy Erika Smith</u> is Ms. Spottiswoode's attorney and is a named

partner at Smith Mullin P.C.  She received her law degree from Rutgers

University Law School.  Her practice focuses on employment litigation.  Ms. Smith is as an attorney that uses a combination of press and litigation pressure to extract substantial settlements in high profile sexual assault and harassment cases.  On information and belief, Ms. Smith is a United States citizen domiciled in the state of New Jersey.

**d.**   Defendant <u>Michael Zweig</u> served as Ms. Spottiswoode's counsel prior to Ms. Smith.  He received his law degree from the New York University School of Law, and his undergraduate degree from Cornell University.  Mr. Zweig is a partner in the law firm Loeb & Loeb.  On information and belief, Mr. Zweig is a United States citizen domiciled in the state of New York.

**e.**   Defendant <u>Edward Johnson</u> is Mr. Spottiswoode's attorney.  He received his law degree from Harvard Law School, and his undergraduate degree from Williams College.  Mr. Johnson is a partner in the law firm Theodora Oringher.  On information and belief, Mr. Johnson is a United States citizen domiciled in the state of California.

**FACTS OF THE CASE**

33.   On 16 November 2021, Ms. Tatiana Spottiswoode deliberately lied to and misled Congress,

falsely accusing me of rape, attacking her with intent to murder, pedophilia, harassment,

and multiple verbal and physical assaults.  At the same time, Ms. Spottiswoode portrayed

herself as an innocent and unwilling victim.  Shortly thereafter in the press Ms.

Spottiswoode and her lawyers described me as a "misogynist" and a "sexual predator" and

described my behavior as "horrific".  A catalog of Defendant's extensive false statements is

attached as Exhibit B.

34.   In December 2014, Ms. Spottiswoode and I commenced a physical and romantic

relationship.  She was 21 and I was 44.  With occasional interruption, we were romantically

involved for almost three years through September 2017.

35.   A central feature of this consensual, multi-year sexual relationship was the sharing of

scratching, slapping, biting, and choking which left behind corresponding physical marks on

both of us.  Ms. Spottiswoode introduced me to these practices.

**First Romantic Interest – December 2014**

36.   Our first romantic encounter was in Deer Valley, Utah in December 2014 on a ski holiday.

37.   Citing this encounter, Ms. Spottiswoode told Congress that I created a nonexistent nephew

that would also be joining us in Deer Valley, ostensibly to give Ms. Spottiswoode false

comfort about the nature of the trip.

38.    Ms. Spottiswoode was genuinely surprised to learn that the nephew did not exist.

However, consistent with her pattern of half-truths, Ms. Spottiswoode did not elaborate to

Congress that it was she who had earlier suggested I develop an excuse to placate her

parents, whom I had known for a decade, and who might have objected to her seeing me in

other than platonic context.  Later, Ms. Spottiswoode told me that my invention of a

nephew was "one of the most attractive things" about me.

39.    This fabrication of lies to her parents and inner circle by Ms. Spottiswoode to avoid

discovery of her relationship with me would become a recurrent feature of Ms.

Spottiswoode's conduct.  Two more such fabrications for her parents are evidenced in this

complaint:  one in which she misrepresented her whereabouts to visit me in Spain in

September 2015, and another to visit me in Cuba in August 2016.


**Courtship – December 2014 to September 2015**

40.    From December 2014 forward we exchanged multiple flirtatious and erotic

communications, including explicitly describing sexual fantasies with each other.  As an

example, in April 2015 Ms. Spottiswoode sent me multiple nude photographs of herself in

her bedroom in which she stares into the camera while lying prone on the floor, covered

only with a strategically placed book.  *See* Exhibit H, Photograph 1 and Photograph 2.  In one

of the images, she referenced our shared enjoyment of sexual practices such as biting and

scratching by imposing graphic blood spatters over her breasts and thigh.  I did not ask for

the pictures, much less pressure Ms. Spottiswoode to send them.  These photographs

required thought and effort by Ms. Spottiswoode to stage and edit.  Nonetheless, Ms.

Spottiswoode claimed to Congress that she was actively rejecting my purportedly

unsolicited advances during that period.


**Intense Relationship – September 2015 to November 2015**

41.     Our second intimate encounter was in Ibiza, Spain in September 2015.  To keep our

relationship hidden, Ms. Spottiswoode fabricated a story for her family in which she

remained in the United States, even though I had encouraged her to be transparent with

her parents and be forthright about her whereabouts.  Her parents discovered the ruse a

few days into her visit, when, worried after not having heard from her, they successively

called friends of Ms. Spottiswoode until one revealed where she was.  Ms. Spottiswoode

wrote to me immediately after the trip: "I wanted to tell you that I spoke with my parents

this morning and told them that we were not entirely platonic friends, or whatever it is.  I

also told them that the secrecy was all my weird paranoia about N and that you were all for

telling them from the beginning, which is the truth, so my dad wasn't upset with you for not

saying anything, either."  In this exchange "N" is Natasha Spottiswoode, Ms. Spottiswoode's

elder sister, with whom Ms. Spottiswoode perceived she competed for my affection.

42.     During our trip to Ibiza, Ms. Spottiswoode verbally communicated to me her enjoyment in

sexual practices that involved the sharing of bite, scratch, and slap marks and physically

guided me in how she enjoyed receiving them.   We had intercourse on the first night we

were both together in Ibiza.  During this intimacy and while in the superior position, Ms.

Spottiswoode dug her fingernails into her posterior, and then held my hands and

encouraged me to do the same.  Thereafter we engaged in sexual intercourse several times, during which we bit, scratched, and slapped each other.

43.    Through November 2015 we were in a romantic relationship that involved us taking holidays together in Miami and Toronto, and my visiting Ms. Spottiswoode in Providence. During this period Ms. Spottiswoode indicated enjoyment in being struck with a leather riding crop which left corresponding whip marks, and in being choked with a leather collar. I took a photograph evidencing such marks when Ms. Spottiswoode and I were in the American Airlines lounge in Miami returning from a holiday together.  *See* Exhibit H, Photograph 3.  It shows welts from whipping Ms. Spottiswoode's posterior.   The bruises visible on this photograph are only those below her dress; her marks proceeded across her entire posterior and further up her torso.

44.    After the Miami holiday, Ms. Spottiswoode sent me an email using the third person to describe her enjoyment of the sexual experience in which she received such marks:   "[…] But then his lubed cock would slide into her pussy and meet the torrent of her wetness.  As he fucked her, there was no longer a defense.  She obviously needed his cock, craved it. Her body betrayed herself to him […] I can't imagine this girl hates herself at all for enjoying things that that seem base and rude – she might wonder at them, and speculate about how to incorporate them into her more general notions of identity […]"

**Breakup and Return to Flirtation – November 2015 to April 2016**

45.     In November 2015, Ms. Spottiswoode broke off our relationship.  Two days later she wrote

me expressing regret about the breakup and describing herself as missing me.  She then

wrote that she was sorry to be "breaking the delightful run we had of whimsy and lust and

friendship, because I don't know if we can get it back again, or that you will want to!  I do."

46.     By December 2015 we were back in flirtatious dialog, with Ms. Spottiswoode describing

herself as looking forward to a "New Year's kiss".  In February 2016, at our next opportunity

to be together, we recommenced a physical and romantic relationship.

47.     In March 2016 we started planning a trip to Cuba together with Ms. Spottiswoode's friend,

Ms. Katharine Groetzinger.  The evening we started planning the trip, Ms. Spottiswoode and

I were sexually intimate at an adult entertainment venue in New York City called The Box.

After this intimacy, Ms. Groetzinger witnessed Ms. Spottiswoode choosing to return to my

room in the Four Seasons hotel at the end of the evening of her own volition for further

intimacy.  The trip to Cuba was planned for the summer of 2016.


**Ms. Spottiswoode Joins Afiniti and Flirtation Continues – April 2016 to August 2016**

48.     In April 2016, while we were physically intimate, Ms. Spottiswoode joined Afiniti, a

company where I served as Chief Executive.  Prior to Ms. Spottiswoode's hiring, I disclosed

to Afiniti's senior leadership that we had a prior intimate romantic relationship.  I recused

myself from the decision to hire her and from any decisions about her role, location,

performance appraisal, promotion, or compensation.

49.   I was cautioned by one board member that that my firm's hiring of Ms. Spottiswoode, while

      legal and not against any company policy, was poor business judgement on my part.  He

      was correct.

50.   Describing this period, Ms. Spottiswoode falsely testified to Congress that I "assured [her]

      that [I] did not expect a sexual relationship".  I did not do so, and Ms. Spottiswoode will

      have no evidence of such an assurance.  Such an assurance would contradict the facts that

      (i) we were concurrently in a physical relationship, and (ii) that we were planning a trip to

      Cuba together a few months later.

51.   Throughout April, May, June, and July of 2016, while she was an employee of Afiniti, Ms.

      Spottiswoode and I were flirtatious and physically intimate.  During this period Ms.

      Spottiswood invited me to have dinner and drinks with her on several occasions and sent

      me numerous romantically suggestive texts, photographs, and images.  Here is a typical

      example from June 2016 of an exchange initiated by Ms. Spottiswoode, inviting me to join

      her at a bar in New York late on a Friday evening:

|  |  |
|---|---|
| **Ms. Spottiswoode:** | Sup ?? |
| | Want to get a drink with us puppy? |
| **Me:** | Just finished dinner. |
| | Four seasons bar to start!  We can figure it out from there. |
| **Ms. Spottiswoode:** | Want to come meet us at a cool bar? |
| | We are going to momofuku bar |
| | … I'll look it up |
| | Booker and Dax |
| | Not that your bar isn't cool !!!! |
| | But come to the east vill |
| **Me:** | Ugh … sorry gang I feel like a total wuss here apparently I have to hop on a super urgent work call |
| **Ms. Spottiswoode:** | Noooo |

|  | Its fine |
| **Me:** | we are trying to close a $65 million deal over the weekend and there is some weird tax issue |
| **Ms. Spottiswoode:** | Lol |
|  | Us too |
|  | High stakes over here |
|  | Hahaha |
| **Me:** | keep me posted.  If I can get out at a reasonable hour I will pop down |
| **Ms. Spottiswoode @ 10:02pm:** | Cool !! We're up to 66 over here |
| **Ms. Spottiswoode @ 10:54pm:** | 67 mill u won't believe it |
|  | Trying to close this deal |



**Ms. Spottiswoode @ 11:39pm:**       Til the bay of pigs ladies and gents

The reference to the "bay of pigs" reflects our planning together of a trip to Cuba, when we were next planning to be together in person.

52. In July 2016 while she was an Afiniti employee, Ms. Spottiswoode sent me two novels as a birthday present:  *The Golden Notebook* by Doris Lessing, and *Infinite Jest* by David Foster Wallace.  These works involve graphic erotic and sexual writing, profanity, and racial slurs. Ms. Spottiswoode described herself as closely identifying with the content of both novels

---

[5] Picture brightness and contrast increased.  Original picture is in Exhibit H Photograph 4.

and greatly appreciating their writing styles.  Example passages from both which indicate

the tone Ms. Spottiswoode encouraged with me are in Exhibit B.

53.    In late July 2016 while Ms. Spottiswoode was an Afiniti employee, we completed our

planning for our Cuba trip.  Ms. Spottiswoode and Ms. Groetzinger were both enthusiastic

participants in the planning.  Ms. Spottiswoode planned a set of T-shirts for us that would

memorialize the trip, advocated purchasing Polaroid cameras to document the trip and

described the trip in a text message to Ms. Groetzinger and me as "Good lord… This is so

fun and also insane".  Earlier, in an email on June 29th, Ms. Spottiswoode had written: "This

is going to be silly amounts of fun.  I can't believe you put this together [Zia], what an insane

amalgamation of weird activities… Really can't wait !!"

54.    Echoing her past conduct, Ms. Spottiswoode again

fabricated a fake trip for the benefit of her parents in

which she and Ms. Groetzinger were going to visit the

Bahamas rather than going to Cuba with me.  To

maintain the lie with her parents, Ms. Spottiswoode

solicited Ms. Groetzinger's cooperation.  Adjacent is a

screenshot of her fabrication to her parents which Ms.

Spottiswoode sent to me.   She followed this screenshot

with a text message stating: "I'm a bad person, but I

can't wait to cheel w u 2", which meant "I am a bad

person, but I can't wait to chill with you two".



55.     Three days before the start of the Cuba trip, Ms. Spottiswoode canceled her participation

        for two reasons.  First, a woman I had a romantic interest in at the time discovered the trip

        and reached out to Ms. Spottiswoode to determine Ms. Spottiswoode's relationship with

        me.  This made Ms. Spottiswoode uncomfortable.  Second, Ms. Spottiswoode's concurrent

        romantic partner, Mr. Jack Ross, put pressure on her to withdraw from the trip because he

        felt insecure about Ms. Spottiswoode's relationship with me.

56.     Through ambiguities and half-truths Ms. Spottiswoode conveyed the false impression to

        Congress that the trip to Cuba was something that I invited her to _after_ she became an

        employee, that she found unwelcome, that involved an unknown and menacing male friend

        of mine who would accompany us, and that she fearfully declined.


