## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ———————————————————— ) | |
| ZIA CHISHTI, *et al.*,  ) | |
|  ) | |
| Plaintiffs,  ) | |
|  ) | |
| v.  ) | Civil Action No. 22-3490 (ABJ) |
|  ) | |
| TATIANA SPOTTISWOODE, *et al.*,  ) | |
|  ) | |
| Defendants.  ) | |
| ———————————————————— ) | |

## MEMORANDUM OPINION

### BACKGROUND

Plaintiffs Zia Chishti and his wife, Sarah Pobereskin, are U.S. dual-citizen residents of Puerto Rico. Unsealed Am. Compl. [Dkt. # 112] ¶¶ 8–9 ("Am. Compl."). Until November 2021, Chishti was the chief executive officer of a technology company, Afiniti, and an executive of an investment company, The Resource Group ("TRG"). Am. Compl. ¶¶ 8, 22, 91. The complaint alleges that Chishti and an employee, defendant Tatiana Spottiswoode, engaged in a "consensual romantic relationship" that was "on-and-off" between December 2014 and January 2017 and then shortly revived between July 2017 and September 2017. Am. Compl. ¶¶ 15, 22, 41. The relationship allegedly ended in early October 2017, when a lawyer for Spottiswoode, Michael Zweig, contacted Chishti and Afiniti on Spottiswoode's behalf to lodge claims of sexual harassment and assault. Am. Compl. ¶¶ 58, 61.

Spottiswoode's father, James Spottiswoode, was a longtime associate of Chishti's who worked as TRG's chief scientist. Am. Compl. ¶ 65. Spottiswoode joined Afiniti as an employee in April 2016, and her employment agreement contained a compulsory arbitration clause

governing claims of workplace misconduct.   Am. Compl. ¶ 22–24; Spottiswoode Employment

Agreement, Ex. A to Am. Compl. [Dkt. # 112-1] ("Spottiswoode Employment Agreement") at 8–

9.   On December 11, 2017, Afiniti and Chishti initiated an arbitration against Spottiswoode in the

American Arbitration Association ("AAA") Employment Arbitration Tribunal to adjudicate her

claims.   Am. Compl. ¶¶ 63–64.

The assigned arbitrator, Ronald Birch, issued two interim orders to govern the use and

disclosure of confidential materials produced in the arbitration that are relevant here: Order

Number 3 on May 9, 2018, and Order Number 9 on August 6, 2018.   *See* Am. Compl. ¶ 174; Order

No. 3, Ex. K to Am. Compl. [Dkt. # 112-1] ("Order No. 3"); Order No. 9, Ex. B to Am. Compl.

[Dkt. # 112-1] ("Protective Order").   Order Number 3 pertained to non-disparagement and non-

disclosure agreements between the parties, and the arbitrator expressly modified those agreements

to permit Spottiswoode to "speak with her father and other immediate family members about

anything related to the case."   Order No. 3 at 2.   Order Number 9 was a protective order designed

to be "supplemental to, and in no way derogatory of" AAA confidentiality rules or "any provisions

still in effect in contracts between the parties."   Protective Order ¶ 1.   The Protective Order

provided that, "[i]n the event of a conflict between the requirements of this Protective Order and

any of those provisions, the more stringent requirements shall hold."   *Id.*

Following discovery and a two-week hearing, on April 19, 2019, the arbitrator issued a 27-

page final award ("Award") in Spottiswoode's favor.   *See* Support Documents – A Document from

the American Arbitration Association in Case No. 01-17-0007-4093, in *Undue Influence:*

*'Operation Higher Court' and Politicking at SCOTUS: Hearing Before the House Comm. on the*

*Judiciary* (added Dec. 17, 2022), available at https://perma.cc/FE7F-7YZB.[1]  Chishti did not seek to vacate or otherwise modify the Award under any of the avenues available to him.  *See* Am. Compl. ¶ 282.[2]

Two years later, in July 2021, the United States House of Representatives introduced a bill entitled "Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act of 2021."  H.R. 4445, 117th Cong. (2022) (enacted).   In furtherance of the legislation, the House Judiciary Committee scheduled a hearing for November 16, 2021 entitled "Silenced: How Forced Arbitration Keeps Victims of Sexual Violence and Sexual Harassment in the Shadows."  *See Silenced: How Forced Arbitration Keeps Victims of Sexual Violence and Sexual Harassment in the Shadows*: *Hearing on H.R. 4445 Before the H. Comm. on the Judiciary*, 117th Cong. (2022). The Committee subpoenaed Spottiswoode to testify at the hearing, Am. Compl. ¶¶ 74–75, 81; *see* Ex. C to Am. Compl. [Dkt. # 112-1] ("Spottiswoode Subpoena"), and Spottiswoode provided an advance copy of her written testimony to the Committee on November 15, 2021.  Am. Compl. ¶ 76; *see also* Written Testimony of Tatiana Spottiswoode, Ex. D to Am. Compl. [Dkt. # 112-1] ("Spottiswoode Written Testimony").  Chishti, for his part, contacted the staff of the Committee

---

1    Since the document has been made public in the Congressional Record, the Court may take judicial notice of it for purposes of establishing the existence and outcome of the arbitration.  *See Hurd v. D.C., Gov't*, 864 F.3d 671, 686 (D.C. Cir. 2017).

2    James Spottiswoode resigned from TRG in the wake of his daughter's accusations.  Am. Compl. ¶ 65.  In September 2018, during the course of Spottiswoode's arbitration, TRG commenced separate arbitration against James Spottiswoode for allegedly stealing trade secrets and confidential information when he departed.  Am. Compl. ¶ 66.  Spottiswoode perceived the initiation of arbitration against her father as retaliation for her own allegations of misconduct, and she filed suit with the New York City Commission on Human Rights ("NYCCHR").  Am. Compl. ¶ 68.  That suit was closed for administrative cause in August 2020.  *See* Notice of Administrative Closure, Ex. 2 to Decl. of Tatianna Spottiswoode [Dkt. # 74-2] at 7.

in advance of the hearing to offer evidence and testimony that would allegedly refute Spottiswoode's account, but his offer was rejected.  Am. Compl. ¶ 78.

Plaintiffs allege that after the November 16, 2021 congressional hearing, Spottiswoode and her attorney for the hearing, Nancy Smith, "commenced a scorched earth public relations campaign aimed at reinvigorating numerous claims against Chishti," including multiple Twitter posts and statements published in the British publication *The Telegraph*.  Am. Compl. ¶¶ 83–87.  Plaintiffs argue that these statements resulted in Chishti's "forced resignation from his executive positions at Afiniti on November 18, 2021, and his executive positions at TRG on November 28, 2021."  Am. Compl. ¶ 91.  They also allege that "after [Chishti's] resignation, in December 2021, TRG opted to settle its arbitration with J. Spottiswoode by paying him money even though he had stolen relevant trade secrets from the company.  The settlement was intended to halt Spottiswoode's and Smith's ongoing media barrage against the company itself."  Am. Compl. ¶ 92.

Over a year later, on December 5, 2022, Chishti wrote a letter to Representative David Cicilline, in which Chishti asked the congressman to cease repeating "false claims made by Ms. Spottiswoode."  Letter from Zia Chishti to Rep. David Cicilline, Ex. J to Am. Compl. [Dkt. # 112-1] ("Chishti Letter") at 61.  Chishti admonished Cicilline in the letter that he was "certain that you yourself have not reviewed the underlying evidence and voluminous communications between Ms. Spottiswoode and myself that belie her narrative."  *Id.*  Thereafter, on December 17, 2022, Chairman Jerrold Nadler of the House Judiciary Committee wrote a letter to Spottiswoode advising her that Chishti had "accused the Committee of not reviewing the underlying evidence of your claim" and requesting a copy of the Award.  Letter from Jerrold Nadler to Tatiana Spottiswoode, Ex. I to Am. Compl. [Dkt. # 112-1] ("Nadler Letter") at 58.  Spottiswoode, through her lawyer,

provided a copy of the Award to Nadler in response to the congressional request, and it was entered into the Congressional Record as part of a separate, unrelated hearing.  Am. Compl. ¶ 96.

On November 13, 2022, plaintiffs filed a complaint against defendants Spottiswoode, her attorneys Zweig and Smith, James Spottiswoode and his attorney, Edward Johnson, and various John Does, individually and collectively.  *See generally* Compl. [Dkt. # 1].  Plaintiffs thereafter filed an amended complaint under seal, naming only Spottiswoode, Zweig, Smith, and various John Does as defendants, *see* Sealed Am. Compl. [Dkt. # 55], which the Court unsealed on May 30, 2024.  *See* Min. Order (May 30, 2024).  The amended complaint alleges a total of eight counts: (1) defamation, (2) false light, (3) breach of contract, (4) tortious interference with contractual relations, (5) abuse of process, (6) intentional infliction of emotional distress, (7) conspiracy, and (8) loss of consortium.  *See* Unsealed Am. Compl. [Dkt # 112] ("Am. Compl.") ¶¶ 105, 164, 179, 208–09, 251, 269, 274, 311–16.  Plaintiffs seek compensatory and punitive damages, declarative relief, injunctive relief, and a rescission of the April 2019 arbitral award between Chishti and Spottiswoode.  Am. Compl. at 90–91.

Defendants Spottiswoode, Smith, and Zweig have each moved to dismiss the amended complaint.  *See* Def. Nancy Erika Smith's Mot. to Dismiss Am. Compl. [Dkt. # 73]; Mem. of Law of Def. Nancy Erika Smith in Supp. of Mot. to Dismiss First Am. Compl. [Dkt. # 73-1] ("Smith Mot."); Def. Tatiana Spottiswoode's Mot. to Dismiss Am. Compl. [Dkt. # 74]; Mem. of Law of Def. Tatiana Spottiswoode in Supp. of Mot. to Dismiss First Am. Compl. [Dkt. # 74-1] ("Spottiswoode Mot."); Def. Michael Zweig's Mot. to Dismiss Am. Compl. [Dkt. # 75]; Mem. of Law of Def. Michael Zweig in Supp. of Mot. to Dismiss First Am. Compl. [Dkt. # 75-1] ("Zweig Mot.").  Chishti and Pobereskin oppose each motion, *see* Pls.' Opp. to Zweig Mot. [Dkt. # 81] ("Opp. to Zweig"); Pls.' Opp. to Smith Mot. [Dkt. # 82] ("Opp. to Smith"); Pls.' Opp. to

Spottiswoode Mot. [Dkt. # 83] ("Opp. to Spottiswoode"), and the matter is fully briefed.  *See* Def. Smith's Reply in Supp. of Mot. to Dismiss [Dkt. # 95] ("Smith Reply"); Def. Spottiswoode's Reply in Supp. of Mot. to Dismiss [Dkt. # 96] ("Spottiswoode Reply"); Def. Zweig's Reply in Supp. of Mot. to Dismiss [Dkt. # 97] ("Zweig Reply").

Defendants' motions will be granted.  Plaintiffs' request for recission of the arbitral award on page 91 of the amended complaint is telling; at bottom, this unnecessarily prolix and sensational pleading, which does not begin to comply with the strictures of Federal Rule of Civil Procedure 8(a)(2), is a not-so-thinly veiled attempt to undo the outcome of an arbitration that rejected Chishti's account of events and ruled in Spottiswoode's favor.  The first complaint filed by Chishti was so lengthy, salacious, and inappropriate that the Court struck it and ordered that it be amended, *see* Order [Dkt. # 31], and plaintiffs have not found a legal basis for relief the second time around. Indeed, they attempted to prosecute this action attacking the arbitral award while barring defendants from referring to the very arbitral award plaintiffs seek to undermine.  *See* Pls.' Mot. in Limine to Preclude Use of the Award [Dkt. # 42] ("Mot. in Limine").[3]  After a lengthy period of unduly contentious litigation, and upon review of the amended complaint and all of the parties' submissions, the amended complaint will be dismissed.