**Pause in Relationship – August 2016 to November 2016**

57.     After her late cancellation, respecting her preference for Mr. Ross over me, I did not contact

        Ms. Spottiswoode for several months.  During this period, she sent me just one text

        message to which I did not respond.  Other than that, there is no conduct on my part that

        could be considered harmful towards Ms. Spottiswoode.  Indeed, during this period Ms.

        Spottiswoode flourished at work.


**Flirtation Resumes – November 2016 to January 2017**

58.     In November 2015, after Ms. Spottiswoode sent me multiple flirtatious messages during a

        company trip to Lahore, Pakistan, we again established romantic and flirtatious contact.  In

        one such communication, Ms. Spottiswoode encouraged me to view the movie Zabriskie

Point, which had the tagline "where a boy and a girl meet, and touch, and blow their minds".  She accompanied this message with seductive photographs of herself and her closest friend, Ms. Natasha Bluth:

 

59.   To Congress, Ms. Spottiswoode claimed that this was a period in which she was continually rebuffing and rejecting my sexual interest in her.

60.   In December 2016 we were again in contact in Dubai on a company trip, where Ms. Spottiswoode approached me at a bar and then flirted with me.  Over the course of our time together, Ms. Spottiswoode familiarly tucked herself in under my arm.  I playfully and secretly squeezed Ms. Spottiswoode's posterior.

61.   While Ms. Spottiswoode did remove my hands from her posterior, she also did so playfully, hinting that she wanted a more private setting for an intimate encounter.  Ms. Spottiswoode falsely described this interaction to Congress as an assault committed in front of co-workers in which I placed my hands inside her pants.  As I did not do so, no co-worker amongst the dozens that were in proximity at the bar witnessed any such assault.

---

[6] Picture brightness Increased.  Original pictures are in Exhibit H Photograph 5 and Photograph 6.

62.     On this same evening I had a consensual intimate encounter with another work colleague. The consensual nature of that encounter was witnessed by multiple parties, including a senior member of the company's legal team in whom the woman confided her romantic interest in me.  Multiple other individuals witnessed us publicly kissing and flirting.  The text communication stream between us showed that earlier the woman had flirtatiously invited me to come see her that evening.

63.     The following day I was accused by that woman of acting in a manner which exceeded her consent, claiming that she would not have acted the way she did if she had not been inebriated.  The matter was settled between us without any finding of wrongdoing, and after an independent investigation of my conduct, the board of directors of my company concluded that I had not acted in any manner that violated law or company policy.

64.     Ms. Spottiswoode falsely conveyed this incident to Congress as one in which I assaulted, harassed, and victimized another woman.

65.     The next day, while the Dubai trip continued, Ms. Spottiswoode approached me at a Company sponsored event and asked me "what shall we do about this sexual tension between us", which I interpreted as a sexual invitation.  I declined.

66.     We next met in January 2017 at a work event in Mexico City.  During this event Ms. Spottiswoode again shared multiple flirtatious and solicitous messages with me.  Here is an example of a typical such exchange:

| | |
|---|---|
| **Ms. Spottiswoode:** | My brain is so mad at me for some reason, you would think I didn't treat it like a princess all the time. |
| **Me:** | Solution: champagne + hot tub |
| **Ms. Spottiswoode:** | Yum |
| **Me:** | Rezzie sorted |

**Ms. Spottiswoode:**



| | |
|---|---|
| **Me:** | Want to play footsie? |
| **Ms. Spottiswoode:** | I'm going to go home and shower and stuff.  Will you let me know when and where to meet you ? I think those restaurants are near my hotel. |
| **Me:** | Ok plan is to meet at Four Seasons Bar |
| | Then go to Sylvestere |
| | Which doesn't take reservations after 9 but kitchen open till 1 |
| | Come by when ready! |
| **Ms. Spottiswoode:** | Ok.  I might take a fifteen minute nap :) |
| | But will then either come to four seasons / u could pick me up on ur way?  Im quite on the way |
| | Whatever makes sense to you guys timing wise |
| **Me:** | I will pick you up |
| | Will give you more nap time |
| | Remind me of hotel name |
| **Ms. Spottiswoode:** | |



| | |
|---|---|
| | Hotel real comino Polanco |
| **Me:** | Roger |
| | Will call your cell when 5 away to wake you |
| | Be prepared for serious debauchery |
| | Degenerate evil |
| **Ms. Spottiswoode:** | Ok!  Im setting an alarm for 20 min too |

67.   To Congress, Ms. Spottiswoode falsely portrayed this period while she worked at Afiniti as

one in which she was being harassed and she was consistently rebuffing my interest.  She

stated to Congress: "As the CEO of the company, he had power over my life and career, and I was anxious not to insult him or make him mad.  I explained that I didn't want to have sex with him in as many different ways as possible.  I said it in person, but I also wrote it in texts and emails.  I reminded him in almost every interaction we had.  I told him his demands were causing me extreme stress, including panic attacks, as well as forcing me to look for work elsewhere".

68.    After work hours we socialized both alone and with other members of our work team, including going to bars, restaurants, and nightclubs.   On our last evening in Mexico, we had a private disagreement on a crowded dance floor.

69.    Referring to this, Ms. Spottiswoode subsequently falsely accused me in front of Congress of humiliating her by calling her a "bitch" in front of co-workers.  I concede and regret using such language, albeit the term was one which Ms. Spottiswoode had used to describe herself before.  However, as our disagreement was private and occurred in a crowded area distant from any co-workers, no co-workers witnessed any name-calling.


**Flirtation Halts After False Accusation – January 2017 to July 2017**

70.    Upon my return to the United States, I received an email from Ms. Spottiswoode falsely accusing me of three assaults.  I was stunned and replied immediately with an email setting out the falsity of her position.  Knowing her propensity to fabricate, I told her that we could not reestablish a personal relationship unless she apologized, told the truth, and agreed to be truthful going forward.

71. Employing a half-truth with Congress, Ms. Spottiswoode falsely conveyed her accusatory email as indicative of my assaulting her at least three times.  She did not disclose to Congress that she had later recanted the email, acknowledged that she had altogether fabricated one incident, could not recall the second, and that she could not reconcile the third with her asking me for sex two days later.   Ms. Spottiswoode also did not disclose to Congress that she affirmed, in writing, that I had not assaulted her in any way.

**Flirtation Resumes – July 2017 to September 2017**

72. Ms. Spottiswoode did not reply to my responsive email, and we ceased interacting until July 2017 when I sent her a conciliatory message.  Ms. Spottiswoode replied enthusiastically to my outreach, and proceeded, in writing, to apologize and acknowledge her earlier fabrications.  To ensure there would be no further misunderstanding, Ms. Spottiswoode clarified in writing that, (i) I had not assaulted her, (ii) that she had a sexual interest in me, and (iii) that she was a "sexual deviant".  Ms. Spottiswoode informed me that she was no longer in a romantic relationship with Mr. Ross, and we recommenced an amorous relationship.

73. Thereafter we resumed romantic and flirtatious banter.  Although Ms. Spottiswoode was concerned as to the pace with which we would recover our historic relationship, Ms. Spottiswoode asked that I "try to win [her] heart again".

74. We next met in August 2017 in New York, where Ms. Spottiswoode came to my room at the Four Seasons hotel in the evening and, of her own volition, played romantic and sexually suggestive video clips by the director Michelangelo Antonioni on her laptop computer while

seated next to me.  We also visited Central Park both earlier in the afternoon, and afterwards later at night.  Earlier, Ms. Spottiswoode had indicated an ambivalence towards having sex with me upon our first conciliatory meeting and, by mutual agreement – even though Ms. Spottiswoode was signaling her sexual interest during our time together – we were not physically intimate.

75.    Shortly after, I sent two erotic emails to Ms. Spottiswoode which memorialized this time together.  The tone and content of the emails were consistent with how we had flirtatiously communicated together in the past and with what Ms. Spottiswoode encouraged with me. The first one described Ms. Spottiswoode as having a sexual interest in me.  Ms. Spottiswoode replied that I was "right on the money".  The second described me as having a sexual interest in Ms. Spottiswoode.   To the second, Ms. Spottiswoode replied by stating "lets hang out in south america next week".

76.    To Congress Ms. Spottiswoode falsely described these emails as "rape fantasies" and her reactions to these emails as "stunned and horrified" and that she "tried to ignore them". These emails and the exchanges around them are detailed in Exhibit B.  They are not rape fantasies, and Ms. Spottiswoode demonstrated only enthusiasm for them.


**Brazil Sexual Intimacy – September 2017**

77.    In September 2017, Ms. Spottiswoode planned a sexual encounter with me in Sao Paolo, Brazil that Ms. Spottiswoode understood in writing would involve biting, scratching, slapping, and choking, consistent with our past relationship.  Here is the relevant exchange from September 12th, one day before my arrival in Brazil:

| | |
|---|---|
| Me: | Did you bring your whip and collar? |
| Ms. Spottiswoode: | I brought my beautiful bracelet that I love 😝 |
| | The other object doesn't really fit in any of my bags !! |
| Me: | Hmmmm |
| | Will have to improvise |
| | One thing is for sure |
| | Pain will be involved |
| Ms. Spottiswoode: | You really know how to smother these things in innuendo |
| | Leave something to the imagination 😝 |
| | Lets see what happens maybe .. ???!!!????!!!?? |
| | Yup |

The emoji that Ms. Spottiswoode repeatedly uses is Squinting Face with Tongue which

"conveys a sense of fun, excitement, playfulness, hilarity, and happiness as if saying Squee!

Or Awesome!"  The "beautiful bracelet" that Ms. Spottiswoode brought to Brazil and

lovingly describes is in the Hermes "Collier de Chien"

bracelet family, which is French for "dog collar".

When looped twice, it can fashionably be worn

around the wrist as a bracelet.  When unlooped, it



can be worn around the neck as a choker.  The "other object" that Ms. Spottiswoode sought



to bring but couldn't fit in her luggage is an

Hermes riding crop.  This is the same riding crop

that Ms. Spottiswoode had encouraged me to

use with her as a sexual prop to whip her in

Miami, resulting in corresponding marks on her posterior and back.

78.    Also on September 12th, Ms. Spottiswoode was explicit in this planning that she was keen

that our encounter would be sexual, writing that she was "looking forward… to being

seduced and slowly undressed".

79.   To Congress, however, Ms. Spottiswoode falsely stated "I summoned my courage and told

Chishti that his sexual demands made me fear that I was going to lose my job and were

causing me to have panic attacks."

80.   The only reference to a panic attack in Ms. Spottiswoode's three-year history of interactions

with me was later that evening of September 12th, after earlier making explicit her keenness

in a sexual encounter with me:

**Ms. Spottiswoode @8:27pm:**

Hey, do you think we are going to have a chance to talk tomorrow at all?
I just had a panic attack haha
Im so afraid of upsetting u . I kno u said we would never be mad at each other again but
    the truth is that this dynamic of this review and us makes me SO scared and I
    thought it would be less scary if I just went for it, but then I started hyperventilating .
And now I'm just telling you everything in the interest of honesty and full disclosure and
    our newly reformed friendship
I've actually been working really hard on my stupid reports 🙇‍♀️
I've been hoping I could show you how amazing ur data teams are
And reveal ~3 people as a complete net loss for you, and thus feel that I have made a
    real , substantial contribution to the success of afiniti
But if I compromise this in any way , like u get pissed off at me and then I ruined this
    week for my own learnings , I will remember this as such a humiliating experience
Anyway , im really afraid of your wrath.  I want to b friends but if I upset u Im sort of
    screwed here . So deciding to make major life decisions in the 3 days before this
    stupid review I am for whatever reason kind of worked up about
I just want to show you my ACA query
And if/when we consummate our long delayed lust, I want it to be because I WANT it.
Im not sure this is that time . W anxiety about all the coworkers .
But open to discussion haha 😛 [7]
Mostly just wondering if u now hate me.  My assumption is that u hate me usually, after
    I say something , that it will have been loathsome to u in some way
But back in NYC, that's my city, feel super safe there, anonymous, make my own choices
    etc
Here is a little different and I'm more nervous I guess
U must think I'm a head case !
Safe travels
!!!!

[7] In the exchange Ms. Spottiswoode shared the "Face with Tongue" emoji with its text shorthand "p".

**Ms. Spottiswoode @8:45pm:**

Haha . Am I the most difficult person u have ever hooked up w ?
Don't answer that
Anyway . Hope ur having a good flight . im much calmer now lol
… c u … in the morning I guess ! Ok ! Yup

While the text of the exchange speaks for itself, the emojis that Ms. Spottiswoode employs add to understanding the interaction.  In particular, the 😛 emoji is Face with Tongue, which "can variously convey a sense of fun, excitement, silliness, cuteness, happiness, or jesting, as if saying *Just Kidding!*"

81.     In her single "panic" exchange out of our three years of communications, Ms. Spottiswoode cited the following concerns:

    a.  She is worried that if she changes her mind about having sex with me once we are both in Brazil, that I might be angry with her.

    b.  She is worried that sex with me would constitute a major life decision.

    c.  She is worried that our relationship might be discovered by our co-workers.

    d.  She is worried that she might perform poorly on her assignments in Brazil if we resume a sexual relationship.