## STANDARD OF REVIEW

In evaluating a motion to dismiss under either Rule 12(b)(1) or 12(b)(6), the Court must "treat the complaint's factual allegations as true and must grant plaintiff 'the benefit of all

---

[3]    Since this opinion does not rely upon information in the Award in order to rule on the pending motions to dismiss, the motion in limine can be **DENIED** as moot.  The Court will also address the merits of plaintiffs' claim in Count Three that the Protective Order was violated in Section II of its opinion below.  Plaintiffs sought to prohibit any reference to the contents of the Award on the grounds that defendants had breached the terms of the Protective Order.

inferences that can be derived from the facts alleged.'" *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000) (citations omitted), quoting *Schuler v. United States*, 617 F.2d 605, 608 (D.C. Cir. 1979); *see also Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011), quoting *Thomas v. Principi*, 394 F.3d 970, 972 (D.C. Cir. 2005) (applying principle to a Rule 12(b)(1) motion).   Nevertheless, the Court need not accept inferences drawn by the plaintiff if those inferences are unsupported by facts alleged in the complaint, nor must the Court accept plaintiff's legal conclusions.  *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002) (rule 12(b)(6) case); *Food & Water Watch, Inc. v. Vilsack* , 808 F.3d 905, 913 (D.C. Cir. 2015) (rule 12(b)(1) case).

## Subject Matter Jurisdiction

Under Rule 12(b)(1), the plaintiff bears the burden of establishing jurisdiction by a preponderance of the evidence.  *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992); *Shekoyan v. Sibley Int'l Corp.*, 217 F. Supp. 2d 59, 63 (D.D.C. 2002).  Federal courts are courts of limited jurisdiction, and the law presumes that "a cause lies outside this limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994); *see also Gen. Motors Corp. v. EPA*, 363 F.3d 442, 448 (D.C. Cir. 2004) ("As a court of limited jurisdiction, we begin, and end, with an examination of our jurisdiction.").  "[B]ecause subject-matter jurisdiction is 'an Art[icle] III as well as a statutory requirement . . . no action of the parties can confer subject-matter jurisdiction upon a federal court.'"  *Akinseye v. District of Columbia*, 339 F.3d 970, 971 (D.C. Cir. 2003), quoting *Ins. Corp. of Ir., Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982).

When considering a motion to dismiss for lack of jurisdiction, unlike when deciding a motion to dismiss under Rule 12(b)(6), the court "is not limited to the allegations of the complaint." *Hohri v. United States*, 782 F.2d 227, 241 (D.C. Cir. 1986), *vacated on other grounds*, 482 U.S.

64 (1987). Rather, "a court may consider such materials outside the pleadings as it deems appropriate to resolve the question [of] whether it has jurisdiction to hear the case." *Scolaro v. D.C. Bd. of Elections & Ethics*, 104 F. Supp. 2d 18, 22 (D.D.C. 2000), citing *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992); *see also Jerome Stevens Pharms.*, *Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005).

### Failure to State a Claim

"To survive a [Rule 12(b)(6)] motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In *Iqbal*, the Supreme Court reiterated the two principles underlying its decision in *Twombly*: "First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions," and "[s]econd, only a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 678–79, citing *Twombly*, 550 U.S. at 555–56.

A claim is facially plausible when the pleaded factual content "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678, citing *Twombly*, 550 U.S. at 556. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*, quoting *Twombly*, 550 U.S. at 556. A pleading must offer more than "labels and conclusions" or a "formulaic recitation of the elements of a cause of action," *id.*, quoting *Twombly*, 550 U.S. at 555, and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*, citing *Twombly*, 550 U.S. at 555.

When considering a motion to dismiss under Rule 12(b)(6), the Court is bound to construe a complaint liberally in the plaintiff's favor, and it should grant the plaintiff "the benefit of all

inferences that can be derived from the facts alleged." *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994), citing *Schuler*, 617 F.2d at 608.  Nevertheless, the Court need not accept inferences drawn by the plaintiff if those inferences are unsupported by facts alleged in the complaint, nor must the Court accept plaintiff's legal conclusions.  *See id.*; *see also Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002).  In ruling upon a motion to dismiss for failure to state a claim, a court may ordinarily consider only "the facts alleged in the complaint, documents attached as exhibits or incorporated by reference in the complaint, and matters about which the Court may take judicial notice." *Gustave-Schmidt v. Chao*, 226 F. Supp. 2d 191, 196 (D.D.C. 2002), citing *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624–25 (D.C. Cir. 1997).

## ANALYSIS

### I.    Defamation and False Light (Counts One and Two) [4]

In Count One of the amended complaint, Chishti alleges that Spottiswoode and her attorney in connection with the congressional proceedings, Smith, engaged in three "categories" of defamation:

- "Defamatory statements to the media and on social media platforms (Twitter) that are not protected under any arguable claims of privilege or opinion";

- "Defamatory statements to Congress, and others, both in written and oral form, that are not subject to any privilege because they have been made in bad faith and are rooted in unlawful or tortious conduct"; and

- "Defamatory statements, in the form of oral testimony, and written communication, that the Defendants themselves acknowledge are part of the *res gestae* and necessary to give context to the defamatory statements made to the media, and others."

---

4    Although the torts of defamation and false light have distinct elements, the same First Amendment protections and common law privileges apply to both, *see Weyrich v. New Republic, Inc.*, 235 F.3d 617, 627 (D.C. Cir. 2001), and the Court will analyze them together.

Am. Compl. ¶ 105.

The statements at issue consist of Spottiswoode's written and oral testimony before the House of Representatives; subsequent posts by Smith on the social media site Twitter related to Spottiswoode's testimony and allegations; statements attributed to Spottiswoode in a November 18, 2021 article published in *The Telegraph* that describe the "misogynist culture at Afiniti" and the arbitration filed against Spottiswoode's father; and statements attributed to Smith in a November 20, 2021 article published in *The Telegraph* that refer to Chishti as a "sexual predator." *See* Am. Compl. ¶¶ 81–22, 84–87, 125.  Because Spottiswoode's statements to Congress pose distinct analytical issues from the post-hearing statements made by Spottiswoode and her attorney, the Court will address them separately.

### A.    Spottiswoode is entitled to legislative immunity for her statements to Congress.

Spottiswoode argues that dismissal of Counts One and Two of the amended complaint is required because she is entitled to absolute immunity for claims of defamation or false light related to her congressional testimony.  *See* Spottiswoode Mot. § II.A.1.  The Court agrees.

The D.C. Circuit has held that the Restatement (Second) of Torts' articulation of the legislative privilege accurately "reflects" the common law of the District of Columbia.  *See Webster v. Sun Co., Inc.* ("*Webster II*"), 790 F.2d 157, 160 (D.C. Cir. 1986).  The Restatement provides:

> A witness is absolutely privileged to publish defamatory matter as part of a legislative proceeding in which [s]he is testifying or in communications preliminary to the proceeding, if the matter has some relation to the proceeding.

Restatement (Second) of Torts § 590A (1977). "The determination of whether a communication is privileged is a question of law for the court." *Arneja v. Gildar*, 541 A.2d 621, 623 (D.C. 1988) (citations omitted).

Here, Spottiswoode provided both written and oral testimony to the House Committee on the Judiciary in the context of a November 2021 hearing concerning mandatory arbitration clauses and sexual harassment, a subject of legislation pending before Congress. *See* Am. Compl. ¶ 195; Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act of 2021, H.R. 4445, 117th Cong. (2022) (enacted). Her statements detailed the treatment she allegedly suffered at the hands of Chishti in the workplace and the role of compulsory arbitration in resolving her allegations against her employer. *See* Am. Compl. ¶ 106. Such statements – delivered orally and submitted in written form in advance of the hearing as required by the Rules of the House of Representatives[5] – plainly "relat[e] to" the legislative proceeding at which they were offered. Restatement § 590A. Under a clear application of the Restatement rule, then, Spottiswoode is entitled to absolute immunity for alleged defamation, regardless of whether any given piece of information contained within the statements is, in fact, false. *Id.*

Chishti seeks to avoid the breadth of absolute legislative immunity by arguing that Spottiswoode's congressional statements were "illegitimate and made in bad faith" and, therefore,

---

5    *See* Rules of the United States House of Representatives, 117th Cong., Rule XI(2)(g)(5)(A) ("Each committee shall, to the greatest extent practicable, require witnesses who appear before it to submit in advance written statements of proposed testimony and to limit their initial presentations to the committee to brief summaries thereof.").

unprotected by the privilege.[6]  Am. Compl. ¶ 109.  His argument is rooted in the D.C. Circuit's

opinion in *Webster v. Sun Co., Inc.* ("*Webster I*"), 731 F.2d 1 (D.C. Cir. 1984).

*Webster I* involved an entity, Sun Company, that transmitted an unsolicited memorandum

to the Congressional Research Service ("CRS") allegedly disparaging the device of a competitor.

*Id.* at 2–3.  The competitor sued Sun Co. for libel after learning of Sun Co.'s communications with

Congress's research arm.  *Id.* at 3.  The district court granted summary judgment in favor of the

defendant, holding that the legislative privilege applied because the memorandum "related to"

CRS's activities.  *Id.* at 3–4.  On appeal, however, the D.C. Circuit remanded the decision based

on the nature of the communications at issue.  *Id.* at 4.

The Circuit's opinion noted that when confronting "unsolicited statements made to the

legislature or its investigative arm," as opposed to solicited statements, simply applying a

"relation-to" test would result in an overextension of the legislative privilege.  *Id.* at 5.  It held,

then, that unsolicited statements to Congress would be privileged only when two conditions were

met: "First, the communicator must show that he would not have made the unsolicited statement

but for his intention to inform the legislative body on a subject properly within its jurisdiction.

Second, the statement must have some relation to the legitimate legislative business to which it is

addressed."  *Id.*   In other words, an additional inquiry was warranted regarding whether an

---

6       Chisti includes the following allegations as evidence of "bad faith": that "[v]irtually every
sentence in the statement is demonstrably false"; that "Smith and Spottiswoode conspired to ensure
that [he] would not timely receive notice of the subpoena"; and that "Spottiswoode and Smith
mounted a press campaign to attack [him] based on [the statements] in order to unseat him from
executive positions and force a settlement of Spottiswoode's father's arbitration." Am. Compl. ¶ 110.

individual's statements were "contemplated in good faith and seriously considered to bear on potential legislative action." *Id.* at 6 (internal quotes omitted).

Chishti's reliance on *Webster I* is misplaced for multiple reasons. First, it is doubtful that the portion of the opinion he relies on remains good law. Following the *Webster I* panel's remand and a decision from the district court on the defendant's intent, the case was heard on appeal a second time. *See Webster II*, 790 F.2d. The Court of Appeals observed in its later decision "that the earlier panel's requirement of an 'intention to inform' the legislature appears to have no basis in the common law of the District of Columbia," and it expressed its "doubt that it ever should have been applied." *Id.* at 161. It instead noted that the district court's initial opinion – holding that legislative immunity attaches as long as statements to Congress are "related to" a proceeding – is "much more consistent with the majority common law approach, embodied in the Restatement, that is typically followed by the District of Columbia." *Id.* Consequently, to the extent Chishti asks this Court to focus on Spottiswoode's intent in communicating with Congress, his motion fails in light of the authority that renders the speaker's intent irrelevant to the application of the legislative privilege.

Second, even if *Webster I*'s intent requirement remains in force, it is inapposite in the context of Spottiswoode's remarks. The *Webster I* court was careful to "limit [its] definition of the privilege in this case to the context of *unsolicited statements* made to the legislature or its investigative arm." 731 F.2d at 5 (emphasis added). Spottiswoode's written and oral testimony, however, was not unsolicited; it was called for by the Judiciary Committee to aid its consideration of a bill pending before Congress, and it was ultimately backed by a congressional subpoena. *See* Spottiswoode Subpoena; Spottiswoode Written Testimony. As even the *Webster I* panel observed, in such circumstances, "an individual must feel unrestrained by potential defamation liability when

addressing the legislature. Only then can the lawmaking process be fully informed and operate with maximum effectiveness." 731 F.2d at 5.