However, she is also clear that

    a.  She has a sexual attraction for me.

    b.  New York was a better place for us to resume our sexual relationship because it is more anonymous and there is less risk of discovery by co-workers.

    c.  She is open to discussion on her concerns.

    d.  Before I respond to her, eighteen minutes later she indicates she is much calmer and looking forward to seeing me when I would land in Brazil the following morning.

    e.  She is being funny and flirtatious

82.  In describing this exchange, Ms. Spottiswoode misled Congress by both half-truths and blatant falsehoods:  "I summoned my courage and told Chishti that his sexual demands made me fear that I was going to lose my job and were causing me to have panic attacks.  In response, he sent me two pornographic emails describing his rape fantasy, including strangling me while having sex".  In fact:

    a.  I never made any sexual demands of Ms. Spottiswoode.

    b.  We had discussed resuming a sexual relationship, and Ms. Spottiswoode immediately prior to this exchange had asked me in writing to have sex with her.

    c.  Ms. Spottiswoode never told me she feared losing her job.

    d.  She cited a single alleged panic, not plural as she testified.

    e.  Despite the alleged panic, she described her sexual attraction to me and her openness to discussion around her reservations.

    f.  Before I responded, she described herself as recovered from the alleged panic and again looking forward to seeing me.

    g.  The pornographic emails Ms. Spottiswoode cites preceded both this exchange and Ms. Spottiswoode asking me to seduce and undress her.  They did not follow this exchange as Ms. Spottiswoode testified.

    h.  Neither of the emails described a rape fantasy or strangulation.

      i.   Both emails were replied to enthusiastically by Ms. Spottiswoode.  She acknowledged her sexual interest in me and asked that we "hang out" in Brazil.

      j.   The following day, on her initiative, we resumed amorous banter

**83.**    On the 13th of September, Ms. Spottiswoode resumed a flirtatious dialog with me.  As an example, that evening we had the following exchange:

| | |
|---|---|
| **Ms. Spottiswoode:** | You are probably exhausted!  Yesterday I fell so deeply asleep at like 10:30. Maybe something romantic tomorrow?  LOL *hates self* 🤦‍♀️ |
| **Me:** | Hahaha.  Good plan. |
| **Ms. Spottiswoode:** | I don't know, you could treat me like a princess or something casual 😳 |
| **Me:** | I will plot and scheme. |
| **Ms. Spottiswoode:** | I might not complain 😐😐😐 😏 LOL I am two Indian drinks in!  So brazen!! |
| **Me:** | Good starting point. |
| **Ms. Spottiswoode:** | I'm above everything, you know 😳 But I also like being treated like a princess. I can't help it 🤦‍♀️ |

Although the words of this exchange speak for themselves, the associated emojis add further meaning of the exchange.  The 🤦‍♀️ emoji is Woman Facepalming which displays "frustration or embarrassment at the ineptitude of a person".  The 😳 emoji is Flushed Face which conveys "flattery, surprise, disbelief, admiration, affection, and excitement".   The 😐 emoji is Neutral Face which conveys "a deadpan sense of humor".  The 😏 Emoji is Smirking Face which implies "flirtation and sexual innuendo".

**84.**    Early in the evening of the 14th of September after time with a broader social group including an early dinner, Ms. Spottiswoode indicated that going home leaving with me in full view of work colleagues would be inappropriate.  I suggested that we both leave

individually and meet up together afterwards.  In text communications with me she then

cited strong concerns about the upcoming client review the following day, together with an

aversion to having sex with me.  We had the following exchange:

| | |
|---|---|
| **Ms. Spottiswoode:** | Can I come over and not say that I'm necessarily going to have sex [with you] |
| | I feel weird about it |
| | I feel like we are negotiating |
| | And like [you're] going to be mad at me as usual |
| | My stomach hurts |
| **Me:** | We can agree not to have sex if you prefer |
| | It's overrated anyway |
| **Ms. Spottiswoode:** | I really don't want to 😣 I feel like a [fucking] prostitute |
| | I have never wanted sex less than [right] now |
| | Haha |
| | I just don't want [to] be your like employee slut person |
| **Me:** | Dude |
| | I am not a rapist |
| | !!! |
| **Ms. Spottiswoode:** | 😐 |
| | I didn't mean to suggest that. |
| | U just text / email /message me things that [are] very suggestive |
| | And not very "friend"ly |
| | I don't [know] what [you] want from me. |
| | It seems to be sex |
| | Most of the time |
| | [You're] not like sending me book recommendations |
| **Me:** | Good subjects |
| **Ms. Spottiswoode:** | Ok. |
| **Me:** | We can discuss over booze. |
| | Since we are not having sex or [redacted] |
| | I guess we work with conversation and alcohol |
| **Ms. Spottiswoode:** | Im sorry to sound like such a puritan |
| **Me:** | Dude you are worried about way more than you need to |
| | Anyway should I come get you |
| | Or are you coming here |
| **Ms. Spottiswoode:** | [You] should come pick me up! |
| | Can [you] [please]? |
| **Me:** | Sure |

The two emojis Ms. Spottiswoode employs are Crying Face which "may convey a moderate degree of sadness or pain", and Grimacing Face which "may represent a range of negative or tense emotions, especially nervousness, embarrassment, or awkwardness".

85.    This exchange was confusing to me.  Throughout the 14th, Ms. Spottiswoode had been eagerly in my company and flirting with me.  The previous day she had asked that we do something "romantic" at this time, where I would treat her like a "princess".  I concluded that perhaps while Ms. Spottiswoode wanted a romantic relationship, it was too early to have sex, and uncomfortable for her to have sex with me as an employee.  I agreed with her that sex was not a possibility if that was her choice.  Accepting this, Ms. Spottiswoode then asked that I should pick her up from her hotel.

86.    Our humorous and amorous banter then resumed.  She asked "Do [you] have a plan?"  I replied "Always".  Ms. Spottiswoode chuckled "LOL 😎". The emoji is Smiling Face with Glasses which is "used to convey… cool… also a confident, carefree attitude or that something is excellent".   When I arrived at her hotel, Ms. Spottiswoode invited me up to her room:

| | |
|---|---|
| **Me:** | What room are you in? |
| **Ms. Spottiswoode:** | 606 |
| | Want to come up? |
| **Me:** | I will come up |
| | Yup |
| | Easier |
| **Ms. Spottiswoode:** | [Cool] |

87.    As her elevator required a key for entry, Ms. Spottiswoode came down to meet me, and together we went to her room.  In her room we searched online for an evening venue and

exchanged some lighthearted conversation, then we proceeded to a popular rooftop bar for drinks.

88.    At the bar, over the course of several hours our banter grew more intimate.  We recalled the most enjoyable times of our relationship together.  Ms. Spottiswoode suggested we return to her hotel room.

89.    Once back in Ms. Spottiswoode's hotel room, at Ms. Spottiswoode's instigation, we shared an intimate physical encounter which involved dancing, kissing, and intimate petting.

90.    After some time together, I asked Ms. Spottiswoode if she had any other concurrent romantic interests, hoping the answer to be no.  I was surprised to hear that she did have another romantic interest, Mr. Jay Mamana.  I felt awkward about the discovery, and there was a change in the mood as a result.  Ms. Spottiswoode then suggested that the evening might come to an end, and I kissed her and left.

91.    Shortly after I left, I texted Ms. Spottiswoode: "This was a great evening.  I am glad we did that."  Ms. Spottiswoode responded: "Yeah it was :)".

92.    The following morning on the 15th of September, after an initial client review session in which Ms. Spottiswoode was prominently involved, she texted "that was so much fun".  Ms. Spottiswoode flirted with me, and spent time with me alone during breaks.  Later in the day I asked her if she "still [felt] weird about working together?"  She replied: "No I'm having so much fun 🥺".  The non sequitur Crying Face emoji was a typographical error.

93.    Later that evening, Ms. Spottiswoode and a group of work colleagues shared a work dinner with me, where Ms. Spottiswoode voluntarily sat next to me and flirted with me.  Many of the dinner participants witnessed this flirtatious behavior.

94. After dinner, I announced publicly that there was no further work requirement, but that all were welcome to join me socially at a bar at the hotel where I was resident.  Several people chose to go home.  Several other individuals joined me, including Ms. Spottiswoode who, unprompted, jumped into my taxi for the ride back to the hotel.

95. Arriving at the hotel, Ms. Spottiswoode asked to go to my room to drop off her backpack, which she did.  Her backpack contained her toiletries and the leather choker that we had used together before as a sexual prop.  She then rejoined me and the broader group at the bar.  This is a photograph taken by the bartender after Ms. Spottiswoode, seated next to me, had dropped off her backpack in my room.  Seated left to right are Mr. Charles Monteaux, Ms. Jussara Koga, Ms. Spottiswoode, me, and Mr. Khurram Waqar:



Mr. Monteaux, Ms. Koga, and Mr. Waqar all witnessed Ms. Spottiswoode flirting with me and enjoying herself with me over the course of the evening.  Ms. Spottiswoode indicated no signs of distress or discomfort.

96.     After some time with the broader group, Ms. Spottiswoode and I excused ourselves, ostensibly to go to the bathroom.  Instead, we went to my hotel room and had a brief sexual encounter during which I performed oral sex on Ms. Spottiswoode.   During this first sexual encounter of the evening Ms. Spottiswoode asked me to have intercourse with her, asking "Why are you not inside me already?"  I demurred as I thought the balance of the group would notice our extended absence.  Shortly after this encounter she described herself in writing as "having SO much fun".

97.     Ms. Spottiswoode described this evening to Congress as "I felt completely trapped and hopeless.  I was 23 and very far from home.  I didn't want to lose my job.  I didn't want him to get any angrier.  I did not feel that anyone would protect me.  I was too tired to argue with him anymore."

98.     As the evening proceeded, the group dwindled to three people:  me, Ms. Spottiswoode, and Mr. Khurram Waqar.  At approximately 1:30am, Ms. Spottiswoode told me that she had a plan to get rid of Mr. Waqar and proceeded to do so.  Ms. Spottiswoode's ruse is detailed at the outset of this complaint on pages 2 and 3.

99.     To Congress Ms. Spottiswoode brazenly twisted this ruse into its reverse.  She testified to Congress that "I texted him I was sick and going back to my hotel… I said I was vomiting…". In fact, she texted to inform me that she was <u>not</u> sick, <u>not</u> going back to her hotel, and <u>not</u> vomiting, but rather that I should convey those lies to Mr. Waqar to make him believe the evening was at an end, and to encourage him to leave so that we could resume our earlier sexual encounter.  She omitted to tell Congress that in this exchange she told me up front that she was "giving [Mr. Waqar] an excuse to leave", when both Mr. Waqar and I fell for

her ruse, she laughingly wrote "Hahahahahahahah… I am so convincing", and finally when I

told her that Mr. Waqar had left and that I would see her imminently, she said "Nice… I just

got desperate".

100.   Our second sexual encounter on September 15th lasted several hours.  Unprompted by me,

Ms. Spottiswoode retrieved her leather choker collar, which she referred to as her

"beautiful bracelet", from her backpack and affixed it to her neck.  This choker had been

used between us several times before as a sexual prop.  Ms. Spottiswoode explicitly asked

me to have sex with her multiple times during the encounter.  Consistent with our past

sexual conduct, this encounter involved each party scratching, slapping, and biting the

other, and **both** parties received bite, slap, and scratch marks.  Ms. Spottiswoode had sex

with me in the superior position, and covered my neck, face, and shoulders with kisses.

During this intimacy Ms. Spottiswoode said "I love you" to me multiple times.  I fell asleep

holding Ms. Spottiswoode in my arms.

101.   The following morning, I awoke to Ms. Spottiswoode still in my room.  Ms. Spottiswoode

had been free to leave at any time.  Had she been in any distress, or had she been fearful of

me, she could simply have left once I had fallen asleep.  Instead, she remained there several

hours later.

102.   While waiting for me to awake, Ms. Spottiswoode was texting with her other romantic

partner, Mr. Mamana.  When I asked her what she was doing, she described to me as doing

"damage control" with Mr. Mamana.  We had a friendly discussion and agreed to meet

again.  She packed her toiletries and leather choker into her backpack, and I walked her to

her taxi and kissed her goodbye.

103.    Contrary to what she testified to Congress, Ms. Spottiswoode did not have strangulation

marks, a black eye, a bump on her head, or any symptoms of a concussion.

104.    Later in the day I texted to ask her if her attempt at damage control was successful.  She

replied "yah".  I replied "too bad".  Both she and I took flights out of Brazil shortly

thereafter.

105.    Ms. Spottiswoode's narrative to Congress was that I flew into a rage because she had

persistently rejected me, and therefore I proceeded to violently assault her.  This false tale

will not survive contact with the facts.  The evidence will show that:

   a.   Ms. Spottiswoode was repeatedly clear that she wanted to have romantic and

        sexual encounters with me.

   b.   Shortly prior to the time Ms. Spottiswoode claims she was assaulted, we had

        already had one sexual encounter after which she described herself in writing as

        having "SO much fun".  Just a day prior we had had another intimate encounter,

        which she agreed with me was a "great evening".

   c.   Throughout the evening, Ms. Spottiswoode was free to leave me at any time.