For these reasons, those portions of Counts One and Two that pertain to Spottiswoode's communications with House Committee on the Judiciary will be dismissed.[7]

---

7  To the extent that Chishti bases his claim of defamation or false light on alleged preliminary discussions with members of Congress, that portion of the claim fails. In the amended complaint, Chishti posits it is a "likely conclusion" that "Spottiswoode and Smith reached out to Congress to solicit Congressional interest in Spottiswoode." Am. Compl. ¶ 142. Specifically, Chishti alleges that, "[o]n information and belief, in order to solicit Congressional interest in Spottiswoode's testimony Spottiswoode levelled an allegation of rape, and likely leveled some or all the allegations that she subsequently made in her subpoenaed testimony." Am. Compl. ¶ 146.

The Court need not accept Chishti's inferences as true, as he does not supply the facts to support them. Here, while it may well be possible that Spottiswoode or her lawyer communicated with the Committee concerning the prospect of future testimony, Chishti's claim that he was defamed in those conversations is not supported by its factual premise. Chishti bases this allegation entirely on the fact that a member of the House Judiciary Committee, Representative Pramila Jayapal, asked Spottiswoode a question during the hearing about the parties' interaction in Brazil. *See* Am. Compl. ¶ 144. According to Chishti, prior to Representative Jayapal's questioning, "Spottiswoode had leveled no accusation of rape in her testimony. Accordingly, it is a reasonable inference that Congresswoman Jayapal had been briefed *prior* to Spottiswoode's subpoenaed testimony by Spottiswoode and Smith as to a false accusation that Chishti had raped Spottiswoode." Am. Compl. ¶ 145.

The Court need not accept this inference, though, because the amended complaint makes it clear that Spottiswoode provided a copy of her testimony in written form to the Committee in advance of the hearing as required by the Rules of the House of Representatives. *See* Am. Compl. ¶ 106; *supra* at 11. While Spottiswoode's statement did not include the word "rape," it did state that Chishti "beat [Spottiswoode] while having sex" after she had rejected his multiple advances. Am. Compl. ¶ 106. Representative Jayapal's characterization of the events says nothing about whether she had been "briefed" in advance; it was the language she chose to use when asking about a matter presented on the record as testimony. Since Chishti does not plead any other facts to support the conclusion that he was identified or defamed in a conversation with a member of Congress prior to the hearing, there is no substance to this part of the claim.

**B.    Spottiswoode and Smith's post-hearing statements to the public.**

**1.    Spottiswoode's comments to *The Telegraph* are protected expressions of opinion and address matters of public interest.**

In response to a request from a journalist reporting for *The Telegraph* on Chishti's departure from Afiniti, Spottiswoode offered comments that appeared in a November 18, 2021 article.  The relevant portions of the article read:

> In her first public comments since her testimony to the US Congress, Ms. Spottiswoode said Afiniti should 'immediately release all employees from any NDAs or other confidentiality clauses' preventing them from speaking out, and 'release all employees and former employees from forced arbitration.'
>
>        * * *
>
> On Thursday Ms. Spottiswoode told The Telegraph: 'Everyone involved in the misogynist culture at Afiniti – there are quite a few – should be held accountable. Everyone who enabled it should be held accountable. As long as they still have forced arbitration, we can assume that this behaviour is ongoing.' Ms. Spottiswoode urged the company to drop legal action against her and her father, whom she said had been targeted in an attempt to force her to erase an arbitration ruling against Mr. Chishti. "On a personal level, the board should insist that Afiniti and Chishti pay my father for the stock they seized and for his attorneys fees and dismiss the retaliatory arbitration they filed to scare and punish me.'

James Titcomb & Lucy Burton, *Afiniti Chief Zia Chishti Forced Out One Day After Royal Friend Insisted Tech Boss Would Stay*, The Telegraph (Nov. 18, 2021), Ex. F. to Am. Compl. [Dkt. # 112-1] at 38–41.  Chisti labels these statements as defamatory, arguing that they paint him as a "misogynist" who "led a misogynist culture at Afiniti" and "falsely assert[] that Chisti had retaliated against her father and that Afiniti had seized her father's stock."  Am. Compl. ¶ 85.  Spottiswoode contends that her comments are non-actionable opinions and/or privileged commentary on matters of public interest.  Spottiswoode Mot. at 24.

As the Court of Appeals for the District of Columbia has recognized, courts "must vigilantly stand guard against even slight encroachments on the fundamental constitutional right of all citizens to speak out on public issues without fear of reprisal." *Myers v. Plan Takoma, Inc.*, 472 A.2d 44, 50 (D.C. 1983).  To this end, "[e]xpressions of opinion are entitled to constitutional protection unless they imply the existence of undisclosed defamatory facts as the basis of the opinion."  *Id.* at 47; *see also Washington v. Smith*, 80 F.3d 555, 556 (D.C. Cir. 1996).  In determining whether a statement is opinion or fact, "the court must consider whether the allegedly defamatory words are susceptible to proof of their truth or falsity," and "[s]tatements that cannot readily be proven true or false are, of course, more likely to be viewed as statements of opinion, not fact." *Myers*, 472 A.2d at 47. Moreover, "the court must consider the context in which the document containing the allegedly defamatory reference is published," recognizing that "in the course of legitimate debate over issues of public importance, offensive rhetoric on the borderline between fact and opinion is to be expected, and such statements are much more deserving of constitutional protection than similar statements made for purely private motives." *Id.* (citations omitted).

Even according plaintiffs the benefit of all inferences at this stage of the proceedings, it is clear that Spottiswoode's comments convey not facts but her own opinions, and primarily her opinions about Afiniti rather than Chishti: that Afiniti *should* release its employees from NDAs and compulsory arbitration clauses; that Afiniti employees who promote misogyny *should* be held accountable; and that Afiniti *should* pay her father for stock that was seized and dismiss the then-pending arbitration against him.  Ex. F. to Am. Compl. [Dkt. # 112-1] at 38–41.  Whether any of these events *should* happen is, of course, a matter of debate.  Spottiswoode obviously felt strongly about her preferred outcomes, but others may reasonably disagree.  In other words, her comments

16

are "[s]tatements that cannot readily be proven true or false," *Myers*, 472 A.2d at 47, and, as such, are afforded constitutional protection.

Moreover, the "fair comment" privilege "was incorporated into the common law as an affirmative defense to an action for defamation" out of "concerns that unduly burdensome defamation laws could stifle valuable public debate." *Milkovich v. Lorain J. Co.*, 497 U.S. 1, 13 (1990). "The privilege 'afford[s] legal immunity for the honest expression of opinion on matters of legitimate public interest when based upon a true or privileged statement of fact.'" *Coles v. Wash. Free Wkly., Inc.*, 881 F. Supp. 26, 32 (D.D.C. 1995), quoting *Milkovich*, 497 U.S. at 13. And "[i]n the District of Columbia, the fair comment privilege is applicable 'even if the facts upon which it [the opinion] is based are not included along with the opinion.'" *Coles*, 881 F. Supp. at 32, quoting *Fisher v. Wash. Post Co.,* 212 A.2d 335, 338 (D.C. 1965).

To the extent one can draw an inference that these statements to *The Telegraph* included "defamatory facts" about Chishti – that he is a "misogynist" who "led a misogynist culture at Afiniti," or that he "had retaliated against her father and that Afiniti had seized her father's stock," Am. Compl. ¶ 85 – they fall squarely with in the privilege. First, the characterization "misogynist" is an opinion, not a fact, and whether an action was retaliatory is also debatable. Also, Spottiswoode's testimony before the House Judiciary Committee was a matter of public interest; Chishti's claim is based on comments that appeared in a foreign media outlet reporting on the topic precisely because of the interest in the company and the matter abroad, as well as Chishti's own high-profile status.

Nor can it seriously be argued that any facts were "undisclosed" or otherwise not predicated on Spottiswoode's own prior statements. Indeed, the inference that Chishti's behavior was misogynistic permeated the entirety of Spottiswoode's testimony before the House Judiciary

Committee, and she explicitly referenced her belief that the arbitration initiated against her father was retaliatory in nature. *See* Spottiswoode Written Testimony at 3–4 ("Forced arbitration is the reason Chishti is able to carry out this on-going campaign of retaliation against me, my family, and probably other victims."). Given that the Court has found that this testimony was privileged, *see supra* § I.A, it follows that the facts upon which Spottiswoode's comments to *The Telegraph* were based had entered the public domain in a lawful manner. Her later public comments are therefore a proper subject of the fair comment privilege.

For these reasons, those portions of Counts One and Two of the amended complaint directed at Spottiswoode's comments in *The Telegraph* will be dismissed.

### 2. Smith's post-hearing statements are protected expressions of opinion and address matters of public interest.

Finally, Chishti alleges in Counts One and Two of the amended complaint that Smith, Spottiswoode's attorney in connection with the congressional hearings, defamed him in a series of tweets and statements to media outlets in the aftermath of Spottiswoode's November 2021 testimony. Am. Compl. ¶ 105. Chishti points to the following statements allegedly published by Smith from her Twitter account @nancyerikasmith:

- A November 16, 2021 tweet stating, "So proud of Tatiana Spottiswoode for her brave & powerful testimony before the House Judiciary Committee today." Am. Compl. ¶ 115;

- A November 16, 2021 tweet republishing the video of Spottiswoode's testimony and stating, "Harassers know secret corporate arbitrations will allow them to abuse women without consequences. Watch this riveting testimony & call your Representative to vote to end forced arbitration!" Am. Compl. ¶ 116;

- A November 16, 2021 tweet republishing a link from *The New York Times* and stating, "Watch powerful & poignant testimony by @tatianaspottiswoode before the House Judiciary Committee today. #EndForcedArbitration @HouseDemocrats @SmithMullin." Am. Compl. ¶ 117;

- A November 17, 2021 tweet reposting a video segment of Spottiswoode's testimony and stating, "@NYCCHR should investigate Afiniti like it investigated

18

Fox 'News.' Tatiana filed a retaliation complaint with the City when Chishti filed a retaliatory arbitration against her father."  Am. Compl. ¶ 118;

- A November 17, 2021 tweet sharing a link to the board of directors section of Afiniti's website and stating, "Someone should ask the current & former Afiniti board members what they knew about Zia Chishti's arbitration with Tatiana Spottiswoode & any other claims of harassment against Chishti." Am. Compl. ¶ 119;

- A November 17, 2021 tweet reposting without commentary an article from a publication called aajenglish.tv entitled "Former Employee testifies Afiniti Founder Zia Chishti Sexually Assaulted Her."  Am. Compl. ¶ 120;

- A November 18, 2021 tweet reposting an article from *The Guardian* and stating, "The judge of the matter – in the forum chosen by Afiniti – ruled against Chishti after 14 days of trial. There is no longer a 'dispute' about what happened. It's been decided."  Am. Compl. ¶ 122;

- A November 18, 2021 tweet reposting without commentary a *Bloomberg* article entitled "Afiniti Founder Zia Chishti Ousted After Sexual Assault Allegations." Am. Compl. ¶ 123;

- A November 19, 2021 tweet stating, "Forced arbitration enabled [Chishti]. The light of day brought him down. So proud of my client Tatiana Spottiswoode! Thank you   @RepJerryNadler  @RepCheri  @HouseJudiciary  @GretchenCarlson @julieroginsky @JusticeDotOrg."  Am. Compl. ¶ 124;

- A November 23, 2021 tweet reposting an article from pakistantoday.com.pk and stating, "Zia Chishti had it coming. But do founders (who are also significant shareholders) ever truly get shown the door?"  Am. Compl. ¶ 126;

- A November 24, 2021 tweet reposting without commentary an article from vizaca.com entitled "Zia Chishti Steps Down From His Role as CEO of AFINITI." Am. Compl. ¶ 127;

- A November 28, 2021 tweet sharing an article from *The Telegraph* entitled "Dethroned Afiniti Founder Threatened with Release Of More Alleged Abuse Photos" in which Smith was quoted, and stating, "There has already been an 'investigation.' After a period of legal discovery, Chishti's chosen judge & jury (arbitrator) in his chosen forum (secret arbitration) ruled against him after 14 days of trial, in his chosen location (DC). It's been ruled on!"  Am. Compl. ¶ 125, 129;

- A February 7, 2022 tweet reposting a video of Spottiswoode's testimony and stating, "Brave testimony from women who were silenced by forced arbitration! Let's end it! @RepJayapal @RepCheri @GretchenCarlson @JusticeDotOrg @SmithMullin."  Am. Compl. ¶ 130;

- A July 27, 2022 tweet stating, "Hey @AOC @RepRaskin @RashidaTlaib @CoriBush & @RepMaloney – a subpoena would trump any NDAs these employees have signed. It's how we were able to expose Zia Chishti's horrific behavior at the top of Afiniti. Reach out if you have any questions!"  Am. Compl. ¶ 131; and, finally,

- A January 10, 2023 reposting an article from propakistani.pk entitled "TRG Sues Former CEO Zia Chishti and His Wife."  Am. Compl. ¶ 132.