        She repeatedly made the choice to stay with me.

   d.   Despite Ms. Spottiswoode's claim that she was alone, there were many people

        present in our social group that evening, right up until the final few minutes

        between our second sexual encounter.  Multiple witnesses saw her flirting with

        me.

**e.**  Ms. Spottiswoode created a ruse to cause the last person in our social group to leave, so she might be alone with me.  In the seconds prior to our encounter, Ms. Spottiswoode described herself as "desperate" to see me.

**f.**  After our sexual encounter, I fell asleep holding Ms. Spottiswoode in my arms. When I woke up several hours later, Ms. Spottiswoode was still in my room waiting for me to rise and join her.  Ms. Spottiswoode will not be able to explain why, if she was under duress, she did not simply leave after I had fallen asleep.

**g.**  If Ms. Spottiswoode testifies honestly, she will concede that in our encounter she:

    **i.**  told me multiple times that she loved me

    **ii.**  verbally asked me to have sex with her

    **iii.**  had sex with me in the superior position

    **iv.**  voluntarily wore her choker collar without my asking

    **v.**  covered my face, shoulders, and torso with kisses

    **vi.**  caused several of her own bite and scratch marks

    **vii.**  spent long spells talking with me, intimately describing her hopes and fears

**h.**  I have never struck a woman in anger.

**i.**  A forensic investigation of Ms. Spottiswoode's injuries will show that they are not consistent with a several-hour, murderous attack by a 200-pound athletic male against a captive 130-pound female.  Instead, her injuries are simply minor scratch, slap, and bite marks, consistent with our prior sexual practices.

**j.**  Contrary to her Congressional testimony, Ms. Spottiswoode did not have strangulation marks, a black eye, a bump on her head, or any symptoms of a concussion.

**k.**  My physician's report six weeks after our encounter indicates that both Ms. Spottiswoode and I shared comparable scratch, slap, and bite marks.  The difference was that, given the superficial and consensual nature of the marks, I didn't think to immediately photograph them, while Ms. Spottiswoode promptly weaponized hers.

**Ms. Spottiswoode Demands Payment and Threatens Litigation – October 2017**

**106.**  Approximately two weeks after our encounter in Brazil, in early October 2017 I was contacted by Ms. Spottiswoode's attorney Michael Zweig demanding money from me for claims of harassment and assault.  Ms. Spottiswoode's demands continued, culminating in a threat to publicly file litigation against me, thereby releasing pictures of Ms. Spottiswoode showing scratch and bite marks on her body and claiming that I had non-consensually inflicted them on her, unless I paid Ms. Spottiswoode $50 million.  *See* Exhibit G.  This strategy aimed to elicit public outrage and horror by not providing the critical context that

**a.**  The depicted marks were a recurrent feature of our consensual sexual relationship.

**b.**  Both of our bodies bore similar marks.

**c.**  Ms. Spottiswoode caused many of the marks herself.

107. I refused to accede to Ms. Spottiswoode's and her attorney's threats.  Naively believing that the truth, as well as that Ms. Spottiswoode's and my declared love for each other would yet prevail, I did not initially even seek to engage legal counsel.

108. After I rejected my Ms. Spottiswoode's initial demands, on or about late October Ms. Spottiswoode's attorneys then brought their complaint to my employer, Afiniti.  After Ms. Spottiswoode threatened Afiniti and harmed my reputation with Afiniti, Afiniti and I engaged legal counsel.

109. Now aware of Ms. Spottiswoode's commitment to spreading her false claims, I visited my physician, Dr. Jeffrey Sherman on November 2nd.  Dr. Sherman documented the now-fading marks on my body that Ms. Spottiswoode made during our encounter in Brazil:

> "…review[ed] evidence on his body from a sexual encounter with aggressive features (BDSM) on Sept 15th 2017 in Brazil.  He said he had a consensual sexual encounter with a prior sexual partner.  This included biting of fingers, and possibly other areas as well as deep scratches on the torso… [He] has scarring from traumatic injury on left index and right middle finger as well as torso.  These are well on the way to being healed.  Injuries are consistent with the prior described physical encounter.  Areas on skin linear either healing with decreased pigmentation changes or area with increased pigment these have the appearance of healing scratches."

110. In early December 2017, Ms. Spottiswoode's nearly two months of threats came to a head.  Ms. Spottiswoode's lawyer Mr. Zweig gave me a final fixed deadline of 11th December 2017 to comply with their demand for $50 million.  Otherwise, they threatened they would initiate public litigation of such an explosive nature that it would destroy my career and reputation, cause me to incur substantial legal fees, and irreparably harm the businesses affiliated with me.

111. Shortly before Ms. Spottiswoode's deadline expired, Afiniti and I initiated an arbitration against her pursuant to her employment agreement with Afiniti.

112.    To Congress Ms. Spottiswoode falsely portrayed my finally engaging in arbitration with her

        after two months of threats from her legal team as "As soon as my lawyers contacted

        Afiniti, Chishti initiated an arbitration against me".

113.    Confidential arbitration was a highly opportune forum for Ms. Spottiswoode.  In such a

        forum, she would have been able to hire attorneys on contingency, incur minimal or no

        expenses in her pursuit of the arbitration, and keep confidential her own conduct in the

        matter.  Any award she might have received would be essentially unappealable,

        substantially lowering both evidentiary and legal standards.

114.    Still committed to the truth, early in the arbitration, I suggested that Ms. Spottiswoode and

        I both take lie detector tests to establish the truth of the matter and promptly resolve the

        dispute.  Ms. Spottiswoode never agreed, and the offer still stands.


        **Mr. Spottiswoode's Arbitration**

115.    Also in December 2017, Ms. Spottiswoode's father, James Spottiswoode, resigned his

        position as Chief Scientist with The Resource Group.  I implored him to stay on, but he

        refused.

116.    The Resource Group and I later learned that Mr. Spottiswoode stole confidential

        information and trade secrets related to projects he was working on.

117.    Because my arbitration with Ms. Spottiswoode was still pending, I recused myself from

        taking a decision to pursue any legal remedy against Mr. Spottiswoode's theft.

        Nevertheless, in September 2018, The Resource Group initiated an arbitration against Mr.

        Spottiswoode related to the trade secrets he had stolen.

118.    In January 2019, Ms. Spottiswoode filed a complaint alleging retaliation with the New York

City Commission on Human Rights.  The complaint was subsequently adjudicated by the

NYCCHR on the initial pleadings and dismissed in 2020 as not having sufficient merit to

proceed to further investigation.

119.    To Congress Ms. Spottiswoode falsely claimed that I retaliated against her by suing her

father.  Neither did I sue Ms. Spottiswoode's father, nor did I retaliate against her.

120.    After the conclusion of her arbitration, Ms. Spottiswoode in conjunction with her attorney

Mr. Zweig, transmitted confidential information from the arbitration to Mr. Spottiswoode in

conjunction with his attorney Mr. Johnson.  Based on this information, Mr. Johnson

attempted to subpoena further confidential information from Ms. Spottiswoode's

arbitration.

121.    Ms. Spottiswoode, Mr. Spottiswoode, and their respective attorneys then used confidential

information from Ms. Spottiswoode's arbitration to force The Resource Group to abandon

its claims.

122.    The Resource Group refused to settle the arbitration against Mr. Spottiswoode but agreed

to settlement discussions.  The two parties made several offers to each other but were

unable to reach a settlement, and the arbitration between The Resource Group and Mr.

Spottiswoode was ongoing at the time of Ms. Spottiswoode's testimony to Congress in

November 2021.

**Ms. Spottiswoode Approaches Congress - 2021**

123.   On information and belief, in the summer of 2021 Ms. Spottiswoode engaged Defendant

Nancy Erika Smith as counsel to develop a strategy to attempt to force a settlement in The

Resource Group's ongoing arbitration with Mr. Spottiswoode.

124.   On information and belief, in retaining Ms. Smith, Ms. Spottiswoode communicated

materials from our confidential arbitration to her.

125.   On information and belief, Ms. Smith and Ms. Spottiswoode developed a strategy to secure

Ms. Spottiswoode an opportunity to provide testimony in front of Congress.  This would be

done under the ostensible cover of supporting the law-making process but would in

actuality serve to publicly attack me from behind a perceived shield of testamentary

immunity.  In Ms. Spottiswoode's and Ms. Smith's strategy, the outrage resulting from Ms.

Spottiswoode's testimony would result in the loss of my executive positions and create

sufficient pressure within my affiliated companies to force a successful settlement of her

father's arbitration.

126.   Upon information and belief, Congress did not randomly reach out to Ms. Spottiswoode,

one of three hundred and thirty million Americans, to solicit her testimony.  Instead,

Defendants approached Congress and engaged in a process of creating Congressional

interest in Ms. Spottiswoode's false testimony.

127.   On information and belief, to effect their solicitation scheme, Ms. Spottiswoode and Ms.

Smith revealed confidential information from Ms. Spottiswoode's arbitration to Congress.

128.   On information and belief, to solicit Congress's interest Ms. Spottiswoode and Ms. Smith

specifically supplied Congress with photographs of Ms. Spottiswoode, falsely portraying the

bite and scratch marks on her body as evidence of my violence towards her, and described me as a murderous rapist and pedophile, amongst other heinous accusations.

129. The timelines support this belief.  On 4th November 2021, the U.S. House of Representatives issued a subpoena to Ms. Spottiswoode to testify at a Congressional hearing on 16th November.  The subpoena commanded Ms. Spottiswoode to appear before the House Judiciary Committee at a certain date, time, and location but provided no further details. Neither the name of the hearing, nor the topics to be discussed, nor what testimony Ms. Spottiswoode was being asked to provide were described in the subpoena.

130. According to the subpoena's certificate of service, it was then not served for another eight days, until November 12th, a Friday.  Rather than effectuating service on Ms. Spottiswoode, the subpoena was served by electronic mail via Ms. Smith, who, on information and belief, had until that point never entered an appearance in any matter on behalf of Ms. Spottiswoode.

131. Three days after its receipt, on or about Monday 15th November, Ms. Smith submitted on her letterhead a document purporting to be Ms. Spottiswoode's proposed testimony to the House Judiciary Committee.  Given the mode of service via counsel, the sparsity of the subpoena, the timing of service, and the speed with which Ms. Spottiswoode submitted her proposed testimony, on information and belief Ms. Smith and Ms. Spottiswoode were aware of the issuance of the subpoena before Ms. Smith was officially served.

132. On information and belief, Ms. Smith and Ms. Spottiswoode were aware that Ms. Spottiswoode would be testifying under a subpoena and revealing confidential information even before the subpoena was issued.

133.     Ms. Smith and Ms. Spottiswoode did not provide me with a copy of the subpoena until the day before Ms. Spottiswoode testified, and neither Ms. Smith nor Ms. Spottiswoode ever gave me notice that Ms. Spottiswoode was going to disclose confidential information in response to the subpoena.

134.     The lack of notice that I received of the subpoena and of Ms. Spottiswoode's intent to disclose confidential information denied me a reasonable opportunity to contact Congress to attempt to prevent disclosure of confidential information or to provide evidence countering Ms. Spottiswoode's narrative.  It also ensured that I was not sufficiently prepared to contest and correct the false record Ms. Spottiswoode was imminently going to share with the public.

135.     On information and belief, Ms. Smith and Ms. Spottiswoode intentionally delayed giving me notice of the subpoena and intentionally avoided giving me notice of Ms. Spottiswoode's intent to disclose confidential information to maximize the harm they would do to me, and to maximize the benefits they would seek to generate for themselves.

136.     Nevertheless, concerned about what Ms. Spottiswoode may divulge or concoct in her testimony, in the few working hours left before Ms. Spottiswoode's testimony my counsel and I scrambled to contact the House Judiciary Committee.

137.     The staff of the Committee was clear that, based on what Ms. Spottiswood had already told them, they would not consider – let alone solicit, as natural justice would demand – evidence, explanation, or testimony from me that would refute Ms. Spottiswoode's claims or even clarify the staff's understanding.  They stated that they had no interest in my side of

the story, and shared their belief that my professional career would promptly end because of Ms. Spottiswoode's testimony.

138.    Had Ms. Smith's and Ms. Spottiswoode's false narrative and gamesmanship not prevented me from also offering testimony and evidence to Congress, the public would have discovered that Ms. Spottiswoode, while eloquent and intelligent, is an individual that invented multiple parallel realities:  for me, for her parents, for her friends, for her other lovers, and even for herself.  She has a documented history of falsely alleging harassment and assault against multiple individuals and later dropping or recanting her accusations.  My testimony would have shown that Ms. Spottiswoode had falsely accused *me* of multiple assaults only to later apologize and acknowledge in writing her fabrication of those assaults. Rather than a one-sided, false narrative, Congress and the public would have received from me both written and photographic evidence that Ms. Spottiswoode enjoyed being scratched, slapped, bitten, whipped, and choked with a leather collar as part of her sexual enjoyment.  I would have pointed Congress to public chat groups for sadomasochists where Ms. Spottiswoode participated under a disguised persona.  I would have testified that she had requested I participate in those sexual acts throughout our sexual history, and particularly so in the instance in Brazil that she made appear as though I had assaulted her. I would also have provided evidence that showed Ms. Spottiswoode telling me that she possessed a "relentless desire to have [her] will and body periodically subjugated".