*See also* Ex. E to Am. Compl. [Dkt. # 112-1] at 31–36 (collecting screenshots of tweets).

Chishti also alleges that Smith defamed him on two occasions by providing commentary to the British publication *The Telegraph*.  The first statement reads:

> Every single sexual predator has this playbook of saying the harassment was 'welcome'. When I sued Roger Ailes on behalf of Gretchen Carlson, Ailes immediately released a "thank you" note she had written to somehow prove that she consented to his harassment. Does Chishti claim that Ms. Spottiswoode consented to being beaten? If he is going to violate the confidentiality provisions he imposed, we will answer him with additional photos and information.

Am. Compl. ¶ 125; *see also* Lucy Burton, *Dethroned Afiniti Founder Threatened with Release of More Alleged Abuse Photos*, The Telegraph (Nov. 20, 2021), Ex. G. to Am. Compl. [Dkt. # 112-1] at 43–45.  The second, appearing in an article entitled "AT&T Told To Act Over Afiniti Sex Scandal," reads:

> Customers and shareholders should assign responsibility to board members and the companies that prop up harassers and enablers. Money talks and customers have a powerful voice. I hope they use it.

Am Compl. ¶ 128; *see also* James Titcomb, *AT&T Told To Act Over Afiniti Sex Scandal*, The Telegraph (Nov. 27, 2021), Ex. H to Am. Compl. [Dkt. # 112-1] at 47–56.

Smith maintains that her statements on Twitter and to *The Telegraph* represent her opinion about Spottiswoode's sexual harassment claims and testimony before Congress, and, therefore, are not actionable in a claim for defamation.  *See* Smith Mot. at 20–22.  Chishti argues – somewhat hyperbolically – that the statements in question are factual in nature and either expressly or through

the incorporation of Spottiswoode's testimony accuse him of "criminal conduct including rape, attempted murder, and pedophilia, and other horrific conduct such as assault, harassment, and retaliation." Opp. to Smith at 8. The Court agrees with Smith.

Considered individually and collectively, Smith's comments all relate to her client's completed public testimony on a matter of public interest: she directed attention to published accounts of the testimony and characterized it as "brave," which is a matter of opinion; she expressed her opinion about the merits of forced arbitration in light of her client's testimony and the public facts of her client's previous arbitration; she expressed her belief about the obligations owed by corporate directors and shareholders to victims of sexual harassment in general; and she articulated her client's position in the news media in response to journalistic inquiries. These statements within the context of legal advocacy – along with some self-promotion – are mere expressions of opinion that fall plainly within the fair comment privilege and, as such, are not actionable as a matter of law. *See Coles*, 881 F. Supp. at 32, quoting *Milkovich*, 497 U.S. at 13. Therefore, Chishti's claims in Counts One and Two of the amended complaint will be dismissed.

## II.    Breach of Contract (Count Three)

In Count Three of the amended complaint, Chishti alleges that defendants Spottiswoode, Smith, and Zweig breached the terms of the Protective Order and therefore committed breach of contract.

With respect to defendants Spottiswoode and Smith, Chishti alleges that they violated the Protective Order "on at least four occasions," Am. Compl. ¶ 179, including:

- By providing a copy of the arbitral award to Representative Nadler on December 17, 2022. Am. Compl. ¶¶ 180–82;

- By revealing in Spottiswoode's November 2021 oral testimony to Congress protected confidential information learned during arbitration, specifically the information that another Afiniti employee allegedly experienced comparable

treatment by Chishti, as well as the fact and disposition of arbitration between Spottiswoode, Chishti, and Afiniti. Am. Compl. ¶¶ 183–85;

- By revealing the same confidential information in Spottiswoode's earlier written statement to Congress. Am. Compl. ¶¶ 193–94; and

- By revealing the "existence of the arbitration, its award, and its award's contents to Congress" at an unknown date prior to November 15, 2021, although Chishti frames this alleged breach as a "reasonable inference" because "Congress is highly unlikely to have reached out to Spottiswoode" to testify without such a disclosure. Am. Compl. ¶ 195.

With respect to defendants Spottiswoode and Zweig, Spottiswoode's attorney in the arbitration, Chishti alleges that the two "violated the [P]rotective [O]rder by disclosing the existence and contents" of the arbitral award to Spottiswoode's father and his lawyer in a June 24, 2019 letter.  Am. Compl.  ¶ 197.

To prevail on a breach of contract claim, a plaintiff must establish "(1) a valid contract between the parties; (2) an obligation or duty arising out of the contract; (3) a breach of that duty; and (4) damages caused by [the] breach." *Brown v. Sessoms*, 774 F.3d 1016, 1024 (D.C. Cir. 2014), quoting *Tsintolas Realty Co. v. Mendez*, 984 A.2d 181, 187 (D.C. 2009); *see also Xereas v. Heiss*, 987 F.3d 1124, 1135 (D.C. Cir. 2021). Under District of Columbia law, "[t]he party asserting the existence of an enforceable contract . . . bears the burden of proving that the parties entered into an enforceable contract." *Ponder v. Chase Home Fin., LLC*, 666 F.Supp.2d 45, 48 (D.D.C. 2009) (citation omitted).  "For an enforceable contract to exist, there must be both (1) agreement as to all material terms; and (2) intention of the parties to be bound." *Jack Baker, Inc. v. Office Space Dev. Corp.*, 664 A.2d 1236, 1238 (D.C. 1995), quoting *Georgetown Ent. Corp. v. District of Columbia*, 496 A.2d 587, 590 (D.C. 1985). .  In the absence of a valid agreement, a breach of contract claim cannot be sustained.  *Virtual Def. and Dev. Int'l, Inc. v. Republic of Moldova*, 133 F. Supp. 2d 9, 19 (D.D.C. 2001).

A.     **Chishti's breach of contract claim against Smith must be dismissed for failure to state a claim.**

At the outset, Chishti concedes in his opposition to Smith's motion to dismiss that Smith – who represented Spottiswoode later, in connection with the congressional hearing – was not a party to the Protective Order.  *See* Opp. to Smith at 16.  He nevertheless argues that his claim against Smith is valid because he is a third-party beneficiary of a contract, presumably the Protective Order.  *See id.*, citing *Needham v. Hamilton*, 459 A.2d 1060, 1062 (D.C. 1983).

According to Chishti, under this theory, "a jury may reasonably find that Smith was aware of the obligations of the Protective Order" and may be held liable for its breach. *Id.* Although he is correct that privity in contract is not required where "plaintiffs were the direct and intended beneficiaries of the contracted for services," *Needham*, 459 A.2d at 1062, citing *Security Nat'l Bank v. Lish*, 311 A.2d 833 (D.C. 1973), Chishti has not identified a contract that *Smith* entered into for his benefit. Because Chishti has failed to allege the first element of a breach of contract claim – namely, the existence of a contract between himself and Smith or one entered into by Smith for his benefit – his breach of contract claim against her must be dismissed for failure to state a claim.[8]

**B.      Chishti's breach of contract claim against Spottiswoode will be dismissed for failure to state a claim and because Spottiswoode is entitled to absolute immunity.**

**1.      The Court will exercise subject-matter jurisdiction over Chishti's claim.**

Chishti alleges that he and Spottiswoode are parties to a valid contract because they "stipulated and agreed to the terms of a protective order governing the use and disclosure of

---

[8]      *Needham* concerned an action for legal malpractice premised on the negligent drafting of a will, which resulted in the plaintiff being "denied the extent of the estate" the decedent intended him to take.  459 A.2d at 1061.  Chishti reads the decision as creating a special rule regarding lawyers that would somehow give rise to a cause of action against Spottiswoode's lawyer.  *See* Opp. to Smith at 16 ("If two parties do not have a contract between them, then it is generally axiomatic that no claim in contract would lie.  However, there is a critical exception to this general principle which applies to attorneys.").  But this case does nothing of the sort, and the sentence Chishti quotes simply recites generally applicable principles of contract law.  The *Needham* decision simply applied the general rule that parties may sue when they are the direct and intended beneficiaries of a contract in the specific context of the case, which happened to allege legal malpractice.  *See Needham*, 459 A.2d at 1062 ("The application of the privity of contract rule to legal malpractice cases involving the drafting or execution of wills is a matter of first impression here.").

confidential materials pertaining to the arbitration."  Am. Compl. ¶ 176; *see also* Protective Order. In her motion to dismiss, Spottiswoode asserts that the breach of contract claim against her must be dismissed for multiple reasons.  First, she argues that any breaches of the Protective Order are not enforceable in this Court.  Spottiswoode Mot. at 28.  According to Spottiswoode, because the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq.*, does not grant jurisdiction over interim orders like protective orders, Chishti's claim cannot be heard.  *See* Spottiswoode Mot. at 28, citing *Nolu Plastics, Inc. v. Valu Eng'g, Inc.*, No. Civ. A. 04-4325, 2004 WL 2314512, at *6 (E.D. Pa. Oct. 12, 2004); *see also* 9 U.S.C. § 9 (granting jurisdiction to federal courts to confirm, vacate, modify, or correct final arbitral awards).  Spottiswoode also contends that any breaches are subject to absolute privilege and thus cannot form the basis of a breach-of-contract claim; that the Protective Order "authorized disclosure 'in response to a lawful subpoena or other compulsory process;'" and that "once [she] gave her privileged testimony to Congress, the information was in the public domain," and her statements cannot be considered violations of the Protective Order. Spottiswoode Mot. at 29–30.

With respect to her first contention, Spottiswoode is correct that, generally, the FAA does not generally grant jurisdiction to enforce interim orders like the Protective Order.  *See* 9 U.S.C. § 9 (granting jurisdiction only over final arbitral awards).  However, Chishti's claim is not rooted in the FAA.  It is instead styled as a state law claim for breach of contract, and jurisdiction is based on the parties' diverse status.  *See* Am. Compl. ¶ 3 ("This Court has diversity jurisdiction over this action, pursuant to 28 U.S.C. § 1332, in that the action is between citizens of different States and the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs.").

There is some support for the notion that a remedy for the post-litigation violation of a judicial protective order may be sought in this manner, provided that a separate, underlying

agreement exists between the parties.  *Cf. Absolute Activist Value Master Fund Ltd. v. Devine*, 998 F.3d 1258, 1268–69 (11th Cir. 2021) ("[I]f a party wishes to enforce the terms of a stipulated protective order following a Rule 41(a)(1)(A)(i) dismissal in federal court, the party can take the stipulated protective order to a state court of general jurisdiction and file a run-of-the-mill breach of contract claim.").  Plaintiff has not pointed any authority that would authorize a court to step in to enforce a protective order entered by an arbitrator in a proceeding entirely outside of the judicial process.  However, since the arbitrator himself declined to take up the matter, *see* Response to Request, Ex. J to Decl. of Evan K. Farber [Dkt. # 51-1] (Sealed) at 45, the Court will go on to consider whether plaintiff's claim could move forward, assuming this Court has diversity jurisdiction over a state law breach of contract claim.

### 2.    Spottiswoode is entitled to legislative immunity for a breach of contract claim predicated on her communications with Congress.