139.    Additionally, Congress would have heard that, in January 2019, Ms. Spottiswoode filed a complaint alleging retaliation with the New York City Commission on Human Rights, and

that the complaint was subsequently dismissed on the initial pleadings as not having
sufficient merit to proceed to further investigation.

140.   In short, if Ms. Smith and Ms. Spottiswoode had provided Congress with an accurate picture
of what transpired between Ms. Spottiswoode and myself, Congress likely would have been
reluctant to provide Ms. Spottiswoode with a unilateral opportunity to air her false and
highly destructive testimony.

141.   On or around 15th November, Ms. Smith provided a written statement of Ms.
Spottiswoode's proposed testimony on Ms. Smith's letterhead to Congress.  The statement
is attached as Exhibit B1.  This statement was not required by the Congressional subpoena
and, on information and belief, was submitted without any legal requirement to do so.

142.   On 16th November, Ms. Spottiswoode falsely testified orally in front of the House Judiciary
Committee.

143.   In their written and oral statements, Ms. Smith and Ms. Spottiswoode accused me of rape,
an attack on Ms. Spottiswoode with murderous intent, pedophilia, harassment, multiple
assaults of Ms. Spottiswoode, harassment, assault, and violating conduct towards other
women, and criminality.

144.   Ms. Smith provided in her written submission, and Ms. Spottiswoode publicly testified, that
she prevailed in our arbitration.

145.   It was evident from the questions being asked of Ms. Spottiswoode in her testimony that
several members of Congress had been briefed prior to her testimony that I had raped Ms.
Spottiswoode and thought to murder Ms. Spottiswoode, amongst other heinous crimes.

146.    As a result of Ms. Spottiswoode's and Ms. Smith's false submissions to Congress, the House Judiciary Committee did not give me any opportunity to refute Ms. Spottiswoode's testimony either during or after it was made.

**Ms. Spottiswoode and Ms. Smith Commence PR Campaign – November 2021**

147.    Ms. Spottiswoode and Ms. Smith built on their submissions to Congress by commencing a public relations campaign which incorporated and repeated Ms. Spottiswoode's claims against me.

148.    Immediately after Ms. Spottiswoode's testimony on November 16th, while physically present in the District of Columbia, Ms. Smith published on Twitter from her handle @nancyerikasmith that Ms. Spottiswoode's testimony was "brave" and "powerful", thereby endorsing the validity Ms. Spottiswoode's testimony and incorporating its accusations. Amongst other recipients, Ms. Spottiswoode specifically targeted the American Association for Justice with their handle @JusticeDotOrg, which is in the District of Columbia.

149.    On November 18th, two days after Ms. Spottiswoode's testimony to Congress Ms. Spottiswoode falsely published comments in *The Daily Telegraph*, a British newspaper, that I was a misogynist and led a misogynist culture at Afiniti.  She further falsely asserted that I had retaliated against her father and that Afiniti had seized her father's stock.  Without any context other than Ms. Spottiswoode's Congressional testimony, her statements effectively incorporated the allegations that Ms. Spottiswoode made in front of Congress.

150.    The next day, on November 19th, Ms. Smith published on Twitter from her handle @nancyerikasmith, referring to me, that "Forced arbitration enabled him.  The light of day

brought him down.  So proud of my client Tatiana Spottsiwoode!  Thank you

@RepJerryNadler @RepCheri @HouseJudiciary @GretchenCarlson @julieroginsky

@JusticeDotOrg".  This tweet, without any context other than Ms. Spottiswoode's

testimony, validated and repeated Ms. Spottiswoode's defamations of in front of Congress

just three days earlier.

151.    The next day, on November 20th in *The Telegraph*, Ms. Smith referred to me publicly as a

"sexual predator", compared my conduct to that of Roger Ailes, and indicated that I would

have no evidence to challenge Ms. Spottiswoode's narrative.   Ms. Smith further indicated

that Ms. Spottiswoode was "beaten" without her consent.  Without any context other than

Ms. Spottiswoode's testimony, Ms. Smith's statements validated Ms. Spottiswoode's

testimony and incorporated the allegations that Ms. Spottiswoode made in front of

Congress.

152.    Ms. Spottiswoode and Ms. Smith continued this public relations campaign to bring pressure

to bear on clients and affiliates of Afiniti to end their business relationships if I maintained a

role with Afiniti or The Resource Group.  In particular, on November 27th Ms. Smith

challenged AT&T to cease its commercial relationship with one of my businesses if I

continued to stay as an executive there.  An article publishing evidence of these tortiously

interfering statements is attached as Exhibit C.  The implication of Ms. Smith's comments in

the article was that Ms. Spottiswoode's Congressional testimony was true.

153.    To ensure that I would not publicly respond to her allegations, Ms. Smith, acting as agent

for Ms. Spottiswoode, proceeded to publicly blackmail me by threatening to release

reputationally damaging photographs[8] and communications between Ms. Spottiswoode and myself if I attempted to clear my name.  In an article *The Telegraph* entitled "Dethroned Afiniti founder threatened with release of more alleged abuse photos", Ms. Smith stated: "If [Chishti] is going to violate the confidentiality provisions he imposed, we will answer him with additional photos and information".  *The Telegraph* also reported that "[Ms. Smith] said if Mr. Chishti attacks her client or starts 'cherry picking information' she will hit back with new evidence'.  Ms. Smith's blackmail was clear:  if I attempted to clear my name, she would release more pictures of Ms. Spottiswoode's scratch, bite, and slap marks which were calculated to shock and horrify.  Exhibit D contains the full article.

**154.** Ms. Smith's threats in *The Telegraph* indicate Defendants' hypocrisy and fear of the truth.  Ms. Smith and Ms. Spottiswoode themselves conspired to violate their duties of confidentiality.  Then Ms. Smith and Ms. Spottiswoode testified in front of Congress ostensibly in support of eliminating confidentiality in arbitration.  Yet here they were threatening me that I dare not do the same.  Their reason for attempting to blackmail me into silence is clear:  despite their publicly asserting that I would have no evidence to counter Ms. Spottiswoode narrative, Defendants knew that I did indeed have ample such evidence and that they risked Congress discovering that it had been lied to and misled.

---

[8] The threatened photographs are most likely those of Ms. Spottiswoode's consensual scratch and bite marks, of which a representative selection is annotated and attached in Exhibit G.

**Harm to Me – November 2021 and Ongoing**

155.   Ms. Smith's defamatory statements and blackmail resulted in my forced resignation from

my executive positions at Afiniti on 18 November 2021, and my executive positions at The

Resource Group on 28 November 2021, to save my businesses from collapse.

156.   In December 2021, after my resignation from my various roles, to halt Ms. Spottiswoode's

and Ms. Smith's ongoing media barrage against it, The Resource Group settled its

arbitration with Mr. Spottiswoode by paying him money even though he had stolen from

The Resource Group.

157.   After ensuring the favorable settlement of Mr. Spottiswoode's litigation with The Resource

Group, Ms. Spottiswoode and Ms. Smith ceased their aggressive press campaign.  However,

Ms. Smith continues to sporadically defame me.  On 27 July 2022, Ms. Smith tweeted from

her handle @nancyerikasmith "Hey @AOC @RepRaskin @RashidaTlaib @CoriBush &

@RepMaloney – a subpoena would trump any NDAs these employees have signed.  It's how

we were able to expose Zia Chishti's horrific behavior at the top of Afiniti.  Reach out if you

have any questions!"

158.   Defendants' conduct, broadcast on the world stage, irreparably destroyed my career.  I have

lost all my executive positions and resulting ongoing income.  Despite never having been

prosecuted – let alone convicted – of even a misdemeanor, it is now impossible for me to

seek meaningful employment.  Fearing a renewed broadside from Ms. Spottiswoode and

her allies, the businesses I founded and led from inception refuse to engage with me in any

way.   Ms. Spottiswoode's and Ms. Smith's public false narrative has constrained

accountants, banks, financiers, and others from being business counterparts to me.

Similarly, government bodies are refusing to process ordinarily routine applications for me, citing public policy concerns.  I have lost almost all my philanthropic positions, and I am effectively barred from seeking meaningful public service.

159.     Defendant's conduct has caused me extraordinary financial loss and damaged the businesses I was affiliated with.  Afiniti, where I served as Chief Executive, had multiple clients cancel their ongoing or future business because of the publicity generated by Ms. Spottiswoode.  From November 15th to December 3rd, a period in which no other material information was released, my holding company's share price fell approximately 40%, implying a loss of market value of approximately one billion dollars across the portfolio of companies where I was a beneficial owner.

160.     Defendant's intentional conduct has caused immense psychological harm to me and those dear to me.  I struggle to sleep at night, and my days are consumed with anxiety.  I fear raising my young son in a world which believes that I am a criminal of the worst order.  Both my mother and my wife of two years, while enormously supportive, carry the burden of Ms. Spottiswoode's allegations as well and similarly suffer from sleepless nights, anxiety, and fear.  Many of my erstwhile friends and social circle, even knowing that what I am accused of may be untrue, are hesitant to maintain my acquaintance because of social pressure.

161.     Defendants' conduct has caused pervasive reputational harm to me that has impacted me personally and economically and extends beyond my career and professional life.

162.     Former British Prime Minister David Cameron, who chaired Afiniti's advisory board, former Chairman of the United States Joint Chiefs of Staff Admiral Michael Mullen, who was a member of Afiniti's advisory board, former CEO of Lifetime Networks Andrea Wong who

was a member of Afiniti's advisory board, and former CEO of Thomson Reuters Thomas Glocer who was a member of Afiniti's advisory board – all of whom I considered friends – resigned their positions on Afiniti's advisory board citing Defendants' allegations.

163.    Due to the damaging effect of Defendants' conduct, my wife and I moved to Puerto Rico in February 2022.  As a citizen of Puerto Rico, I submitted an Act 60 application which, if approved, would allow me to benefit from the exemptions from income taxes on dividends, interest, and capital gains.  On information and belief, my Act 60 application has not been approved due to Defendants' conduct.

164.    In March 2022, the accounting firm Price Waterhouse Coopers informed me that they could not accept me as a client due to the risk to their franchise posed by the public allegations against me by Defendants and my subsequent resignation from Afiniti.

165.    In October 2022, citing Defendants' allegations of sexual assault, The Resource Group, which I founded, filed litigation in the Sindh High Court in Karachi attempting to bar me from exercising my rights as a shareholder, and successfully received an interim Court order to that effect.

166.    In short, in contemporary vernacular, I am cancelled.

**CLAIMS**

**First Cause of Action**

**Libel Per Se and False Light against**

**Defendant Smith and Defendant T. Spottiswoode**

*By republishing Ms. Spottiswoode's false Congressional testimony*

*Ms. Spottiswoode and Ms. Smith libeled me*

**167.**  I repeat and reallege the allegations set forth above as though fully set forth herein.

**168.**  On 16 November 2021 Ms. Spottiswoode testified in a hearing in front of the Judiciary Committee of the United States House of Representatives in the District of Columbia.

**169.**  Immediately after this testimony Ms. Smith published a tweet on Twitter in which she wrote: "So proud of Tatiana Spottiswoode for her brave & powerful testimony before the House Judiciary Committee today."  On information and belief, Ms. Smith was present in the District of Columbia at the time she published the tweet.

**170.**  By describing Ms. Spottiswoode's testimony as "brave" and "powerful", Ms. Smith incorporated and endorsed Ms. Spottiswoode's defamations in Congress against me.

**171.**  On November 18, 2021, two days after Ms. Spottiswoode's testimony to Congress Ms. Spottiswoode falsely published in *The Daily Telegraph*, a British newspaper, that:

   a.  I was a misogynist.

   b.  I lead a misogynist culture.

   c.  Afiniti had retaliated against her father

   d.  Afiniti had seized her father's stock

Coming two days after her Congressional testimony and absent any other context, Ms. Spottiswoode's references to misogyny incorporated the false allegations she made in her Congressional testimony.  The full article is attached as Exhibit D1.  Even taken independently of Ms. Spottiswood's underlying Congressional testimony, these statements are false, defamatory, and have severely harmed my reputation, caused me financial harm, and caused me psychological harm.

172.   On November 20, 2021, four days after Ms. Spottiswoode's testimony to Congress Ms. Smith published in *The Telegraph* that:

   a.   I was a "sexual predator".

   b.   I was comparable to Roger Ailes, a deceased American executive accused by multiple women of sexual harassment and assault.

   c.   That I would have no evidence to counter Ms. Spottiswoode's and Ms. Smith's narrative about me.

   d.   That I had "beaten" Ms. Spottiswoode without her consent.

The full article is attached as Exhibit D2.  By making these statements and without Ms. Smith providing any other context, Ms. Smith incorporated and endorsed Ms. Spottiswoode's defamations in Congress against me.  Even taken independently of Ms. Spottiswood's underlying Congressional testimony, these statements are false, defamatory, and have severely harmed my reputation, caused me financial harm, and caused me psychological harm.