Spottiswoode argues that Chishti's claim must be dismissed because the legislative privilege invoked with respect to the claim for defamation, *supra* § 1.A., extends to actions for breach of contract.  *See* Spottiswoode Mot. at 29.  Chishti insists that the legislative privilege is limited to actions for defamation and libel.  *See* Spottiswood Opp. at 32.

It appears that this issue has not yet been addressed by either the D.C. Circuit or the courts of the District of Columbia.  To support her position that the legislative privilege extends to a breach of contract claim, Spottiswoode points to a decision from another court in this District, *U.S. ex rel. Head v. Kane Co.*, 668 F. Supp. 2d 146 (D.D.C. 2009), and a series of opinions from federal appellate courts in other circuits that address the scope of the *litigation* privilege.  *See* Spottiswoode Mot. at 29.  The courts in the cited cases each held that the litigation privilege – which shields witnesses in judicial proceedings from defamation liability – extends to claims other than defamation, reasoning that such an extension serves the purpose of the privilege: the promotion of

the due administration of justice and free expression by participants in judicial proceedings. *Id.*, citing *Head*, 668 F. Supp. 2d at 155; *Rain v. Rolls-Royce Corp.*, 626 F.3d 372, 377-78 (7th Cir. 2010); *Kelly v. Golden*, 352 F.3d 344, 350 (8th Cir. 2003). She also cites an opinion from a court in another district applying the same reasoning, but in the context of legislative testimony like the situation presented here. *See Bio/Basics Int'l Corp. v. Ortho Pharm. Corp.*, 545 F. Supp. 1106, 1116 (S.D.N.Y. 1982).

Chishti rests his argument on a decision from a court in this district, in which the court declined to extend the legislative privilege in that manner. *See* Opp. to Spottiswoode at 32, citing *United States v. Philip Morris USA, Inc.*, 337 F. Supp. 2d 15 (D.D.C. 2004). The district court relied on the previously cited (and arguably abrogated) *Webster I* decision to state that, "[w]hile the common law provides absolute immunity for witnesses in *judicial* proceedings in order to encourage candor without fear of prosecution, the immunity in *legislative* proceedings extends only to actions for defamation or libel." *Philip Morris*, 337 F. Supp. 2d at 27 (emphasis in original), *amended by* No. CIVA 99-2496 GK, 2004 WL 5370172 (D.D.C. Aug. 10, 2004), citing *Webster I*, 731 F.2d at 5.

After reviewing the relevant opinions, as well as the portion of the Restatement upon which the *Webster* decisions were predicated, the Court finds the decision in *Bio/Basics* more persuasive, particularly in the circumstances presented in this case.

While "[g]rants of absolute immunity ought to be interpreted narrowly to serve only the purposes justifying the immunity," *Webster I*, 731 F.2d at 4, the purpose of the legislative privilege is clear:

> In order for a democratic government to govern democratically, it is necessary that an atmosphere be created whereby facts may be freely presented to the governing legislative body. Without such a free-speaking environment, individuals might be discouraged from addressing their government.

*Id.*, quoting *Sherrard v. Hull,* 456 A.2d 59, 62 (1983), *aff'd,* 460 A.2d 601 (1983). The decisions cited by Spottiswoode recognize that it would be odd indeed to afford individuals absolute immunity from defamation for their testimony in certain fora, only to permit liability for breach of contract for the same conduct. That those decisions arose in the context of the litigation privilege, rather than the legislative privilege, does not command a different outcome; "[t]he absolute privilege of witnesses in legislative hearings and other legislative proceedings is similar in all respects to that of witnesses in judicial proceedings." Restatement (Second) of Torts § 590A cmt. a.

It is also worth considering the facts underlying this claim as they are set forth on the face of the amended complaint. In November 2021, Spottiswoode provided testimony to a Committee of the House of Representatives. As noted above, she is absolutely immune from liability for defamation claims arising out of that testimony, *see supra* § I.A, and it would defeat the purpose behind that ruling if the testimony were to form the basis for Chishti's breach of contract claim, especially given what Chishti alleges happened here. Over one year after Spottiswoode's testimony, Chishti re-opened the matter. He wrote to a member of Congress and accused him of not having "reviewed the underlying evidence and voluminous communications between Ms. Spottiswoode and [himself] that belie [Spottiswoode's] narrative." Chishti Letter, Ex. J to Am. Compl. [Dkt. 112-1] at 61. In response, the Chairman of the Committee before which Spottiswoode testified requested the available summary and compendium of "the underlying evidence" of the parties' dispute – a copy of the Award – and Spottiswoode complied with the

request.  Nadler Letter at 58.  Chishti now seeks to hold Spottiswoode liable under a theory of breach of contract, even though he initiated the chain of events.  It was Chishti's allegation – made to a member of Congress – that a review of the evidence would reveal Spottiswoode's "lies" before Congress that spurred the Committee to ask for a copy of the Award and resulted in Spottiswoode's compliance with the request.  Chishti can hardly complain about events he set in motion by leveling accusations against Spottiswoode.

It is true that the Circuit went so far as to state in *Webster I* that "[a]n individual must feel unrestrained by potential defamation liability when addressing the legislature."  731 F. 2d at 5. But the Court of Appeals was not asked to consider the applicability of the legislative privilege for claims of breach of contract, as the plaintiff in that case only brought claims for libel and disparagement of product.  *Id.* at 3.  Reading the relied-upon statement as holding that the legislative privilege applies *exclusively* to defamation liability, as the court did in *United States v. Philip Morris USA, Inc.*, 337 F. Supp. 2d at 27, and as Chishti would have the court do here, would be particularly inappropriate in this case, where the alleged violation of a pre-existing agreement was instigated by the plaintiff and occurred completely within the context of the legislative proceeding.

A comparison of the facts of this case and *Philip Morris* demonstrates why a different outcome is warranted.  In *Philip Morris*, tobacco companies were accused of violating the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq.*, for "intentionally and willfully deceiv[ing] and mislead[ing] the American public about, among other things, the harmful nature of tobacco products, the addictive nature of nicotine, and the possibility of manufacturing safer and less addictive tobacco products."  337 F. Supp. 2d at 21.  A number of the companies' executives had previously testified at a congressional hearing, where they each

"denied under oath any manipulation of nicotine content." *Id.*  The executives argued that their testimony at the hearings, even if false, could not provide any basis for civil liability in their RICO case "because statements to a legislature are afforded 'absolute immunity' at common law." *Id.* at 27.  The district court found their argument lacking because "[t]he Supreme Court and other federal courts have rejected Defendants' claim that the common law immunity from defamation and libel suits, which protects litigants in judicial proceedings, amounts to 'absolute immunity' for fraudulent conduct." *Id.* (citations omitted).

That decision makes sense.  Affording absolute immunity to the executives for their false statements to Congress would not only fail to promote the purpose of legislative immunity, it would directly contravene it by permitting the executives to perpetuate the alleged fraud of which they were accused by the government.  In contrast, extending the legislative privilege here would further the goal of the privilege: the candid presentation of facts, without fear of reprisal, in aid of the legislative process.

Therefore, the Court holds that in this case, where the private breach of contract claim is predicated solely on evidence provided to a legislature; submission of the evidence arose in the context of and "relate[d] to" the legislative inquiry at hand; and was prompted by assertions made by the counterparty to the contract within the context of the legislative proceeding, the defendant is absolutely immune from suit.  Chishti's breach of contract claim against Spottiswoode will therefore be dismissed.

### 3.    Chishti fails to state a claim for breach of the Protective Order.

In three of the four "occasions" in which Chishti alleges Spottiswoode breached their contract, he claims that Spottiswoode violated the Protective Order by revealing "confidential information," including the information that another Afiniti employee allegedly experienced

comparable treatment by Chishti, as well as the fact and disposition of arbitration between Spottiswoode, Chishti, and Afiniti.  Am. Compl. ¶¶ 179, 183–85, 193–95.  But the Protective Order does not protect against the disclosure of "confidential information"; it only protects against the disclosure of "Confidential Material," defined in the Order as "materials produced in discovery ('Discovery Material'), as well as discovery requests and responses, pleadings, motions, briefs, testimony, transcripts, correspondence, orders, and the award."  Protective Order ¶ 2.  This means that it was not a violation of the Protective Order for Spottiswoode to reveal the fact and disposition of the arbitration.[9]

To the extent a breach of the Protective Order took place, then, it could only be found in the fourth alleged event – Spottiswoode's December 2022 provision of a copy of the Award to Representative Nadler.  Am. Compl. ¶ 180, 182.  Chishti alleges in the amended complaint that Spottiswoode's delivery of the Award violated the Protective Order in two ways: "by (i) publicizing an Award which should have been destroyed, and (ii) absent any compelling requirement, publicizing an Award which was required to be kept confidential."  *Id.* ¶ 182; *see also* Mot. in Limine ¶ 2 ("In blatant violation of the terms of the arbitration, Defendants did not destroy the award . . ."; and "The Protective Order [ ] explicitly provides that the Award [ ] may not be used for any purpose whatsoever outside the confines of the arbitration . . . .").

---

9       Chishti appears to confuse the obligations imposed by the Protective Order with those imposed by Spottiswoode's Employment Agreement, which required her to keep confidential "the fact of any arbitration, and any proceedings, claims, or disputes relating to the arbitration." Employment Agreement, Ex. A to Am. Compl. [Dkt. # 112-1] at 9.  But that separate contract was between Spottiswoode and Afiniti, not Spottiswoode and Chishti, and Chishti cannot sue for its breach.

Disputes over the scope and application of provisions within a protective order are settled using ordinary methods of contract interpretation. *See LJC Corp. v. Boyle*, 768 F.2d 1489, 1495 (D.C. Cir. 1985). "Those ordinary methods refer us to the meaning a reasonable person in the position of the parties would have given to the disputed provision." *Id.* at 1495, citing *Intercounty Constr. Corp. v. District of Columbia,* 443 A.2d 29, 32 (D.C. 1982). To determine what a reasonable person in the position of the parties would have thought the disputed language meant, the Court "must consider the agreement 'as a whole, giving a reasonable, lawful, and effective meaning to all its terms.'" *N.W. v. District of Columbia*, 107 F.Supp.3d 141, 148 (D.D.C. 2015), quoting *1010 Potomac Assocs. v. Grocery Mfrs. of Am., Inc.,* 485 A.2d 199, 205 (D.C.1984). Both the interpretation of an unambiguous contract and the determination of whether a contract is ambiguous are questions of law. *See Abdelrhman v. Ackerman*, 76 A.3d 883, 887 (D.C. 2013) (citations omitted). Reading the Protective Order as a whole, neither of Chishti's assertions is consistent with the language of the alleged contract.

With respect to plaintiff's second allegation, Am. Compl. ¶ 178, that the Protective Order set down an iron-clad requirement that the Award was to remain confidential, that interpretation is undermined by the provision in the Order that authorized disclosure under certain circumstances, including in response to legal process. *See* Protective Order ¶ 8.

As to the claim that the Protective Order required the parties to "destroy" all copies of the Award, plaintiff points to language in paragraph 10 of the Order that talks about the destruction of "Confidential Material." Am. Compl. ¶ 178; Opp. to Spottiswoode at 20. Again, the term "Confidential Material" is defined in the Order to include "materials produced in discovery ('Discovery Material'), as well as discovery requests and responses, pleadings, motions, briefs,

testimony, transcripts, correspondence, orders, and the award." Protective Order ¶ 2. The

Protective Order then requires the following:

> Within 45 days of the final disposition of this action – including all related litigation and all appeals therefrom – all **recipients** of Confidential Material must either **return to the Producing Party, or destroy**, all such material, including all copies thereof. In either event, by the 45-day deadline, each **recipient** must certify its return or destruction by submitting a written certification to **the Producing Party** that affirms that it has not retained any copies, abstracts, compilations, summaries, or other forms of reproducing or capturing any of the Confidential Material. Notwithstanding the foregoing, counsel of record for each Party shall be entitled to retain Confidential Material included in submissions to the Arbitrator, deposition or hearing transcripts, exhibits, expert reports, legal memoranda, correspondence, or attorney work product, provided that any Confidential Material so retained remains subject to the terms of this Protective Order.