173.   On 22 July 2002, Ms. Smith tweeted "Hey @AOC @RepRaskin @RashidaTlaib @CoriBush & @RepMaloney – a subpoena would trump any NDAs these employees have signed.  It's how

we were able to expose Zia Chishti's horrific behavior at the top of Afiniti.  Reach out if you have any questions!".  Without any other context, Ms. Smith's description of my "horrific behavior" incorporated and endorsed Ms. Spottiswoode's defamations in Congress against me.  Even taken independently of Ms. Spottiswood's underlying Congressional testimony, describing me as having "horrific behavior" while leading Afiniti is false, defamatory, and has harmed my reputation, caused me financial harm, and caused me psychological harm.

174. A portion of Ms. Spottiswoode's and Ms. Smith's targeted audience for libel was in the District of Columbia.

175. The central defamations of me that Ms. Spottiswoode made, as endorsed by Ms. Smith, arising from Ms. Spottiswoode's false public testimony to Congress include that I:

    a. attacked Ms. Spottiswoode with intent to murder

    b. raped Ms. Spottiswoode

    c. am a pedophile

    d. assaulted Ms. Spottiswoode on at least three occasions

    e. have assaulted other women

    f. am a criminal

    g. harassed Ms. Spottiswoode

    h. have harassed other women

    i. sent two unwelcome rape fantasies to Ms. Spottiswoode

    j. pursued Ms. Spottiswoode despite her persistent rejection of me

    k. retaliated against Ms. Spottiswoode for her arbitration against me

    l. retaliated against other individuals

Defamations (a), (b), and (c) reflect the most severe crimes of moral turpitude, are

punishable as felonies in the District of Columbia, and are abhorred globally.  They

constitute *per se* defamation in the District of Columbia.  Defamations (d), (e), and (f) are

also punishable as felonies and constitute *per se* defamation in the District of Columbia.

176.   In Ms. Spottiswoode's question-and-answer session with Congresswoman Jayapal, Ms.

Spottiswoode, as endorsed by Ms. Smith in her tweet and Telegraph article, defamed me as

attacking Ms. Spottiswoode with the intent to murder, rape and strangle her:

| | |
|---|---|
| **Ms. Jayapal:** | When Chishti sent you an email about him fantasizing about raping and strangling you, how did you react and how did you feel about your safety? |
| **Ms. Spottiswoode:** | I was appalled.  I felt very unsafe.  I was really afraid for my life and my wellbeing. |
| **…** | |
| **Ms. Jayapal:** | Do you believe that Chishti planned in advance to strangle, beat, and rape you in Brazil? |
| **Ms. Spottiswoode:** | I try not to think about what he was thinking, but yes. |
| **…** | |
| **Ms. Jayapal:** | Were you afraid that Chishti might try to kill you especially if you continued to ignore or resist him? |
| **Ms. Spottiswoode:** | I was. |
| **…** | |
| **Ms. Jayapal:** | And the attack occurred overseas.  Did you feel comfortable going to the Brazilian police and would the law even have allowed you to seek help from American police? |
| **Ms. Spottiswoode:** | I did not feel comfortable going to the Brazilian police. |

177.   Ms. Spottiswoode, as endorsed by Ms. Smith, defamed me as a rapist in Ms. Spottiswoode's

question-and-answer session with Congressman Garcia:

| | |
|---|---|
| **Mr. Garcia:** | I know that you have talked about fear and I think you said earlier that you didn't go to the police because you were in Brazil, right? |
| **Ms. Spottiswoode:** | Yes, that's right. |
| **Mr. Garcia:** | And that you have to have a level of trust to be able to sit down and talk to law enforcement about this, I know that this is true for many rape victims. |
| **Ms. Spottiswoode:** | Absolutely. |

178.  Ms. Spottiswoode, as endorsed by Ms. Smith, defamed me as a pedophile when Ms.
      Spottiswoode testified that I had invited her on a holiday to "groom" her:  "Chishti, who was
      43 at the time, invited me on a ski trip… …The trip was designed to groom me".  The term
      "groom" was most recently in widespread use to describe the alleged sexual behavior of
      Jeffrey Epstein and Ghislaine Maxwell in their interactions with underage girls.  Soliciting sex
      with a minor is a federal offense punishable as a felony.  Ms. Spottiswoode and therefore
      Ms. Smith reinforced their defamation of me as a pedophile when Ms. Spottiswoode falsely
      stated: "He told me that he should have had sex with me when we first met when I was
      thirteen years old".  Ms. Spottiswoode's lie that I wanted to have sex with her when she
      was thirteen constitutes one of the most damaging defamations possible.  As a result, Ms.
      Spottiswoode's and Ms. Smith's statements constitute *per se* defamation under the laws of
      the District of Columbia.

179.  Ms. Spottiswoode, as endorsed by Ms. Smith, defamed me as having assaulted her at least
      three times when she represented to Congress: "In just one email in January 2017 I wrote to
      Chishti:  'three times you have behaved inappropriately and with my explicit non-consent.' I
      reminded him that I had said to his face: 'Zia, this is not consensual.  I don't want this.' I
      told him 'these experiences were frightening, degrading and embarrassing for me…..I do not
      trust you when you are drunk and these experiences make me feel scared and
      apprehensive.'"  Ms. Spottiswoode further testified "In May 2019, the arbitrator in my case
      ruled that I had been… assaulted by Chishti".  In the District of Columbia, assault is a crime
      punishable as a felony and, as such Ms. Spottiswoode and Ms. Smith's assertions constitute
      *per se* defamation.

**180.**     Ms. Spottiswoode, as endorsed by Ms. Smith, defamed me as having assaulted other

women when Ms. Spottiswoode claimed in her Congressional testimony: "Forced

arbitration is the reason Chishti is able to carry out this on-going campaign of retaliation

against me, my family, and probably other victims."  Ms. Spottiswoode, and therefore Ms.

Smith also defamed me as having assaulted and victimized other women in Ms.

Spottiswoode's question-and-answer session with Congressman Nadler:

| | |
|---|---|
| **Mr. Nadler:** | Prior to joining Afiniti, you had no idea if your attacker had previously acted like this towards anyone else at the Company. You believe that secret arbitration proceedings endangered men and women in similar situations? |
| **Ms. Spottiswoode:** | Of course.  Even at Afiniti I don't know whether there are women there like me who might think that they are the only person that this has happened to.  And, like me, would have to wait months into an arbitration proceeding to learn that there are other victims. |

Ms. Spottiswoode repeated the defamation again in her question-and-answer session with

Congresswoman Lee:

| | |
|---|---|
| **Ms. Lee:** | Ms. Spottiswoode, you indicated in your testimony that there was another young woman who was harassed and assaulted on an international trip.  Do you believe that Chishti has a pattern of luring young women out of the Country and assaulting them which changes the framework of your legal rights? |
| **Ms. Spottiswoode:** | I personally believe that.  Certainly, there were a lot of similarities between what happened to me and the other young woman that I learned about. |

As assault is punishable as a felony in the District of Columbia, Ms. Spottiswoode's and

therefore Ms. Smith's defamation of me constitutes *per se* defamation.

**181.**     Ms. Spottiswoode, as endorsed by Ms. Smith, defamed me as being a criminal when Ms.

Spottiswoode engaged in a question-and-answer session with Congressman Gohmert:

| | |
|---|---|
| **Mr. Gohmert:** | Ms. Spottiswoode, sorry for not knowing, but your attacker – did he ever face criminal consequences? |
| **Ms. Spottiswoode:** | No, as far as I know he is still the CEO of the Company.  In fact, I am very much afraid of what will happen after this hearing. |

Ms. Spottiswoode repeated the defamation in her question-and-answer with Congressman

Johnson:

| | |
|---|---|
| **Ms. Spottiswoode:** | Multiple times that I was assaulted, it was on international trips. |
| **Mr. Johnson:** | Probably to keep you from being able to file a criminal action against Mr. Chishti, correct? |
| **Ms. Spottiswoode:** | Perhaps. |

Ms. Spottiswoode's and Ms. Smith's accusations of criminality on my part are *per se*

defamation in the District of Columbia.

182.    Ms. Spottiswoode, as endorsed by Ms. Smith, defamed me as harassing Ms. Spottiswoode,

most evidently in Ms. Spottiswoode's prepared Congressional testimony:  "Chishti was not

willing to treat me like an employee… he oscillated between pressuring me for sex and

punishing me.  When I rebuffed him, he humiliated me in front of co-workers and then

ignored me completely, causing me to fear for my job… He was very angry and refused to

speak to or acknowledge me for months… he put his hands inside my pants and grabbed my

butt in front of co-workers… he had power over my life and career… I explained that I didn't

want to have sex with him in as many different ways as possible.  I said it in person, but I

also wrote it in texts and emails.  I reminded him in almost every interaction we had… He

repeatedly got angry with me for rejecting his advances… Chishti became more hostile…

Chishti's suggestions became more and more violent… he sent me two pornographic emails

describing his rape fantasy… I was stunned and horrified and tried to ignore them… I

avoided him as much as I could, but was under increasing pressure from him… I began to

worry that… Chishti wanted to hurt me and punish me for rejecting him".  Ms.

Spottiswoode further testified "In May 2019, the arbitrator in my case ruled that I had been

sexually harassed… by Chishti".

183.    Ms. Spottiswoode, as endorsed by Ms. Smith, defamed me as harassing other women, most

evidently in Ms. Spottiswoode's prepared Congressional testimony:  "[Chishti] turned his

attention to another 20-something female employee, also the daughter of someone Chishti

called a friend.  The next morning she texted him that she felt 'violated' that she had 'asked

[him] to stop many times...and that he knew how drunk she was.'  Afiniti executives and

Chishti… later paid her a secret settlement – and the company did nothing to protect other

Afiniti women, including me."

184.    Ms. Spottiswoode, as endorsed by Ms. Smith, defamed me by accusing me of sending two

unwelcome rape fantasies to Ms. Spottiswoode, most evidently in Ms. Spottiswoode's

prepared Congressional testimony: "he sent me two pornographic emails describing his

rape fantasy, including strangling me while having sex.  I was stunned and horrified and

tried to ignore them".

185.    Ms. Spottiswoode, as endorsed by Ms. Smith, defamed me as pursuing Ms. Spottiswoode

despite her persistent rejection of me, most evidently in Ms. Spottiswoode's prepared

Congressional testimony:  "Chishti… invited me on a ski trip… I initially declined – but he

insisted…. I rejected him then… after he persisted in pursuing me… I agreed to date him… I

broke off the relationship… Months later… I signed a contract with Afiniti… Chishti…

oscillated between pressuring me for sex and punishing me… I rebuffed him… I declined to

go to Cuba with Chishti… The head of my office… suggested I avoid Chishti… Chishti made

that impossible… I explained to him that I didn't want to have sex with him in as many different ways as possible.  I said it in person, but I also wrote it in texts and emails… I reminded him in almost every interaction we had… In Brazil I avoided him as much as I could".

186.    Ms. Spottiswoode, as endorsed by Ms. Smith, defamed me as retaliating against Ms. Spottiswoode because of her initiating legal proceedings against me, most notably in Ms. Spottiswoode's prepared Congressional testimony:  "Nine months later, just before my deposition, to punish and scare me, he sued my father, who had quit the day I returned from Brazil, in secret arbitration".  Ms. Spottiswoode also stated "…Chishti is able to carry out this on-going campaign of retaliation against me, my family, and probably other victims."

187.    Ms. Spottiswoode, as endorsed by Ms. Smith, defamed me as retaliating against other individuals:  "…Chishti is able to carry out this on-going campaign of retaliation against me, my family, and probably other victims".

188.    Exhibit B details and refutes several defamatory statements giving rise to this cause of action.

189.    Ms. Smith's defamations on Twitter and in *The Telegraph* were devastating.  They have caused the loss of all my executive positions together with their attendant income and caused the value of companies affiliated with me to fall by approximately $1 billion.  They have damaged my reputation to the point that it is unlikely that I will ever again be able to gain meaningful employment, build and take public another company as I have done four

times in my career, or enter public service which I have long hoped to do.  I struggle to sleep

at night, and I am consumed with anxiety by day.

190.   Ms. Smith was malicious and reckless in her defamation of me.  As counsel to Ms.

Spottiswoode, she either knew or should have known that the facts belie her narrative.

Indeed, she was so afraid of the subsequent emergence of the actual narrative, that she

attempted to blackmail me into silence.  She nevertheless undertook her defamation to

successfully accomplish her objectives:  to advance her own credentials as a champion of

victims' rights, and to extricate Ms. Spottiswoode's father from an arbitration that he was

undergoing with The Resource Group, where I served as Chairman.

191.   Ms. Smith was acting as an agent for Ms. Spottiswoode and as a result Ms. Smith and Ms.

Spottiswoode are jointly and severally liable for the malicious and intentional defamation in

this First Cause of Action.

192.   As a result of the Defendant Smiths' and Defendant Spottiswoode's conduct, I am entitled

to an award of exemplary and punitive damages against Defendants, and all costs and

expenses incurred in these proceedings.

193.   In this cause of action, I do not seek damages for injury caused to my reputation in the eyes

of readers of The Daily Telegraph, *The Sunday Telegraph*, and *https://www.telegraph.co.uk*

in England and Wales, for which I am seeking separate redress in the High Court of England

and Wales.