*Id.* ¶ 10 (emphasis added). The references to "producing party" and "recipient" make clear that

the "return or destroy" requirement is meant to apply to "Discovery Material." This makes sense,

as this is often agreed to in litigation and arbitration, and it would be inappropriate for parties to

retain private materials they possess solely by virtue of an adversarial proceeding and compulsory

process.

It is also notable that the rule reasonably carves out legal memoranda and witness testimony

presented to the arbitrator that may rely on the otherwise private materials produced by one side

or another. *Id.* ¶ 10. Like hearing transcripts, neither side "received" or "produced" the Award,

and, like legal memoranda, evidence, and hearing testimony, a copy of the Award must be retained

in the event of ancillary proceedings to enforce or modify it later. The Protective Order therefore

cannot be read to call for the destruction of the Award itself in the time period allotted. Indeed,

plaintiff plainly recognizes this; his own lawsuit is based on the Protective Order, and "orders" are

included in the definition of "Confidential Material," too. Protective Order ¶ 10. If the Court were

to agree with Chishti's interpretation of paragraph 10's requirements, that same provision would

have required Chishti to destroy all copies of the protective order he now seeks to enforce, as "orders" are also not included in the list of materials counsel were authorized to retain.

Given that the Protective Order expressly provides that its terms will survive in perpetuity and remain enforceable, *see id.* ¶ 11 ("The terms of this Protective Order shall survive any final disposition of this Arbitration and any related litigation."); that it anticipates the possibility of "related litigation," *id.*; and that even "Confidential Materials" may be disclosed in response to lawful process, *id.* ¶ 8, it is apparent that the destruction requirement in paragraph 10 was meant to apply to materials produced by the opposing party in discovery, and not to governing or dispositive documents issues by the arbitrator, such as the Award or the Protective Order. This provides an additional reason to dismiss the breach of contract claim under Rule 12(b)(6).

### C.    Chishti's breach of contract claim against Zweig must be dismissed for failure to state a claim.

Chishti's claim for breach of contract against Zweig rests on the premise that Zweig breached the Protective Order by acknowledging the existence of the arbitration and its outcome in a June 24, 2019 email to J. Spottiswoode and his lawyer. *See* Am. Compl. ¶ 197. The communication stated:

> Ms. Spottiswoode believes, as do we, that the arbitration commenced in California against James Spottiswoode ("California Arbitration") was in retaliation for her filing (in arbitration) claims of sexual harassment and assault against Afiniti and Mr. Chishti, which proceeding has now been concluded through an award of the arbitrator in her favor.

Am. Compl. ¶ 69.

The claim against Zweig will be dismissed. The Protective Order at issue expressly contemplated disclosures to "[a]ny other person to whom . . . the Arbitrator in writing permit[s] disclosure." Protective Order ¶ 4(j). Arbitrator Birch issued an order regarding Spottiswoode's confidentiality obligations during arbitration, and that order permitted her to "speak with her father

and other immediate family members about anything related to [the] case."  Order No. 3 at 2.  The complained-of disclosure described in the amended complaint was a mere acknowledgement of the Spottiswoode arbitration and its outcome, not a disclosure of "Confidential Material."  Am. Compl. ¶ 69.  It was made by Zweig on behalf of Spottiswoode to her father and his own lawyer-agent during global settlement discussions also involving Chishti, and it falls within the scope of disclosures authorized by the Protective Order.  *Id.*  Because Chishti fails to allege that Zweig breached the Protective Order in any fashion, Chishti's claim against him will be dismissed for failure to state a claim.

## III.    Tortious Interference (Count Four)

In Count Four of the amended complaint, Chishti alleges that defendants[10] "tortiously interfered with two sets of contracts to which Chishti was a party" by allegedly defaming him: the Protective Order governing the Spottiswoode arbitration, as well as three employment contracts between Chishti and his employers Afiniti, TRG Pakistan, and TRG International.  Am. Compl. ¶ 209.

The D.C. Court of Appeals explained in *Casco Marina Dev., L.L.C. v. D.C. Redevelopment Land Agency* that a claim of tortious interference requires a plaintiff to plead the following: "(1) the existence of a contract; (2) knowledge of the contract; (3) intentional procurement of a breach of the contract; and (4) damages resulting from the breach."  834 A.2d 77, 83 (D.C. 2003), quoting *Paul v. Howard Univ.,* 754 A.2d 297, 309 (D.C. 2000).  The law is the same whether a plaintiff

---

10      The Court notes that Count Four of the amended complaint has been brought against "all defendants," *see* Am. Compl. at 62, but many of the allegations concern defendants who were named in the original complaint but later terminated: James Spottiswoode and Edward Johnson. The Court includes allegations pertaining to these terminated defendants only insofar as they are relevant to its opinion.

alleges tortious interference with an existing contract or tortious interference with prospective business advantage. *See Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1134 (D.C. Cir. 2015); *Casco Marina Dev., L.L.C.*, 834 A.2d at 84 ("The elements of tortious interference with prospective business advantage mirror those of interference with contract . . . however, a plaintiff obviously need not demonstrate the existence of a contract, but merely a prospective advantageous business transaction.") (citation omitted).

### A. Tortious interference with the Protective Order.

#### 1. Chishti's claim for tortious interference with the Protective Order against Spottiswoode must be dismissed because an individual cannot interfere with her own contract.

As discussed above, to the extent the Protective Order constitutes a contract, Spottiswoode herself was a party to that contract. It is a "hornbook rule that '[a] defendant's breach of his own contract . . . is not a basis for the tort' of interference with contractual relations." *Raskauskas v. Temple Realty Co.,* 589 A.2d 17, 26 (D.C.1991), quoting W. Prosser & W.P. Keeton, Prosser on Torts, § 129 at 990 (5th ed. 1984). This rule "stems from the common sense notion that a plaintiff should not be allowed to convert a breach of contract claim into a claim for tortious interference." *Id.* Accordingly, Chishti's claim against Spottiswoode for tortious interference with the Protective Order will be dismissed for failure to state a claim.

#### 2. Chishti's claim against Smith will be dismissed because Smith's actions are properly attributed to Spottiswoode given their agency relationship.

As noted above, the amended complaint alleges that the Award was transmitted to the Chair of the House Judiciary Committee by Spottiswoode's attorney, Smith, in December 2022, more than one year after Spottiswoode's testimony, and after plaintiff reached out to a congressman to assert that the testimony was "belie[d]" by the underlying evidence. Am. Compl. ¶¶ 95, 180–82;

Chishti Letter, Ex. J to Am. Compl. [Dkt. 112-1] at 61.  In Count Four of the amended complaint, though, Chishti posits that Smith, among others, "induced Spottiswoode to make public the existence and content of the Award and other protected information through Smith's and Spottiswoode's various submissions and testimony to Congress in November 2021, and likely earlier."  Am. Compl. ¶ 210(b).  Chishti also alleges that Smith alone "induced Spottiswoode to provide the Award verbatim to Congress in December 2022, likely in retaliation for Chishti filing the instant litigation in November 2021."  Am. Compl. ¶ 210(c), *see also* Am. Compl. ¶ 225 ("Smith provided a copy of the Award itself to Representative Jerry Nadler who then promptly published it on Congress's website.").  According to the amended complaint, the "crux of [Smith's] effort was Smith making publicly available the arbitral Award through its publication to Congress under the presumed protection of absolute privilege."  Am Compl. ¶ 219.  Chishti relies on a July 2022 tweet published by Smith to support his claim, arguing that "Smith, engaged by [Spottiswoode] to find a pathway to violate her confidentiality obligations, publicly bragged about doing so after succeeding in her scheme:"

> Hey @AOC [Rep. Alexandria Ocasio-Cortez] @RepRaskin [Rep. Jamie Raskin] @RashidaTlaib [Rep. Rashida Tlaib] @CoriBush [Rep. Cori Bush] & @RepMaloney [former Rep. Carolyn B. Maloney] – a subpoena would trump any NDAs these employees have signed. It's how we were able to expose Zia Chishti's horrific behavior at the top of Afiniti. Reach out if you have any questions!

Am. Compl. ¶ 222; *see also id.* ¶ 221 (arguing that "Smith's engagement by Spottiswoode" was undertaken in part undertaken to secure a favorable outcome in the J. Spottiswoode arbitration).[11]

---

[11]    In the amended complaint, Chishti alleges that Smith's conduct was undertaken as part of a larger scheme with J. Spottiswoode and his lawyer, Johnson, to secure a favorable outcome in the J. Spottiswoode arbitration, centered around the violation of the Protective Order.  *See* Am. Compl. ¶¶ 220–22.

Chishti fails to state a claim for tortious interference with the Protective Order. While the Court is obliged at this stage to accept plaintiffs' factual assertions as true, it is not obliged to accept legal conclusions or summary allegations in the amended complaint. *Scahill v. District of Columbia*, 909 F.3d 1177, 1186 (D.C. Cir. 2018). The first problem with plaintiff's surmising that Smith was urging Spottiswoode to reveal the Award all along boils down to chronology. There is no allegation that Spottiswoode or Smith passed the Award along before, during, or after Spottiswoode's written or oral testimony in 2021. This count conveniently ignores the alleged intervening event of plaintiff's own making: his contacting a member of the Committee over a year later. Am. Compl. ¶ 95. He also overlooks his own allegation that after that, Chairman Nadler contacted Spottiswoode and requested a copy of the Award. Am. Compl. ¶ 95; Nadler Letter at 58.

Moreover, it is challenging to accept plaintiff's allegations on their face when they are internally inconsistent. The amended complaint makes clear that prior to the 2022 request for the Award, what Spottiswoode shared with Congress was her personal experience with Chishti, and the Court has already ruled that the events underlying the arbitration were hers to share. While Chishti alleges that Smith "induced" Spottiswoode to violate the Protective Order, that allegation cannot be squared with his assertion that Smith was specifically engaged as an attorney by Spottiswoode to – in his words –"find a pathway to violate [Spottiswoode's] confidentiality obligations" under the Protective Order. Am. Compl. ¶ 222. Chishti's assertion that Spottiswoode "violate[d]" the Protective Order is a legal conclusion the Court need not accept, and has already rejected, but it is also clear that Chishti's allegations center on Smith's conduct as Spottiswoode's *agent*. *See also* Am. Compl. at 54 (entitling subsection of Count III as "Breaches by Spottiswoode and Smith as her Agent").

38

Just as an individual cannot tortiously interfere with her own contract, an agent acting within the scope of her agency cannot interfere with a contract to which her principal is a party, as the actions of the agent are attributable to the principal. *See Press v. Howard Univ.*, 540 A.2d 733, 736 (D.C. 1988) (citing cases and noting that there was "ample support" underlying trial court's determination that "individual defendants, all of whom were officers of the University, were acting as agents of the other party to the contract, and that the University through their actions could not tortiously interfere with its own contract"). Although Chishti uses the verb "induced," he offers no facts to support his assertion that Smith prevailed upon Spottiswoode in any manner; nor does he allege facts to show that Smith was not acting at Spottiswoode's direction or on her behalf. Therefore, Smith's conduct must be viewed as if it were Spottiswoode's own, and his claim against Smith will be dismissed.

Finally, with respect to Smith's 2021 course of conduct, Chishti fails to state a claim for tortious inference with the Protective Order. While the gravamen of this claim is that Smith was engaged "to find a pathway" for Spottiswoode "to violate her confidentiality obligations," Am. Compl. ¶ 222, and Smith obliged, that claim is based on a legal conclusion that is not supported by the facts. There is nothing wrong with a lawyer advising a client regarding what would be permitted and what would be prohibited by a contract or arbitral order. Here, the Protective Order expressly permitted the disclosure of confidential material "in response to a lawful subpoena or other compulsory process, . . . provided that such Party gives written notice to the Producing Party as soon as reasonably possible . . . ." Protective Order ¶ 8. Spottiswoode was served with a subpoena by the House Judiciary Committee to provide testimony before Congress, *see, e.g.*, Am. Compl. ¶ 188, and plaintiffs complain that she divulged "confidential information" and "the fact and disposition of the Arbitration." As the Court ruled above, Spottiswoode was permitted to

discuss her own experience, and the "fact and disposition" of the Arbitration do not fall within the definition of "Confidential Material" covered by the Protective Order. While Chishti takes issue with the timing of Spottiswoode's notice of the subpoena, *see* Am. Compl. ¶¶ 187–88, he fails to identify any "Confidential Material" produced by him and disclosed by Spottiswoode in the course of her testimony that would require notice. Chishti therefore fails to allege a critical element of a claim for tortious interference – namely, a breach of the Protective Order by Spottiswoode. *See Casco Marina Dev., L.L.C.* 834 A.2d at 83. For these separate reasons, Chishti's claim against Smith for tortious interference with the Protective Order will be dismissed.