**Second Cause of Action**

**Libel Per Se against Defendant Smith,**

*Ms. Smith libeled me by submitting an*

*unsolicited written statement to Congress*

194.   I repeat and reallege the allegations set forth above as though fully set forth herein.

195.   On or around November 15th, 2021, Ms. Smith submitted a write-up of Ms. Spottiswoode's

proposed testimony on Ms. Smith's letterhead to the House Judiciary Committee, knowing

that it would be posted on the Committee's website and thereby reach the public.  That

document is attached as Exhibit B1.

196.   On information and belief, this submission was made and received in the District of

Columbia.

197.   Ms. Spottiswoode's subpoena did not request any proposed written testimony.  On

information and belief, Ms. Smiths' written submission was not required for any other

reason.

198.   The defamations of me that arose from Ms. Smith's written submission to Congress include

that I:

      a.   am a pedophile

      b.   assaulted Ms. Spottiswoode on at least three occasions

      c.   have assaulted other women

      d.   harassed Ms. Spottiswoode

      e.   harassed other women

    f.   sent two unwelcome rape fantasy narratives to Ms. Spottiswoode

    g.   pursued Ms. Spottiswoode despite her persistent rejection of me

    h.   retaliated against Ms. Spottiswoode for her arbitration with me

    i.   retaliated against other individuals

Defamations (a), (b), and (c) constitute crimes punishable as felonies in the District of Columbia and, as such, constitute *per se* defamation.

199. Ms. Smith's libeled me as a pedophile by writing that I arranged a trip to Deer Valley "designed to groom" Ms. Spottiswoode.  She also wrote that I told Ms. Spottiswoode that I "should have had sex with [Ms. Spottiswoode] when we first met when [she] was thirteen years old".

200. Ms. Smith libeled me as having assaulted Ms. Spottiswoode on at least four occasions when she wrote that Ms. Spottiswoode told me: "three times you have behaved inappropriately and with my explicit non-consent".  In addition, Ms. Smith's submission claimed that I assaulted Ms. Spottiswoode in Brazil: "[Chishti] beat [her] while having sex with [her].  [She] told him he was hurting [her]; he said 'good'…[She] had bruises around [her] neck that looked like [she] had been strangled, a large bump on [her] head, a black eye.  A nurse at the hospital said [she] had the symptoms of a concussion".

201. Ms. Smith libeled me as having assaulted other women when she wrote: "[Chishti] turned his attention to another 20-something female employee, also the daughter of someone Chishti called a friend.  The next morning she texted him that she felt 'violated,' that she had 'asked [him] to stop many times…[and] that [he] knew how drunk [she] was… the company did nothing to protect other Afiniti women, including me".  They also wrote:

"Forced arbitration is the reason Chishti is able to carry out this on-going campaign of retaliation against… other victims".

202. Ms. Smith libeled me as harassing Ms. Spottiswoode:  "Chishti was not willing to treat [Ms. Spottiswoode]  like an employee… he oscillated between pressuring [her] for sex and punishing [her].  When [she] rebuffed him, he humiliated [her] in front of co-workers and then ignored [her] completely, causing [her] to fear for [her] job… He was very angry and refused to speak to or acknowledge [her] for months… he put his hands inside [her] pants and grabbed [her] butt in front of co-workers… he had power over [her] life and career… [She] explained that she didn't want to have sex with him in as many different ways as possible.  [She] said it in person, but [she] also wrote it in texts and emails.  [She] reminded him in almost every interaction [they] had… He repeatedly got angry with [her] for rejecting his advances… Chishti became more hostile… Chishti's suggestions became more and more violent… he sent [her] two pornographic emails describing his rape fantasy… [She] was stunned horrified and tried to ignore them… [She] avoided him as much as [she] could, but was under increasing pressure from him… [She] began to worry that… Chishti wanted to hurt her and punish her for rejecting him".  Ms. Smith further wrote "In May 2019, the arbitrator in [Ms. Spottiswoode's] case ruled that [she] had been sexually harassed… by Chishti".

203. Ms. Smith libeled me as harassing other women, writing:  "[Chishti] turned his attention to another 20-something female employee, also the daughter of someone Chishti called a friend.  The next morning she texted him that she felt 'violated' that she had 'asked [him] to stop many times...[and] that [he] knew how drunk [she] was.'  Afiniti executives and

Chishti… later paid her a secret settlement – and the company did nothing to protect other Afiniti women, including [Ms. Spottiswoode]."

204. Ms. Smith libeled me as sending two unwelcome rape fantasies to Ms. Spottiswoode, writing: "he sent [Ms. Spottiswoode] two pornographic emails describing his rape fantasy, including strangling [her] while having sex.  [She] was stunned and horrified and tried to ignore them".

205. Ms. Smith libeled me as pursuing Ms. Spottiswoode despite her persistent rejection of me, writing:  "Chishti… invited [Ms. Spottiswoode] on a ski trip… [She] initially declined – but he insisted…. [she] rejected him then… after he persisted in pursuing [her] … [She] agreed to date him… [She] broke off the relationship… Months later… [she] signed a contract with Afiniti… Chishti… oscillated between pressuring [her] for sex and punishing [her]… [She] rebuffed him… she declined to go to Cuba with Chishti… The head of [her] office… suggested [she] avoid Chishti… Chishti made that impossible… [She] explained to him that [she] didn't want to have sex with him in as many different ways as possible.  [She] said it in person, but [she] also wrote it in texts and emails… [She] reminded him in almost every interaction [they] had… In Brazil [she] avoided him as much as [she] could".

206. Ms. Smith libeled me as retaliating against Ms. Spottiswoode because of her initiating legal proceedings against me, writing:  "Nine months later, the day before [Ms. Spottiswoode's] deposition, to punish and scare [her], he sued [her] father, who had quit the day [she] returned from Brazil, in secret arbitration".  Ms. Smith also stated "…Chishti is able to carry out this on-going campaign of retaliation against [Ms. Spottiswoode], [her] family, and probably other victims."

207. Ms. Smith libeled me as retaliating against other individuals:  "…Chishti is able to carry out this on-going campaign of retaliation against [Ms. Spottiswoode], [her] family, and probably other victims".

208. A refutation of the extensive defamations contained in Ms. Smith's submission is contained in Exhibit B.

209. Ms. Smith made her submission to Congress with deliberate malice and a reckless disregard for the truth.  As Ms. Spottiswoode's attorney she either knew or should have known that her statement was false and deliberately misleading.  She also knew that it would be irreparably harmful to me.  She nevertheless proceeded with making a submission to advance Ms. Smith's and Ms. Spottiswoode's objectives:  to be perceived as champions of victims' rights, and to extricate Ms. Spottiswoode's father from an arbitration that he was undergoing with The Resource Group, where I served as Chairman.

210. This libel of me by Ms. Smith, placed on the House Judiciary Committee's website, benefitting from an inherent endorsement of Congress, and available for ongoing world view, has been devastating.  It has caused the loss of all my executive positions together with their attendant income and caused the value of companies affiliated with me to fall by approximately one billion dollars.  My reputation has been damaged to the point that it is unlikely that I will ever again be able to gain meaningful employment, build and take public another company as I have four times done in my career, or enter public service which I have long hoped to do.  I struggle to sleep at night, and I am consumed with anxiety by day.

211.   As a result of the Defendants' conduct, in addition to compensatory damages I am entitled to an award of exemplary and punitive damages against Defendants, and all costs and expenses incurred in these proceedings.

**Third Cause of Action**

**Libel Per Se and Slander Per Se against**

**Defendant T. Spottiswoode and Defendant Smith**

*Ms. Spottiswoode and Ms. Smith acted with deliberate malice*

*and reckless disregard for the truth in their conversations with the staff*

*of the House Judiciary Committee while pursuing a Congressional subpoena*

212.   I repeat and reallege the allegations set forth above as though fully set forth herein.

213.   On information and belief, some time prior to the Congressional subpoena being issued, Ms. Smith and Ms. Spottiswoode engaged in a series of unsolicited communications with Congressional staffers and other intermediaries in an attempt to solicit a Congressional subpoena.

214.   On information and belief, these conversations continued after the subpoena was issued even though they were not required by the subpoena.

215.   On information and belief, those conversations came to include discussion of Ms. Smith's proposed testimony for Ms. Spottiswoode and the substance included in it that Ms. Smith ultimately submitted.

216.    On information and belief, during those conversations Ms. Smith and Ms. Spottiswoode

provided false information about me – which they knew to be untrue – under the guise of it

being factual that:

    **a.** An arbitrator had determined that I had sexually assaulted Ms. Spottiswoode.

    **b.** I had raped Ms. Spottiswoode.

    **c.** I intended to murder Ms. Spottiswoode.

    **d.** I attacked Ms. Spottiswoode with an intent to murder her.

    **e.** I am a pedophile.

    **f.** I assaulted Ms. Spottiswoode on at least three occasions.

    **g.** I have assaulted other women.

    **h.** I am a criminal.

    **i.** I sent two unwelcome rape fantasies to Ms. Spottiswoode.

    **j.** I pursued Ms. Spottiswoode despite her persistent rejection of me.

    **k.** I retaliated against Ms. Spottiswoode by initiating an arbitration against her

    father.

    **l.** I had treated others the way Ms. Spottiswoode was falsely accusing me of

    treating her.

217.    On information and belief, these defamatory statements were made with deliberate malice

and a reckless disregard for the truth.  Their true purpose was not to assist legislative

reform as Ms. Spottiswoode and Ms. Smith portrayed.  Instead, Ms. Spottiswoode's and Ms.

Smith's actual intentions were to portray themselves as champions of victims' rights, to

create leverage to extricate Mr. Spottiswoode from his arbitration with The Resource

Group, to make money.  And, in doing so, to destroy my reputation, my career, my financial position, and my psychological well-being, and to leave me crippled and unable to respond.

218. Ms. Smith's and Ms. Spottiswoode's defamatory communications individually and collectively prejudiced the Congressional staff to whom I reached out on the eve of Ms. Spottiswoode's oral testimony.  As a result, the staff refused to even consider – let alone solicit, as natural justice would demand – any evidence from me that would establish the falsity of Ms. Spottiswoode's narrative.  The reputational harm Ms. Spottiswoode and Ms. Smith caused with respect to the Congressional staff involved with this situation precluded me from having any meaningful chance to correct the false record Ms. Spottiswoode ultimately created with her testimony.

219. Additionally, these defamatory statements inflamed Congress and created the circumstances for Congress to subpoena Ms. Spottiswoode and ultimately provide her with a global stage on which to accuse me of heinous conduct.

220. These defamations of me by Ms. Smith and Ms. Spottiswoode, resulting in Congress giving Ms. Spottiswoode an unrebutted global stage for her accusations and an inherent Congressional endorsement, has been devastating.  It has caused the loss of all my executive positions together with their attendant income and caused the value of companies affiliated with me to fall by approximately one billion dollars.  My reputation has been damaged to the point that it is unlikely that I will ever again be able to gain meaningful employment, build and take public another company, or enter public service.  I struggle to sleep at night, and I am consumed with anxiety by day.

221.   As a result of Defendants' conduct, in addition to compensatory damages I am entitled to an award of exemplary and punitive damages against Defendants, and all costs and expenses incurred in these proceedings.

**Fourth Cause of Action**

**Abuse of Process Against**

**Defendant T. Spottiswoode and Defendant Smith**

*The Defendants abused Congress's legislative process*

*to damage me and advance their interests*

222.   I repeat and reallege the allegations set forth above as though fully set forth herein.

223.   Upon information and belief, in or around July 2021 Defendants approached Congress in the District of Columbia with the intention of seeking a subpoena for Ms. Spottiswoode that would allow her to breach her confidentiality obligations to me and would allow her to defame me.  In Defendants' scheme, a Congressional subpoena would provide a privilege defense against claims arising from defamation and would "trump" any confidentiality obligations of Ms. Spottiswoode to me.

224.   Indeed, on 27 July 2022 Ms. Smith brazenly advertised this strategy by tweeting from her handle @nancyerikasmith "Hey @AOC @RepRaskin @RashidaTlaib @CoriBush & @RepMaloney – a subpoena would trump any NDAs these employees have signed.  It's how we were able to expose Zia Chishti's horrific behavior at the top of Afiniti.  Reach out if you

have any questions!"  Ms. Smith targeted this tweet at five members of Congress, all

located in the District of Columbia.

225.    On information and belief, Defendants lied to and misled Congress in their seeking of such a

subpoena.

226.    On information and belief, based on Defendants' lies and deceptions, Congress issued such

a subpoena to Ms. Spottiswoode, whereunder Ms. Spottiswoode defamed me on a global

stage and violated her confidentiality obligations to me.

227.    On information and belief, while Ms. Spottiswoode's blatant defamations amounted to

perjury, Defendants calculated that in the present cultural environment Congress would not

challenge the veracity of her account and would not seek to proceed with charges of perjury

even if the truth emerged.

228.    Defendants' claimed motive of assisting Congress's legislative agenda was a sham to cover

Defendants' true ulterior motives:  to punish me, advance their financial interests, extricate

Ms. Spottiswoode's father from litigation, and credential themselves as champions for

victims of sexual harassment and assault.