### 3.    Chishti's claim for tortious interference against Zweig will be dismissed for failure to state a claim.

Finally, Chishti alleges in Count Four that "J. Spottiswoode and Johnson [former defendants in this action] induced Zweig and Spottiswood to inject the Award into the arbitration occurring between J. Spottiswoode and TRG commencing after the issuance of the Award on April 19, 2019." Am. Compl. ¶ 210(a).

This claim will also be dismissed. As is apparent from the face of the amended complaint, Chishti does not allege that Zweig improperly induced or otherwise caused Spottiswoode to breach the Protective Order; he instead alleges only that Zweig himself was induced by Spottiswoode's father and his attorney to supply information regarding the Award. *Id.* The sum total of Chishti's factual allegations against Zweig with respect to Count Four amount to the following: "Zweig leaked the existence of the Award to Johnson and J. Spottiswoode at least as early as June 24, 2019, when he copied Johnson on a letter that stated that Spottiswoode's arbitration 'has now been concluded through an award of the arbitrator in her favor." Am. Compl. ¶ 212. These allegations are insufficient to state a claim for tortious interference, which requires, at minimum, some allegation that a defendant induced or caused a breach of contract by another. *See Casco Marina*

*Dev., L.L.C.* 834 A.2d at 83.  Chishti's claim for tortious interference with the Protective Order against Zweig will be dismissed.

### B.    Tortious interference with Chishti's business relationships.

Chishti's alleges that two separate courses of conduct by defendants Spottiswoode and Smith amount to tortious interference with either his employment contracts or prospective business advantages.  First, Chishti alleges that Smith knew that "Spottiswoode's breach of the Protective Order by publicly sharing the existence and contents of the Award would be devastating," Am. Compl. ¶ 234, and that because it was shared, he "was forced to resign from all of his positions resulting in the termination of all his employment contracts, causing direct and extraordinary monetary harm to him."  Am. Compl. ¶ 234–35.  He therefore alleges that Smith "tortiously interfered with his contractual relationships with his employers" by causing Spottiswoode to breach the Protective Order.  Am. Compl. ¶ 236.  Second, he alleges that Smith and Spottiswoode's "campaign of Defamation and Defamation *Per Se*" – *i.e.*, "causing the publication and republication of false and defamatory statements about Chishti" – resulted in his "constructive discharge" from his employment.  Am. Compl. ¶ 239, 241.

The tort of interference with contractual relations may be committed in various ways.  An individual may be held liable for inducing a third party to breach its contract with another, or by interfering with the that person's own ability to perform his contract with the third party.  *Compare* Restatement (Second) of Torts § 766 (describing intentional interference with performance of contract by a third person) *with id.* § 766A (describing intentional interference with another's performance of his own contract).  The critical difference is that, with respect to the former, a defendant induces the plaintiff's counterparty to breach an alleged contract, whereas in the latter a defendant "prevent[s] the [plaintiff] from performing the contract or caus[es] his performance to

be more expensive or burdensome." *Id.* § 766A.  An individual may also be liable if they interfere with another's "prospective contractual relation" by either "inducing or otherwise causing a third person not to enter into or continue the prospective relation" or "preventing the other from acquiring or continuing the prospective relation." *Id.* § 766B.

Once more, Chishti's own allegations are his undoing.

With respect to the first variation of the tort (inducing a third party to breach its contract with another), *id.* § 766, Chishti admits that his departure from his corporate roles at Afiniti and TRG was the product of his own resignation, not his termination. *See* Am. Compl. ¶ 91; *see also* Spottiswoode Mot. at 3, 34–35; Smith Mot. at 25–26.  While he frames this resignation as a "constructive discharge," that allegation is a legal conclusion that the Court need not and cannot accept on its face.  Am. Compl. ¶ 241.

A "constructive discharge occurs where [an] employer creates or tolerates discriminatory working conditions that would drive a reasonable person to resign." *Stewart v. White*, 61 F. Supp. 3d 118, 132 (D.D.C. 2014) (citations omitted).  But an individual cannot be constructively discharged from his employment by an unrelated third party, and Chishti provides no allegations that either Afiniti or TRG – his employers and the relevant contractual actors – subjected him to working conditions so unfavorable that he was driven out.  To the contrary, Chishti alleges that he resigned on his own accord "to save the businesses from economic collapse."  Am. Compl. ¶ 91.  Even assuming that Smith and Spottiswoode were knowledgeable about Chishti's contracts with his employers and "induced" or urged the employers to sever their ties with him, the amended complaint is devoid of allegations that Afiniti or TRG breached their employment agreements with Chishti or took any action against him in response.

With respect to the second variation of the tort (rendering another incapable of performing on his contracts), Restatement (Second) of Torts § 766A, and third variation of the tort (inducing the cessation of prospective contractual relations), *id.* § 766B, the following specific factual allegations ostensibly underlie the claim:

- "Afiniti, an organization where Chishti served as Chief Executive Officer, has witnessed numerous clients cancel ongoing or future business arrangements due to the negative publicity generated by Spottiswoode and her defamatory statements" and that "[b]etween November 15 and December 3, 2021, during a period when no other significant information was disclosed, the share price of Chishti's holding company experienced a drastic decline of approximately 40%, representing an estimated loss of market value amounting to approximately one billion dollars across the portfolio of companies in which he held a beneficial ownership stake." Am. Compl. ¶ 100;

- Numerous high-profile individuals "resigned their positions on Afiniti's advisory board citing Defendants' allegations." Am. Compl. ¶ 101; and

- "TRG – which Chishti founded – initiated legal proceedings in the Sindh High Court in Karachi, Pakistan, attempting to bar Chishti from exercising his rights as a shareholder, and successfully received an interim Court order to that effect." Am. Compl. ¶ 102; and

- "Smith challenged AT&T to cease its commercial relationship with one of Chishti's businesses if he continued to stay as an executive there." Am. Compl. ¶ 128.

These paragraphs support an inference that Afiniti and TRG, and Chishti by extension, suffered financial repercussion as a result of Spottiswoode's testimony and the public reporting that followed. But even according to the complaint, those repercussions were the actions of a series of independent third parties who, putting aside AT&T for a moment, made decisions about how to react to Spottiswoode's lawful and privileged participation in the Committee hearing, without any alleged prodding by Spottiswoode or Smith. And it is not as if the only sources of information for Afiniti or its directors would have been customers' complaints, the Congressional Record, or publicity surrounding the hearing in 2021; Afiniti was a party to the arbitration and privy to all of the arbitrator's conclusions. Chishti alleges no facts to show that he was rendered

unable to fulfill his obligations to either Afiniti or TRG due to Spottiswoode's and Smith's conduct. Indeed, the amended complaint is silent with respect to what Chishti's contractual obligations might have been, never mind how he was unable to meet them.

The closest Chishti comes to stating a claim for tortious interference are his allegations concerning Smith's express "challenge" to AT&T to cease doing business with the company. Am. Compl. ¶ 128. Chishti, however, does not allege that existing or future contracts between *him* and a client were spoiled by Smith's and Spottiswoode's conduct – his allegations address only contracts between *Afiniti* and its clients. But Chishti is not Afiniti. As a result, to the extent the amended complaint identifies one business relationship that Smith called out in a print article, that allegation could play a role in a claim for tortious interference belonging to Afiniti, but not Chishti.

For these reasons, Count Four of the amended complaint for tortious interference – with either Chishti's employment contracts with Afiniti and the TRG entities, or his prospective business relations – will be dismissed for failure to state a claim.

## IV.    Abuse of Process (Count Five)

In Count Five of the amended complaint, Chishti claims that defendants Spottiswoode and Smith committed the tort of abuse of process through their "abuse of the congressional subpoena process." Am. Compl ¶ 259. Specifically, Chishti alleges that Spottiswoode and Smith improperly induced Congress to issue a subpoena to Spottiswoode for the purpose of "enabl[ing] Spottiswoode to breach her confidentiality obligations under the Arbitration Agreement/Protective Order and subsequently defame Chishti unfettered and claim she did so without exposure to liability." Am. Compl. ¶ 245.

To establish abuse of process, a plaintiff generally must show "a perversion of the judicial process and achievement of some end not anticipated in the regular prosecution of the charge."

*Whelan v. Abell*, 953 F.2d 663, 670 (D.C. Cir. 1992), quoting *Morowitz v. Marvel*, 423 A.2d 196, 198 (D.C. 1980). "There are two essential elements to an abuse of process claim: '(1) the existence of an ulterior motive; and (2) an act in the use of process other than such as would be proper in the regular prosecution of the charge.'" *Houlahan v. World Wide Ass'n of Specialty Programs & Schs.*, 677 F. Supp. 2d 195, 199 (D.D.C. 2010), quoting *Hall v. Hollywood Credit Clothing Co.*, 147 A.2d 866, 868 (D.C. 1959).

Here, Chishti does not allege that Spottiswoode and Smith improperly invoked judicial processes at all; he instead focuses his allegations on their actions vis-à-vis Congress and that body's power of legislative investigation.  He contends that, "once issued, enforcement of a congressional subpoena is identical to any other subpoena issued directly by a court.  Accordingly, it becomes part of a judicial process."  *See* Opp. to Spottiswoode at 25.  Second, he argues "that summonses issued by government bodies other than a court are subject to the same analysis for abuse of process as court-issued summons."  Opp. to Spottiswoode at 25.  Although the case law he cites to support these arguments misses the mark,[12] he raises an issue that requires further analysis.

_____

[12]     To support his first argument, Chisti cites *Comm. on the Judiciary of the U.S. House of Representatives v. McGahn*, 968 F.3d 755 (D.C. Cir. 2020), and argues that the D.C. Circuit held in that case that "Congress's power to enforce a subpoena arose out of Article III of the United States Constitution which defines the role of the judicial branch."  Opp. to Spottiswoode at 24.  The Court of Appeals did no such thing.  As Chishti's selected quote summarizes, the *en banc* court held that "the Committee on the Judiciary of the House of Representatives has standing under Article III of the Constitution to seek judicial enforcement of its duly issued subpoena."  Opp. to Spottiswoode at 24–25, quoting *McGahn*, 968 F.3d at 760.  Although Congress may ultimately resort to Article III courts to enforce a subpoena it has issued, that does not make the issuance of the subpoena itself a "judicial process."  Congress' subpoena power flows not from Article III of the United States Constitution or the constitutions of the states establishing their own parallel judicial systems, but from Article I.  That this authority is legislative, rather than judicial, is without question: The "power to investigate is inherent in the power to make laws because '[a] legislative body cannot legislate wisely or effectively in the absence of information respecting the conditions which the legislation is intended to affect or change.'"  *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 504 (1975), quoting *McGrain v. Daugherty*, 273 U.S. 135, 175 (1927).

To support his second argument, Chishti cites *United States v. Feffer*, 598 F. Supp. 973 (E.D. Wis. 1984), an opinion from a district court outside this circuit.  Opp. to Spottiswoode at 25.  That case has little value here.  Not only is that decision not binding on this Court, it also did not involve tort law at all.  It instead concerned whether an IRS summons should be enforced pursuant to 26 U.S.C. § 7604 in light of allegations of government misconduct during the pre-investigatory phase of a tax investigation.  *Id.* at 975, 980.