229.    Ms. Spottiswoode's lies, given global stage by Defendant's abuse of the subpoena process,

have caused me financial, reputational, and psychological harm.  Defendant's conduct has

caused me the loss of all my executive positions together with their attendant income and

caused the value of companies affiliated with me to fall by approximately one billion dollars.

My reputation has been damaged to the point that it is unlikely that I will ever again be able

to gain meaningful employment, build and take public another company, or enter public

service.  I struggle to sleep at night, and I am consumed with anxiety by day.

230. As a result of such conduct, in addition to compensatory damages I am entitled to an award of exemplary and punitive damages against Defendants, and all costs, expenses, and attorney's fees incurred in this litigation by me.

231.



232.

233.

REDACTED

234.

**235.**



REDACTED

**236.**

**237.**

238.

239.

240.



REDACTED

241.

**242.**



REDACTED

**243.**

**244.**

**245.**

**246.**

**247.**

REDACTED

**248.**

249.

250.

251.

252.

REDACTED

253.

254.

**255.**

**256.**



REDACTED

**257.**

**258.**

259.

260.

261.

262.



REDACTED

263.

264.

265.

**266.**

**267.**

**268.**



REDACTED

**269.**



**270.**

**271.**

REDACTED

**272.**

**273.**

**274.**

275.

276.

REDACTED

277.

278.

**279.**

**280.**

**281.**



REDACTED

**282.**

**283.**

REDACTED

### Eleventh Cause of Action

### Tortious Interference Against

### Defendant T. Spottiswoode and Defendant Smith

*Ms. Spottiswoode and Ms. Smith interfered with my business relationships*

*by leveraging Ms. Spottiswoode's Congressional testimony*

284.  I repeat and reallege the allegations set forth above as though fully set forth herein.

285.  In November 2021, I possessed valid employment contracts with both The Resource Group and Afiniti.  Both these contracts provided for a choice of law and choice of venue of the District of Columbia.

286.  Ms. Spottiswoode and Ms. Smith repeated and amplified Ms. Spottiswoode's Congressional testimony and used it to bring pressure to bear on the clients of Afiniti and on clients of Ibex, a portfolio company of The Resource Group, to sever their contractual relationships if Afiniti or The Resource Group maintained a contractual employment relationship with me. Evidence of this tortious interference is attached as Exhibit D.

287.  As a result, given public and client outrage, to avoid business collapse I was forced to resign my contractual positions with The Resource Group and Afiniti.

288.    This tortious interference was deliberate and malicious.  It was designed to extricate Ms.

Spottiswoode's father from his ongoing arbitration against The Resource Group, and to

create credentials for Ms. Spottiswoode and Ms. Smith as champions of legislative reform

and victims' rights.  Ms. Spottiswoode and Ms. Smith were fully aware that this interference

would be devastating to me.

289.    By tortiously interfering with my contracts, Ms. Spottiswoode has caused me financial,

reputational, and psychological harm.  It has caused the loss of all my executive positions

together with their attendant income and contributed towards the value of companies

affiliated with me falling by approximately one billion dollars.  My reputation has been

damaged to the point that it is unlikely that I will ever again be able to gain meaningful

employment, build and take public another company, or enter public service.  I struggle to

sleep at night, and I am consumed with anxiety by day.

290.    As a result of such conduct, in addition to compensatory damages I am entitled to an award

of exemplary and punitive damages against Defendants Ms. Smith and Ms. Spottiswoode,

and all costs and expenses incurred in this litigation by me.

**Twelfth Cause of Action**

**Loss of Consortium Against**

**Defendant T. Spottiswoode, Defendant Smith,**

**Defendant J. Spottiswoode, and Defendant Johnson**

*Ms. Spottiswoode and her conspirators*

*harmed my relationship with my wife*

291.   I repeat and reallege the allegations set forth above as though fully set forth herein.

292.   I married my wife, Ms. Sarah Pobereskin, in December 2020.  We were happily married through November 2021 and welcomed our first child in August 2022.  My wife is the plaintiff in this claim.

293.   On information and belief, Ms. Spottiswoode, Mr. Spottiswoode, Ms. Smith, and Mr. Johnson conspired in 2021 to:

   a.   Breach Ms. Spottiswoode's confidentiality obligations to me.

   b.   Defame, libel, slander, and cast me in false light as a potential murderer, rapist, and pedophile, amongst other horrific allegations of criminality and misconduct. A portion of the worldwide audience that received these defamations was in the District of Columbia.

   c.   Tortiously interfere with my employment contracts with The Resource Group and with Afiniti and have them sever their employment agreements with me. Both employment agreements had a choice of law and a choice of venue of the District of Columbia.

    **d.**   Severely harm me emotionally to a degree that I would not be able to respond to Ms. Spottiswoode's and her conspirators' attacks on me.

    **e.**   Extort The Resource Group to achieve a large payment to Mr. Spottiswoode.

    **f.**   Blackmail me into silence with threats of exposure of photographs that, absent context, would indicate that I am violent assaulter.

**294.**   As a direct result of these deliberate and malicious acts by Defendants, I have been deeply psychologically injured.  My wife and I daily relive Defendants' libels and slanders against me delivered on a global stage including that I am a rapist, a pedophile, a sexual predator, and a potential murderer.  We live in fear of further attacks and defamations by Defendants, and have lost many of our former friends and social circle.  As a result, I cannot provide the same physical and emotional enjoyment to my wife that I was able to prior to Defendants' actions, and I am disabled in my ability to care for our infant son.  Accordingly, my wife suffers tremendously in the enjoyment of our marriage.

**295.**   As a result of such conduct, in addition to compensatory damages to be proven at trial, my wife is entitled to an award of exemplary and punitive damages against Defendants and all costs, and expenses incurred in this litigation by her.

**Thirteenth Cause of Action**

**Intentional Infliction of Emotional Distress Against**

**Defendant T. Spottiswoode, Defendant Smith,**

**Defendant J. Spottiswoode, Defendant Johnson**

*Ms. Spottiswoode and her conspirators sought to harm me emotionally*

296.   I repeat and reallege the allegations set forth above as though fully set forth herein.

297.   On information and belief, a central component of Ms. Spottiswoode's and her conspirators' strategy to extricate Mr. Spottiswoode from his arbitration, to credential themselves as a champion of victims' rights, and to make money was to cause me such crippling psychological harm that I would be in a state of emotional collapse and unable to respond to their attacks on me.

298.   Ms. Spottiswoode and her conspirators were successful in doing so.  For many months after their attack, with my career ruined, my reputation destroyed, facing financial ruin, and isolated from my former social circle, I was in a state of extreme emotional distress, requiring medication to sleep for even brief periods, and incapable of the difficult thinking and trying action required to respond to Ms. Spottiswoode's and her conspirators' conduct. I have still not recovered from Ms. Spottiswoode's and her conspirator's emotional assault.

299.   To achieve this goal, Ms. Spottiswoode acted in an extreme manner that shocks the conscience.  First, she and her conspirators planned and executed a premeditated strategy to lie under oath to the Congress of the United States of America and tell a tale that would destroy my reputation and professional prospects, portray Ms. Spottiswoode as an innocent

victim, and elevate Ms. Spottiswoode and Ms. Smith as champions of victims of harassment and supporters of associated legislative reform.

300.  Second, Ms. Spottiswoode and her conspirators chose the most heinous crimes possible with which to besmirch my reputation.  Under their narrative, I attacked Ms. Spottiswoode with intent to murder, I am a rapist, and I am a pedophile.  Shy of my actually succeeding in my alleged murderous intent, these are the three most horrific crimes an individual can be accused of.

301.  Third, Ms. Spottiswoode and her conspirators sought to destroy my sources of income by repeating their lies with customers of mine in order to force my resignation from my two employers.

302.  Fourth, Ms. Smith brazenly trumpeted this strategy to the world, and sought to solicit further clients for her services as an attorney based on what she had accomplished in attacking and destroying me.

303.  Because of the immediate and crushing psychological harm done to me by Defendants, I was unable to respond with sufficient speed and efficacy to their attacks on me in November and December of 2021 to be able to mitigate the harm they were causing me. This has caused me the loss of all my executive positions together with their attendant income and caused the value of companies affiliated with me to fall by approximately one billion dollars.  My reputation has been damaged to the point that it is unlikely that I will ever again be able to gain meaningful employment, build and take public another company, or enter public service.  I struggle to sleep at night, and I am consumed with anxiety by day.

304.   As a direct result of these deliberate and malicious acts by Defendants, I continue to suffer from extreme anxiety and stress.  I still require medication to control my anxiety and stress, and I rarely am able to sleep a full night without waking up in panic with a racing pulse.  I struggle with anxiety and exhaustion during the day, and my daily ability to function has been severely impaired.

305.   As a result of such conduct by Defendants, in addition to compensatory damages to be proven at trial, I am entitled to an award of exemplary and punitive damages against Defendants and all costs and expenses incurred in this litigation by me.

**Fourteenth Cause of Action**

**Conspiracy Against**

**Defendant T. Spottiswoode, Defendant Smith,**

**Defendant J. Spottiswoode, Defendant Johnson**

*The Defendants conspired to defame me, breach Ms. Spottiswoode's contracts with me, interfere with my business relationships, ruin me financially, and emotionally damage me*

306.   I repeat and reallege the allegations set forth above as though fully set forth herein.

307.   On information and belief, on or around the summer of 2020 Ms. Spottiswoode, Mr. Spottiswoode and their respective attorneys Ms. Smith and Mr. Johnson conspired to develop and execute a plan designed to:

   a.   Have Ms. Spottiswoode and Ms. Smith lie to the United States Congress with an aim to defaming me by labelling me as a potential murderer, rapist, and pedophile.  These lies were to be told to Congressional staff in the District of

Columbia and in a live and televised hearing in front of the United States House Judiciary Committee in the District of Columbia.

**b.** Breach Ms. Spottiswoode's contract with me to selectively reveal information from Ms. Spottiswoode's and my confidential arbitration that was designed to reinforce and amplify their defamations against me, including falsely implying that I had harassed and assaulted other women and that I had sexually assaulted Ms. Spottiswoode.  Ms. Spottiswoode and my contract has a choice of law and venue which is the District of Columbia.

**c.** Tortiously interfere with my contracts with The Resource Group and Afiniti by publishing defamatory material against me in the press implying that I was a potential murderer, rapist and pedophile, and challenging clients of mine to cease doing business with me, such that I would lose my employment and suffer financial harm.  Both The Resource Group and Afiniti are headquartered in the District of Columbia and my contracts with them have a choice of venue and law which is the District of Columbia.

**d.** Extricate Mr. Spottiswoode from his arbitration with The Resource Group.

**e.** Extort money from The Resource Group by forcing a favorable settlement of Mr. Spottiswoode's arbitration, failing which Ms. Spottiswoode and her conspirators would maintain a public broadside of false and defamatory content against The Resource Group and its affiliated companies.

      **f.** Establish Ms. Smith's and Ms. Spottiswoode's credentials as champions of

           victim's rights and legislative reform, which Ms. Smith and Ms. Spottiswoode

           would also subsequently use for social standing and financial gain.

308. On information and belief, this conduct was deliberate, malevolent, and recklessly harmful.

    Ms. Spottiswoode and her conspirators knew that what they were doing was wrong and, if

    their conduct came to light, that it would shock the conscience.  In order to keep me from

    responding, as described elsewhere in this complaint, Ms. Spottiswoode and her

    conspirators sought to cripple me psychologically, ruin me financially, and blackmail me into

    silence.

309. Defendants' conspiracy has caused me financial, reputational, and psychological harm.  This

    has caused me the loss of all my executive positions together with their attendant income

    and caused the value of companies affiliated with me to fall by approximately one billion

    dollars.  My reputation has been damaged to the point that it is unlikely that I will ever

    again be able to gain meaningful employment, build and take public another company, or

    enter public service.  I struggle to sleep at night, and I am consumed with anxiety by day.

310. Because of Defendants' conspiracy, each of the Defendants is jointly and severally liable for

    each of the causes of action in this complaint.

311. As a result of such conduct, in addition to compensatory damages I am entitled to an award

    of exemplary and punitive damages against Defendants, and all costs, expenses, and

    attorney's fees incurred in this litigation by me.

312. REDACTED

313.

314.



REDACTED

315.

316.

**317.** [redacted]

**318.** [redacted]

**319.** [redacted]

REDACTED

[redacted]

**320.** [redacted]

**321.** [redacted]

**322.**

**323.**

REDACTED

**324.**

**325.**

**RELIEF SOUGHT**

326.    My wife and I seek compensatory damages in excess of $500 million including for direct

financial losses, future financial losses, harm to my reputation, psychological harm to me,

and harm to my wife's enjoyment of our marriage.  My wife and I seek further punitive

damages as the court may allow.  We also seek an injunction requiring Defendants to cease

making further false and damaging statements about me, cease further violations of Ms.

Spottiswoode's confidentiality obligations, and cease their further tortious interference

with my various commercial contracts.


Respectfully submitted on 11th November 2022,


/s/                                                    /s/
_____                   _____
Zia Chishti                                         Sarah Pobereskin


100 Paseo de Colon, Suite 9024186, San Juan, PR 00901
(207) 288-7881
chishti.legal@gmail.com

*Pro Se Plaintiffs*