The tort of abuse of process is principally aimed at "judicial" process, but it is not solely limited to the judicial sphere. For example, as recognized across multiple jurisdictions and articulated in the Restatement (Second) of Torts, claims for abuse of process in the context of civil proceedings before administrative boards fall within the ambit of the tort. *See* Restatement (Second) Torts § 680 (liability for abuse of administrative processes where an individual "(a) acts without probable cause to believe that the charge or claim on which the proceedings are based may be well founded, and primarily for a purpose other than that of securing appropriate action by the board, and (b) except where they are ex parte, the proceedings have terminated in favor of the person against whom they are brought"). And at least one case has concerned the alleged abuse of Congress' legislative subpoena power. *See Wheeldin v. Wheeler*, 373 U.S. 647 (1963).

In *Wheeldin*, an individual, Dawson, "was served with a subpoena to appear before the House Un-American Activities Committee." *Id.* at 648. Among other claims, Dawson alleged that the individual who orchestrated the subpoena – a committee investigator named Wheeler – did so with the intent to subject him "to public shame, disgrace, ridicule, stigma, scorn and obloquy, and falsely place upon him the stain of disloyalty without any opportunity of fair defense." *Id.* at 648. A majority of the Supreme Court rejected Dawson's argument on jurisdictional grounds, holding that the statute enabling the Committee to issue subpoenas did not contain an implied cause of action enforceable under federal law. *Id.* at 652. This is the authority by which the Court is bound.

It is true that, in the course of their dissent, three justices laid out a position similar to Chishti's – that is, that legislative processes, too, may be abused:

> [A]s usually defined, [the tort of abuse of process] is committed when the actor employs legal process in a manner technically correct, but for a wrongful and malicious purpose to attain an unjustifiable end. But succinctly, the tort is the perversion of legal process. In the instant case, the process allegedly abused was not judicial, but legislative. I do not, however, consider the distinction material. Abuse of administrative process seems to be a recognized aspect of the tort, and so does abuse of the judicial subpoena power. The congressional subpoena is no less mandatory than the judicial, no less a placing of governmental compulsion upon the recipient. It may, of course, be the first link in a chain leading to eventual criminal prosecution.

*Id.* at 655–56 (Brennan, J., dissenting) (citations and quotations omitted).

But that is not binding precedent, and, more importantly, the *Wheeldin* situation is entirely distinguishable in that it involved the question of whether someone personally involved in the legislative process could abuse it, just as an abuse of judicial process claim turns on a party's misuse of the process. But here, the gist of the amended complaint is that Spottiswoode and Smith somehow induced the Committee to utilize its powers in an inappropriate manner. And as the Court has said repeatedly above, there was nothing improper about Spottiswoode sharing her own story in 2021 or letting it be known that she would share it if asked.

Ultimately, Chishti's abuse-of-process tort claim is governed by state law, and Chishti has not pointed the Court to any case holding that under D.C. law procuring or inviting a legislative subpoena for the purpose of giving personal testimony to Congress may constitute the tort of abuse of process. In the absence of such authority, the Court is loath to extend application of the tort beyond its recognized limits.

Chishti's claim is insufficient for a second reason. Stated generally, the torts of abuse of process and wrongful use of civil proceedings are aimed at holding liable those "who take[] an active part in the initiation, continuation or procurement of civil proceedings *against another.*" Restatement (Second) of Torts § 674 (emphasis added). And in contrast to this typical abuse-of-

process paradigm, Chishti *himself* has not been wrongfully subjected to any process – judicial, administrative, legislative, or otherwise.  The process complained of here (procurement of a congressional subpoena) did not command anything of Chishti, nor did it have the capacity to directly affect his legal interests.  While Spottiswoode's treatment at the hands of Chishti featured in her testimony, it cannot reasonably be said that the hearing in question was proceeding "against" him; its subject was a general legislative inquiry into the effects of mandatory arbitration on workplace misconduct and alleged victims, and Chishti was not the focus of any proposed legislative action.

Given these circumstances – in which the ultimate process involved was not judicial or quasi-judicial but legislative, and in which the plaintiff himself was not improperly subjected to any process – Chishti's claims for abuse of process against defendants Spottiswoode and Smith will be dismissed for failure to state a claim.

## V.   Intentional Infliction of Emotional Distress (Count Six)

In Count Six of the amended complaint, Chishti alleges that defendants Smith and Spottiswoode are liable for the tort of intentional infliction of emotional distress ("IIED"). Am. Compl. ¶¶ 262–71.  Specifically, he alleges that the defendants' "campaign of false and defamatory accusations directed specifically at Chishti was malicious, wanton, and intentional," Am. Compl. ¶ 263, and that their "wrongful conduct is so outrageous in character and so extreme in degree that it is beyond all possible bounds of decency and is to be regarded as atrocious and utterly intolerable in a civilized community."  Am. Compl. ¶ 266.

To state a claim for IIED in the District of Columbia, a plaintiff must allege "(1) extreme and outrageous conduct on the part of the defendant which (2) either intentionally or recklessly (3) cause[d] [him] severe emotional distress." *Halcomb v. Woods*, 610 F. Supp. 2d 77, 80 (D.D.C.

2009), quoting *Larijani v. Georgetown Univ.*, 791 A.2d 41, 44 (D.C. 2002). Spottiswoode and Smith argue that Chishti's IIED claim fails because he does not allege that they engaged in any "extreme and outrageous conduct." Spottiswoode Mot. at 41; Smith Mot. at 30. The Court agrees.

Under D.C. law, "[i]t is for the court to determine, in the first instance, whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery, or whether it is necessarily so." *Newmyer v. Sidwell Friends Sch.*, 128 A.3d 1023, 1037 (D.C. 2015), quoting *Drejza v. Vaccaro*, 650 A.2d 1308, 1316 (D.C. 1994). Here, the thrust of Chishti's claim is that Spottiswoode and Smith spread "false allegations of sexual and professional misconduct." Am. Compl. ¶ 267. In his opposition to Spottiswoode's motion to dismiss, Chishti asserts that she:

> first lied during an arbitration, then breached a Protective Order and again lied to Congress to contrive a subpoena, and under the subpoena again also lied to the United States Congress on a globally televised stage. In her lies to Congress and to the world, she accused Chishti of rape, attempted murder, pedophilia, and a host of other felonies and misconduct.

Opp. to Spottiswoode at 40–41. With respect to Smith, Chishti argues that she:

> encouraged her client to lie to Congress and defame Chishti as a murderous rapist in order to contrive a subpoena. Even before the subpoena was effective, she submitted *per se* defamatory "written testimony" to Congress, the virtual entirety of which is demonstrably false. She then further encouraged her client to again lie to the United States Congress on a globally televised stage. She then repeated her client's lies to Congress, herself accusing Chishti of rape, attempted murder, grooming, retaliation and a host of other misconduct.

Opp. to Smith at 29. According to him, both defendants did so "to extort money, extricate [J. Spottiswoode] from an arbitration alleging his theft, and to destroy Chishti's life – goals in which [they were] successful." Opp. to Spottiswoode at 41; Opp. to Smith at 29.

Putting aside plaintiff's hyperbole and the facts that Spottiswoode's claims against Chishti had already been resolved and the amount of the Award had already been determined *before*

Spottiswoode testified, even if one accepts plaintiff's fundamental premise – that Spottiswoode's allegations were untrue – the Court cannot agree that Spottiswoode's and Smith's conduct is so "extreme and outrageous" to permit recovery.

Here, Spottiswoode alleged to her employer, Afiniti, that she was the victim of workplace sexual misconduct. The employer and Chishti – not Spottiswoode – initiated arbitration to adjudicate her claims. The arbitration resulted in an award in Spottiswoode's favor after a neutral third party considered evidence and sworn testimony presented by both parties, and neither Chishti nor Afiniti appealed the Award within the three months they had to do so. *See* 9 U.S.C. § 12. Spottiswoode had the opportunity to testify and supply supporting material, and Chishti, represented by counsel, enjoyed that opportunity as well. Over two years later, Spottiswoode, once more assisted by legal counsel, provided testimony to a committee of Congress to aid its consideration of a then-pending bill related to a topic with which she was personally familiar: the effects of mandatory arbitration clauses on claims of workplace sexual misconduct and the employees pursuing those claims. Chishti himself offered to testify as well, but Congress declined his offer. Spottiswoode and her attorney then provided commentary to print media outlets, and Smith also posted on social media regarding Spottiswoode's testimony.

This does not rise to the level of actionable outrageous conduct, and to permit Chishti to recover under a theory of IIED under these circumstances would be improper. Chishti disagrees with the ultimate outcome of the Spottiswoode arbitration, but a tort claim for IIED is not the means to undo an award one chose not to challenge in court, or to re-open the question of Spottiswoode's credibility, which was settled by the arbitrator. Were the Court to agree with Chishti, any party subjected to an adverse civil judgment could re-open litigation against their counterparty with the simple allegation that they were "lying" the entire time.

Chishti's claim closely resembles a claim for the tort of wrongful use of civil proceedings, an element of which is that the prior proceeding must have "terminated in favor of the person against whom they are brought." Restatement (Second) Torts § 674(b). In other words, a predicate to establishing that tort is that the "lying" party was disbelieved in the prior proceeding. The logic of this limitation applies equally to a claim of IIED predicated solely on false testimony, and the Court simply cannot agree that making a claim, and succeeding in the ensuing litigation, breaches the bounds of public decency.

Nor can the Court agree that Smith's conduct during the course of her legal representation of Spottiswoode before Congress is so "extreme and outrageous" to permit recovery. According to the amended complaint, Smith was expressly retained to assist Spottiswoode in finding legal avenues to comply with an existing Protective Order and engage in legislative advocacy notwithstanding that Order. There is nothing that exceeds the bounds of decency in assisting a client in preparing written or oral testimony or speaking to the media afterwards once that testimony has garnered public interest. It is not every lawyer's style, and some of Chishti's consternation may be understandable, but that does not make it actionable.

Finally, regarding Spottiswoode's testimony and communications to Congress, the Court's holding with respect to Chishti's defamation claims and the breach of contract claim against Spottiswoode, *supra* § II.B, is relevant. Again, the legislative privilege is designed to cultivate "an atmosphere . . . whereby facts may be freely presented to the governing legislative body." *Webster I*, 731 F.2d at 4 (citation and quotation marks omitted). Just as it makes little sense to afford absolute immunity for claims of defamation and libel for one's statements to Congress only to permit recovery under a theory of breach of contract, *supra* at 29, it makes little sense to permit a claim for IIED based on an allegation that an individual "lied" to Congress. The Court therefore

holds that Spottiswoode is absolutely immune from civil liability for this claim of IIED predicated solely on false statements to Congress.

For these reasons, Chishti's claim for IIED against Spottiswoode and Smith will be dismissed.

## VI.    Conspiracy and Loss of Consortium (Counts Seven and Eight)

To sum up the opinion thus far, Chishti's claims for (1) defamation, (2) false light, (3) breach of contract, (4) tortious interference, (5) abuse of process, and (6) intentional infliction of emotional distress each fail.  This means that his claim in Count Seven of the amended complaint for conspiracy and plaintiff Pobereskin's claim in Count Eight for loss of consortium fall away, too.  A claim for conspiracy is not actionable in and of itself but must instead be supported by an underlying tort.  *See Hill v. Medlantic Health Care Grp.*, 933 A.2d 314, 334 (D.C. 2007); *Levi v. Brown & Williamson Tobacco Corp.*, 528 F. App'x 4, 5 (D.C. Cir. 2013) (per curiam).  Similarly, "a spouse's loss of consortium claim is dependent on or collateral to the other spouse's" tort claim, *Massengale v. Pitts*, 737 A.2d 1029, 1033 (D.C. 1999), not a standalone claim itself.  Because Chishti has not offered any viable claims for relief in this action, Counts Seven and Eight must also be dismissed.

**CONCLUSION**

For the foregoing reasons, defendants' motions to dismiss the amended complaint

[Dkt. #s 73, 74, 75] will be **GRANTED**, and plaintiffs' motion in limine [Dkt. # 42] will be

**DENIED** as **MOOT**.

A separate order will issue.


AMY BERMAN JACKSON
United States District Judge


DATE: September 30, 2024